Thomas Fleener, Wyo. Bar # 6-3747
FLEENER PETERSEN, LLC
506 S. 8th Street
Laramie, WY  82070
(307) 460-4333
(866) 825-6038 fax
tom@fleenerlaw.com

Rex Mann (pro hac vice forthcoming)
Texas Bar # 24075509
Dylan French (pro hac vice forthcoming)
Texas Bar # 24116393
WINSTON & STRAWN LLP
2121 N. Pearl St., Suite 900
Dallas, TX  75201
(214) 453-6500
(214) 453-6400 fax
rmann@winston.com
dfrench@winston.com

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| **JOHN DOE, WILLIAM MICHAEL "MIKE" CROTHERS, AND PETER "PETE" MULDOON** | | |
| **Plaintiffs,** | § | |
| | § | **CASE NO. _____** |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **TETON COUNTY BOARD OF COUNTY** | § | |
| **COMMISSIONERS, MATT CARR in his** | § | |
| **individual and official capacity as Teton** | § | |
| **County Sheriff, ERIN WEISMAN in her** | § | |
| **individual and official capacity as Teton** | § | |
| **County and Prosecuting Attorney, and** | § | |
| **BRETON BOMMER, DAVID HODGES,** | § | |
| **CLAYTON PLATT, ANDREW ROUNDY,** | § | |
| **CLARK ALLAN, AND RICHARD ROES,** | § | |
| **in their individual capacities,** | | |
| | | |
| **Defendants.** | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

COME NOW Plaintiffs John Doe ("Doe"),[1] William Michael "Mike" Crothers ("Crothers"), and Peter "Pete" Muldoon ("Muldoon") (together, "Plaintiffs"), by and through their attorneys, and file this Original Complaint for damages against Defendants Teton County Board of County Commissioners ("Teton County"), Matt Carr, Erin Weisman, Breton Bommer, David Hodges, Clayton Platt, Andrew Roundy, Clark Allan, and RICHARD ROES (together, "Defendants"), and in support thereof, respectfully alleges and shows the Court as follows:

## I.      INTRODUCTION

This case is about consistent patterns and practices of conduct by Teton County and multiple of its law enforcement employees to exert public pressure and take other illegal actions to prejudice and harm individuals wrongly accused of perpetrating a sexual assault-related crime, resulting in the deprivation of those individuals' constitutional rights, along with other civil wrongs. Teton County and its law enforcement have overstepped the law in their overzealous efforts to effectuate alleged justice. Although Teton County's actions have undoubtedly harmed many, the three plaintiffs—Doe, Crothers, and Muldoon—file this lawsuit to seek justice for themselves, and to hopefully cease this practice towards others in the future.

Doe, Crothers, and Muldoon have all been wrongfully accused of sexual assault-related crimes. All three have had their sexual assault-related charges dropped or have otherwise prevailed on them. Doe has had two sexual assault proceedings wrongfully brought against him, only for Teton County to later drop them because they had no merit. Crothers had a sexual battery charge wrongfully brought against him, which he was forced to take to trial where he ultimately prevailed

---

[1] John Doe is filing a motion to proceed under the pseudonym John Doe shortly after this Complaint is filed.

with the jury. Muldoon had an allegation of sexual assault brought to Teton County for investigation, and the allegation was not prosecuted and definitively proven to be false.

One might think that Plaintiffs would be satisfied with their exoneration. One might think that the justice system has worked: three wrongfully accused individuals were found innocent or otherwise prevailed against their alleged crimes. But the process of serving "justice" in Teton County is such that the process the accused must go through as alleged sexual assault perpetrators is nearly as harmful as the consequences of being found guilty. It's a no-win situation.

A significant piece of Teton County's patterns and practices at issue in this case—of which there are many—is the illegal abuse of confidential information relating to the identity of alleged sexual assault perpetrators. It is well known, particularly in today's society, that merely being accused of committing a sex crime carries severe reputational consequences—whether the accused is found innocent or not. For this reason, many states, including Wyoming, have laws that protect both the public identity of the alleged sexual assault victim and the alleged perpetrator—at least until a minimal showing of legitimacy of the claim has been demonstrated. Individuals also have various constitutional rights related to this issue, including their right to a fair trial, right to be free from malicious prosecution, the right to be free from unlawful search and seizure, the right to equal protection, right to free speech, and the right of due process.

In the course of violating the Plaintiffs' constitutional rights and committing other civil wrongs, Teton County, along with many of its employees, repeatedly violated these laws relating to the accused. Teton County did so to all three Plaintiffs to serve Teton County's own interests.

Doe.  For Doe, Teton County took illegal action by filing improperly redacted documents in court that were more than sufficient to identify him as the alleged perpetrator of sexual assault crimes. Numerous newspaper articles followed, both before and after the probable cause hearing, that ruined Doe's reputation and prejudiced his ability to fight in court if needed. This was, of

course, a pattern of Teton County using public pressure in its favor. Fortunately, Doe's defense team was able to discover exculpatory evidence that compelled Teton County to dismiss the charges. Doe's defense team located a "hook up list" or "sex list" on one of the accuser's phones where she kept track of all the men she had sex with, and her description of her experience with Doe was that of consensual sex. In the other case, two eyewitnesses told Doe's investigator that the accuser was the sexual aggressor that night. One eyewitness signed an affidavit attesting to that fact, and the other eyewitness provided videos that supported their recollections. Moreover, it came out that one of the deputies with the Teton County Sheriff's Office was sexting with the alleged star witness for the prosecution. Doe's cases were eventually dropped, but not before Teton County and other defendants violated Doe's constitutional rights and committed other civil wrongs—creating significant harm to Doe's reputation and causing other injuries.

Crothers.  For Crothers, contrary to the law, and similar to the treatment of Doe, Teton County provided identifying information about Crothers though the sexual battery charge remained in the circuit court. Teton County repeatedly violated a Wyoming non-disclosure statute by failing to redact court documents to protect Crothers' identity and by making various public statements to the media that fully identified Crothers. This resulted in numerous inflammatory newspaper articles that harmed Crothers' reputation and tainted the jury pool. The jury ultimately exonerated Crothers on the sexual battery charge but, like Doe, not before Teton County and the other defendants violated Crothers' constitutional rights and committed other civil wrongs—again, creating significant reputational harm and causing other injuries.

Muldoon. Finally, for Muldoon, Teton County and other defendants used the same playbook as they did against Doe and Crothers, and caused the same type of harm, but for different benefits to Teton County and law enforcement. Muldoon, the former mayor of Jackson, Wyoming was publicly critical of law enforcement, and law enforcement saw him as a threat to their power

and funding. Teton County law enforcement was also aware of allegations of sexual assault against Muldoon, which were so weak that law enforcement had decided not to pursue charges. Indeed, an investigation by the Wyoming Department of Criminal Investigation—the unit responsible for investigations into public officials—definitively concluded that the allegations against Muldoon were false. But again, in violation of various laws, Teton County illegally released documents to the public detailing the sexual assault allegations, which they knew to be false, just weeks before election day for Muldoon—to stop what they viewed as a threat to Teton County law enforcement. Unsurprisingly, Muldoon lost the election he was favored to win, and like Doe and Crothers, Muldoon suffered significant reputational harm and other injuries.

This lawsuit seeks to recover damages for the harm caused by Teton County and the other defendants and put an end to the pattern and practices of Teton County and various of its employees that are in violation of the U.S. Constitution and Wyoming law.

## II.    PARTIES

1.      Plaintiff John Doe is a natural person who resided, during the relevant facts at issue, in Jackson, Wyoming.

2.      Plaintiff William Michael "Mike" Crothers is a natural person who resides in Colorado. During the actions that led to this Complaint, Crothers resided in Jackson, Wyoming.

3.      Plaintiff Peter "Pete" Muldoon is a natural person who resides in Jackson, Wyoming.

4.      Defendant Teton County is a governmental entity formed in and existing within the State of Wyoming, and at all times relevant to this Complaint, Defendant Teton County may have employed certain Sheriff's Deputies and Prosecutors who are the subject of this Complaint.  Teton County Sherriff's Office ("TCSO") is a subdivision and/or department of Defendant Teton County and employed certain officers who are referred to in this Complaint. Teton County and Prosecuting

Attorney's Office ("TCPA") is a subdivision and/or department of Defendant Teton County and employed certain attorneys and prosecutors who are referred to in this Complaint.

5.      Defendant Matt Carr is now, and at all times relevant to this Complaint, the Sheriff of the TCSO in the State of Wyoming. He is sued in his individual and official capacity as Teton County Sheriff. He is the County's final policymaker with regard to law enforcement, including training and supervision, and investigation.

6.      Defendant Erin E. Weisman is now, and all times relevant to this Complaint, the Teton County and Prosecuting Attorney of the TCPA in the State of Wyoming. She is sued in her individual and official capacity as Teton County and Prosecuting Attorney. She is the County's final policymaker with regard to prosecution-related decisions, prosecution-related investigations, and the training and supervision of prosecutors.

7.      Defendant Breton Bommer is a natural person who resides at 445 Roberts–Wolfley Road, Etna, Wyoming 83118. Defendant Bommer, at all times mentioned in this Complaint, was a deputy sheriff employed by Defendant Teton County.

8.      Defendant David Hodges is a natural person who resides at 794 Wind River Lane, Jackson, Wyoming 83001. Defendant Hodges, at all times mentioned in this Complaint, was a deputy sheriff employed by Defendant Teton County.

9.      Defendant Clayton Platt is a natural person who resides at 315 Blair Drive, Apartment B., Jackson, Wyoming 83001. Defendant Platt, at all times mentioned in this Complaint, was a deputy sheriff employed by Defendant Teton County.

10.     Defendant Andrew Roundy is a natural person who resides at 119 Saddle Drive, Etna, Wyoming 83118. Defendant Roundy, at all times mentioned in this complaint, was a deputy sheriff employed by Defendant Teton County.

11.     Defendant Clark Allan is a natural person who has resided at 3045 East Wild Horse Drive, Jackson, Wyoming 83001. Defendant Allan, at all times mentioned in this Complaint, was a deputy prosecutor employed by Defendant Teton County.

12.     Defendants RICHARD ROES, at all times mentioned in this Complaint, were employees of Teton County.

13.     Except as expressly stated in relation to the negligence per se and intentional infliction of emotional distress causes of action, Individual Defendants' actions, as described in this Complaint, were under color of law and within the scope of their duties. Other than Weisman and Carr, all causes of action against Individual Defendants are brought against them in their individual or personal capacity.

### III.     JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1343, the Court has subject matter jurisdiction over the claims asserted by Plaintiffs under 42 U.S.C. § 1983.

15.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over all state court causes of action pleaded here because they arise from a common nucleus of operative facts that give rise to the federally based causes of action.

16.     Pursuant to 28 U.S.C. § 1391, venue is proper in the District of Wyoming because a substantial part of the underlying events giving rise to the claims took place in the District of Wyoming, in Teton County, Wyoming. Further, upon information and belief, the Individual Defendants all reside in the District of Wyoming.

17.     Pursuant to Federal Rule of Civil Procedure 20, joinder is proper because Plaintiffs assert rights, jointly and severally, that arise out of the same series of transactions or occurrences and because Plaintiffs' claims involve common questions of law and fact. The events and circumstances that give rise to Plaintiffs' claims are all logically related. Although the dates and

names may vary, Plaintiffs' allegations all involve a common pattern or practice among Teton County and its employees to exert public pressure and take other illegal actions to prejudice and harm individuals wrongly accused of perpetrating a sexual assault-related crime, resulting in the deprivation of those individuals' constitutional rights, along with other civil wrongs.

18.     By reason of the foregoing, the Court has jurisdiction and venue over this action.

## IV.    GOVERNMENTAL CLAIMS FILING

19.     Teton County is a local governmental entity in Wyoming. On February 10, 2022, Plaintiffs timely provided notice by certified mail, return receipt requested, of their governmental claims under WY Stat. § 1-39-113 to the Clerk to the Teton County Board of County Commissioners. Plaintiffs have complied with the statutory requirements of WY Stat. § 1-39-113 and with all pertinent constitutional requirements, including the signature and certification requirements contained in Article 16, § 7 of the Wyoming Constitution. No action has been made on the claims. A copy of the claims is attached hereto and incorporated herein by reference as Exhibit 1.

## V.    JURY TRIAL DEMANDED

20.     Plaintiffs demand a trial by jury on each of the causes of action pleaded in this Complaint.

## VI.    FACTUAL BACKGROUND

21.     This case is about Teton County, Wyoming—including the Teton County Sheriff's Office and the Teton County and Prosecuting Attorney's Office—and various Teton County employees' persistent pattern or practice of violating Plaintiffs' rights and tortious conduct against Plaintiffs. Defendants' wrongdoing here is especially heinous because they are public officials entrusted with the responsibility of protecting and serving the public, not destroying and harming citizens. Plaintiffs are certain that they are not the only ones to have suffered at the hands of Teton

County. This persistent pattern of misconduct is why Plaintiffs are seeking to hold Defendants accountable. Indeed, upon information and belief, Teton County has been forced to make changes to its personnel and/or policies in light of certain issues raised in this Complaint—but more changes are needed. These are the Plaintiffs' stories.

A.      **John Doe ("Doe")**

22.      On December 9, 2019, ten days after Doe turned 18, TCSO Deputies and TCPA prosecutor Clark Allan ("Allan") arrested and charged high school senior John Doe with two counts of first-degree sexual assault related to allegations reported by two accusers who acted in concert. By May 2020, the TCPA and Allan had dismissed both charges against Doe, but not before TCSO deputies and TCPA prosecutors tortiously and intentionally ruined Doe's reputation and future and violated his constitutional rights.

23.      Both accusers were close friends of Doe's ex-girlfriend. Doe's attorneys uncovered texts on the accusers' phones that indicated coordination among the friends. Doe had consensual sexual relations with both accusers, one in March 2018 and the other in March 2019. The accusers claimed rape within days of each other in September 2019 to their respective college campus law enforcement. TCSO Deputy Breton Bommer ("Bommer") interviewed one accuser, known as IU, on September 27, 2019. IU reported that the alleged crime occurred in March 2019 when Doe was a minor (17) and high school junior, and IU was an adult and a high school senior. IU and Doe had subsequent consensual sex at least two times after the alleged rape. IU waited six months to report the allegation. TSCO Deputies David Hodges ("Hodges") and Clayton Platt ("Platt") interviewed the other accuser, known as MR, on October 28, 2019. MR reported that the alleged crime occurred in March 2018 when Doe was a minor (16) and a high school sophomore, and MR was a high school junior. MR and Doe had a prior sexual relationship before the alleged rape and had subsequent sex after the alleged rape. MR waited eighteen months to report the allegation.

According to the TCSO and TCPA, no recording or transcript of Hodges' and Platt's interview with MR exists.

      *i.     Teton County arrested, charged, and prosecuted Doe without conducting a proper investigation into the accusations against him.*

24.     Without conducting any investigation into IU's and MR's accusations, interviewing any of the eyewitnesses IU and MR identified, or speaking with Doe, Teton County arrested Doe on December 9, 2019, and charged him with two counts of first-degree sexual assault related to accusations that were six months old and eighteen months old. Teton County purposely waited until December 9, 2019, to arrest and charge Doe as an adult since Doe had turned 18 years old in late-November 2019. By delaying filing charges until Doe was an adult, Teton County was also able to arrest and interrogate Doe without notifying his parents. Barely 18, Doe spent three nights in jail without the opportunity for bail. Additionally, Teton County has indicated that if Doe was 17 when he was arrested, the news of his arrest would not have been made public in the paper. Teton County wanted to arrest Doe after he turned 18 to deny him access to the juvenile court system. Teton County has argued in court documents that they believe it is the age at the time of arrest that determines concurrent jurisdiction with Wyoming juvenile courts. In fact, certain Individual Defendants have admitted in recorded interviews that they intentionally waited until Doe turned 18 to arrest and charge him.

25.     The investigation, or lack of investigation, was coordinated between the TCSO and TCPA divisions of Teton County. Bommer recognized the TCSO and TCPA's coordination in his September 27, 2019 interview with IU, explaining to IU, "And I—give me—give me some time as far as the case goes, and what I can prove and what I can't prove. My office is just below the County Attorney's …. So I [will just] go upstairs. And I will talk to them and say, you know, 'What do you think we need to prove this?' … I think I've got—I've [got] probable cause now to

arrest him. The difference being if I go arrest him now, then he doesn't have to talk to me [because Doe was still then a juvenile]." Bommer was even more explicit in his December 10, 2019, interview with IU the day after Doe's arrest, telling IU that "[w]e did wait until he was over 18, so we could charge him as an adult." Teton County did not wait to charge Doe in order to conduct a thorough investigation; rather, they purposefully waited until Doe was 18 to arrest and charge him as an adult. As a result of waiting until Doe was 18 years old, Teton County deprived Doe of the protections afforded to juvenile criminal defendants under the Wyoming Juvenile Justice Act (WY Stat. §§ 14-6-201 et. seq.), and committed a due process violation by intentionally delaying bringing charges against Doe to gain a tactical advantage.

26.     After Doe's arrest, and still without having conducted any investigation into the charges against Doe or interviewing any of the known eyewitnesses, TCPA prosecutor Allan argued at the initial appearance that Doe should only be released from custody on $250,000 bond, with a requirement of house arrest and GPS ankle monitor, and not be allowed to return to high school and complete his senior year because he was a danger to the community. The circuit court granted Allan's request with a reduced bail amount, forced Doe to be under house arrest with an ankle monitor, and forbade him from leaving his home and attending high school. There was no valid basis for Allan requesting such excessive bail for stale allegations alleged to have occurred when Doe was a juvenile. Doe had never been in trouble with the law and had no prior criminal record. These excessive bail requirements unduly deprived Doe of his freedom and his education.

27.     Following Doe's arrest, Doe's defense team was quickly able to unearth exculpatory evidence that Teton County should have uncovered and, in fact, had in their possession before arresting Doe, and would have discovered with even a cursory investigation into the accusations.

28.     Related to MR's accusations, unlike Teton County, Doe's defense team interviewed the two eyewitnesses whom MR had identified when she made her accusations to her campus law enforcement in September 2019, and to Teton County in October 2019. These eyewitnesses categorically denied MR's version of events. One of the eyewitnesses had videos of the night in question showing that MR was the sexual aggressor, and the other eyewitness provided an affidavit detailing how MR's version of events could not have occurred. Despite knowing about these eyewitnesses in September 2019 while Doe was still a juvenile, Teton County did not interview these two eyewitnesses until February 13, 2020 and February 17, 2020, five months after MR made her accusations and two months after Teton County arrested and charged Doe. Finally, on March 6, 2020, after news of the arrest and rape allegations had been leaked to the press and six articles had been published in the local newspaper, Teton County filed to dismiss the case against Doe related to MR's accusations.

29.     Related to IU's accusations, Teton County never interviewed either of the only witnesses, RC and KC, that IU identified in her initial interview with Bommer in September 2019. Further, Teton County did not collect IU's cell phone data until March 2020, more than five months after her initial interview with Bommer in September 2019, which would have confirmed or denied whether IU was texting RC in distress on the night in question, as IU claimed. Upon information and belief, TCSO deputies and TCPA prosecutors did not review IU's cell phone data even after it was collected. Five weeks later, in April 2020, TCPA turned over IU's cell phone data to Doe's defense team. In three days' time, Doe's defense team identified that IU created a "hook up" list in the notes of her phone one month prior to alleging that Doe assaulted her. In this note, IU listed 13 consensual sex partners and detailed information about each hook up; included in this list was Doe. IU said this about Doe: *"[Doe] - best friends ex, went three rounds, have hooked up 3 different times, once in a sauna with people in the hot tub, once in a hot tub, and once in his room,*

*also he was my best guy friend."* The "hook up" with Doe "once in his room" was the March 2019 incident IU reported as a rape. IU was not forthcoming to Teton County about the two other hook ups with Doe that she described in her list. Both of the other hook ups with Doe occurred subsequent to the incident IU reported as an assault, and IU did not disclose these two events to Teton County until TCSO deputies confronted her. After Doe's defense shared the exculpatory evidence with Teton County in April 2020, and after news of the arrest and rape allegations were leaked to the press and nine articles had been published in the local newspaper, Teton County filed to dismiss the charges against Doe related to IU's accusations in May 2020.

30.    Cursory investigations into MR's and IU's accusations would have shown Teton County that there was no probable cause for arresting and charging Doe. By the time Teton County realized there was no evidence (other than the accusers' controverted statements) to support the charges, they had already deprived Doe of his rights and permanently damaged Doe's reputation—even though they had a duty under the law, which they violated, to protect the reputation of both the alleged sexual assault victim and alleged actor. Upon information and belief, Teton County's failure to investigate and other improper and illegal actions were intentional and purposeful, as shown by the pattern illustrated in this Complaint.

   ii.    *TCPA Prosecutor Allan made numerous false statements about Doe's character and violated Doe's right to not be identified as a suspect in a sexual assault case prior to being charged in the district court.*

31.    TCPA prosecutor Allan's lack of investigation into the charges he was bringing against Doe did not stop him from making public comments demeaning Doe and illegally identifying Doe as a suspect in a sexual assault case. Upon information and belief, TCPA and Allan were intentionally making such statements to put pressure on Doe, with the help of the media, to plead guilty to the allegations. Doe has proof of and learned about the improper coordination of Teton County with the media through public record requests served after his cases

were dismissed. Upon information and belief, Teton County and Allan intentionally made statements for the media, which they knew not to be true or were made recklessly, for the purpose of forcing Doe to plead guilty or otherwise not challenge the case. TCPA and Allan made statements to and for the media that were outside the scope of their duties as prosecutors. Upon information and belief, TCPA and Allan purposefully used the media to put pressure on Doe to plea and/or taint the small jury pool in Teton County. Plaintiffs have learned that this is a tactic the TCPA and Allan regularly and improperly use.

32.     Allan's illegal public flogging of Doe started immediately. Under Wyoming Statute § 6-2-319, "[p]rior to the filing of an information or indictment in district court charging a violation of an offense under this article, neither the names of the alleged actor or the victim of the charged offense **nor any other information reasonably likely to disclose the identities of the parties shall be released or negligently allowed to be released to the public by any public employee** except as authorized by the judge with jurisdiction over the criminal charges." (emphasis added). Flouting this law, Allan intentionally filed a document with the lower circuit court, which had enough information for Doe to be identified as the alleged actor in violation of Section 6-2-319. The initial charging documents Allan filed with the circuit court identified Doe with his full initials, his full middle name and last initial, included Doe's entire residential address, Doe's age at the time of the alleged assault, the name of the nearby club that Doe's parents were members of, and that Doe had a younger brother. The amount of information illegally provided was more than enough to reasonably likely disclose that the alleged actor was Doe. In fact, Doe was the *only* individual in the world that fit all aspects of Allan's description. Doe's middle name is the primary name he has always used, and Allen left Doe's *entire* residential address in both redacted information. These reckless errors on the part of Teton County resulted in significant local media

coverage of the accusations. Thereafter, word quickly spread throughout the community that Doe had been charged with rape.

33.     Having outed Doe in every way possible except disclosing his last name, and without having investigated the charges against Doe, Allan went on to say that Doe was a "danger to the community and that there is a lot of risk having him outside and not incarcerated." But Allan and Teton County left Doe "outside and not incarcerated" and free to attend high school between September 2019, when MR and IU reported that they were assaulted (and Doe was still a juvenile), and December 2019 when, shortly after Doe turned 18, he was arrested and charged. Allan and Teton County did not seek to speak with Doe or interview any known eyewitnesses between September 2019 and December 2019. Allan and Teton County intentionally delayed bringing charges against Doe until he turned 18 to gain a tactical advantage, specifically to deprive Doe of the protections afforded to juvenile defendants under the Wyoming Juvenile Justice Act.

34.     In January 2020, still without having investigated the charges or interviewing any of the known witnesses, Allan said that TCPA had "strong cases" against Doe, implying that it was likely Doe was guilty of rape.

35.     On February 13, 2020, still before Allan had investigated the charges against Doe, interviewed any of the known eyewitnesses, or read Doe's TCSO interview transcript, Allan argued in court that the State's case against Doe was "strong" because Doe made "a full and complete confession to one of the counts and admitted to every element of the count before the court." But nothing could be further from the truth: Doe made no confession. Allan did not seek to correct this error in court documents.

36.     Allan went on to say that "what we see is predatory behavior. We see grooming and preparation for these events and events that were unfulfilled." There was no predatory behavior. There were no events unfulfilled. Allan also argued that allowing Doe to attend a new

high school so that he could graduate on time and attend college would be "putting the shark into a pool of innocent fish." Doe was not a shark in a pool of innocent fish. He was a teenager who was falsely accused of rape.

37.     Allan was all too aware the media was covering the case, and upon information and belief, Allan purposely made the statements for the media to use, as it ultimately did. Allan's statements were false, unfounded, and tortious. And Teton County did not have strong cases— Teton County was compelled to dismiss both cases in a matter of weeks after Allan's statements. Upon information and belief, Allan did not read the transcript or watch the interview where Doe allegedly made what Allan called the "full and complete confession to one of the counts and admitted to every element of the count before the court"—even though Allan had the transcript. In fact, Allan's office provided Doe's attorneys with Doe's TCSO interview transcript on January 17, 2020, four weeks before this February 13, 2020 hearing.

38.     The following day, consistent with Allan's intent to injure Doe's reputation, the front page of the local newspaper carried a headline above Doe's mug shot touting Doe's alleged confession, "Prosecutor: Suspect confessed to rape." This was no coincidence. Based on emails Plaintiffs have uncovered that show Teton County coordinating with the media, upon information and belief, Allan's statements were specifically made for the media to print a false and misleading headline.

39.     Only after Allan's words above were published in local newspapers and after Doe's reputation suffered immense harm did Allan begin to investigate the accusations, which ultimately compelled Teton County to dismiss both cases against Doe.

     *iii.    Doe's defense team's investigation uncovers other likely crimes that Teton County covered up and failed to investigate.*

40.    Doe's defense team, during its investigation of the charges against Doe, uncovered two other possible crimes that Teton County failed to investigate or prosecute; these cases involved friends of certain Teton County employees.

41.    First, in the IU case, Allan alleged that one of Teton County's "critical witnesses" was a Jackson Hole High School student named RC.[2] Though the defense is unsure what evidence RC could have provided related to IU's case, the defense team investigated RC to make sure that it understood all the facts. Nobody on the defense team expected what they uncovered.

42.    One of the TCSO deputies had been exchanging sexually explicit text messages with Allan's "critical witness," RC.[3] The following is an excerpt of a conversation:

    *RC: Are you a cop?*

    *TCSO Deputy: Yes maam*

    *TCSO Deputy: How do you feel about cum in you*

    *RC: I mean I'd rather swallow it*

    *TCSO Deputy: God bless you. But if I wanted to fill you up at some point you'd be cool with it?*

    *RC: Yeah haha that's what I got on birth control for.*

43.    Teton County's attempt to use a high school student with whom a TCSO deputy was exchanging sexually explicit messages as a "critical witness" in Teton County's case against Doe is unethical (if not illegal) and violative of Doe's due process rights. Doe's defense team

---

[2] Although Plaintiffs do not necessarily believe initials must be used in every circumstance in this complaint, the Plaintiffs are using the initials in an abundance of caution relating to individuals who were minors or potentially are minors. Although IU was not a minor at the time of the alleged event, Plaintiffs are using her initials to identify her.

[3] Plaintiffs have likewise publicly withheld the identity of the TCSO deputy exchanging the sexually explicit text messages with Allan's "critical witness."

raised this shockingly improper conduct with TCSO and TCPA, but neither department responded. Upon information and belief, neither TCSO nor TCPA did anything to address the issue involving the sexually explicit text messages by a TCSO Deputy with a State's witness and a high school student.

44.     Second, while examining the phone extraction of one of Doe's accusers,[4] Doe's attorneys discovered a troubling, detailed description of how that accuser had apparently been repeatedly assaulted by a PE teacher/coach at Jackson Hole High School:

> "My parents were usually around 30 min late to pick me up from practice on a regular day. It usually happened once a week, sometimes twice.
>
> First time he started by touching my butt and boobs. He said he wanted to show me something so he brought me to his office.
> He was already hard and made me give him a blowjob; he came in my mouth.
>
> He told me no one would believe me over him, that I would get kicked off the team, that people wouldn't like me anymore, they would call me a liar, that people would say I just wanted attention, my team would hate me. At the some time, he would treat me almost like his favorite during practice or give me more playing time. He said I liked it anyways. He made it sound like it was my fault and I did something wrong for it to happen. And that I wanted it.
>
> Another time I remember he said it was my turn. He made me take my shirt, bra, and shorts off but had me keep my underwear on. He fingered me while grabbing my boobs and then had me give him a hand job. The whole time he was saying shit like 'you like that don't you' and stuff like that.
>
> A lot of the specific times or things that happened is a blur with some vivid memories throughout.
>
> I remember when he was my PE coach in 9th grade and after class he said he needed to talk to me. He had his hand on the inside of my thigh and moved it up inside my shorts and then started touching me and fingering me again. At the same time his other hand was up my shirt in my bra. He didn't have as much time so nothing else happened that time. It was like I was scared someone would see us, like I would be blamed and thought of as dirty and disgusting."

---

[4] Out of an abundance of caution, Plaintiffs have not disclosed the specific identity of this individual.

45.     Doe's attorneys immediately provided this information to Teton County, in the hopes that what appears to be an awful crime would be investigated. After turning the information over to Teton County, the Doe defense team's investigator confronted Bommer in May 2020, asking him if the TCSO planned to investigate the PE teacher/coach rape described in the accuser's phone. Bommer told the investigator that he knew the only two individuals that the accuser could be describing, and that "I [Bommer] just don't see it." Upon information and belief, Teton County has not investigated the potential high school PE teacher/coach rapist. Upon information and belief, members of the TCSO and/or TCPA intentionally chose not to investigate this sexual assault—which had a significantly stronger basis in evidence than either case against Doe— because of a friendly relationship between members of the TCSO and/or TCPA and the alleged PE teacher/coach at issue. On the other hand, Teton County had no problem charging Doe with multiple crimes based on far less credible "evidence" from the accuser and intentionally smearing Doe's reputation in the media, without conducting any legitimate investigation.

46.     Upon information and belief, Teton County refused to investigate the potential rape of a student by a PE teacher/coach at Jackson Hole High School because of a personal relationship Teton County authorities had with the alleged actor. Upon information and belief, Bommer has been involved with the football program at Jackson Hole High School, and Bommer's wife is currently a track coach at Jackson Hole High School.

47.     In light of TCSO's and TCPA's unwillingness to even investigate Doe's accuser's accusations against the PE teacher/coach, it is unconscionable that Teton County arrested and charged Doe with first-degree sexual assault, without conducting any legitimate investigation. It is also indefensible that Teton County sought to leverage RC as a teenage witness when one of its TCSO deputies was having inappropriate sexual conversations with RC and may have even been in a sexual relationship with RC.

     *iv.*     *Teton County falsified records and executed perjurious affidavits to harass Doe.*

48.     On information and belief, during the prosecution of Doe, employees of Teton County falsified records and executed perjurious affidavits to enhance Teton County's case.

49.     First, TSCO Deputy Hodges, upon information and belief, falsified a record and made a false statement used against Doe. On December 3, 2019, Hodges executed a probable cause affidavit that led to the arrest of Doe for first-degree sexual assault of MR. The affidavit detailed Deputies Hodges' and Platt's interview of MR on October 28, 2019. Included in Hodges' affidavit was that MR accused Doe of rape in March 2018. This is the only accused crime in Hodges' original affidavit. According to the TCSO and TCPA, no recording or transcript of Hodges' and Platt's October 28, 2019, interview with MR exists.

50.     Then, after Doe was arrested on December 9, 2019, and told TCSO deputies that he had had consensual sex with the accusers multiple times, including after the accused crimes, Hodges filed a supplemental report on December 20, 2019, in which he stated that MR told him at the October 28, 2019, interview that Doe had raped her a second time after the March 2018 occurrence. Upon information and belief, the TCSO did not interview MR subsequent to October 28, 2019. Upon information and belief, MR never told Hodges that Doe raped her a second time. Hodges made the false statement in the supplemental report to undermine the exculpatory evidence that Doe provided to the TCSO after he was arrested, and to help construct the false narrative that Doe was a danger to the community. Hodges' supplemental report caused Doe to remain under house arrest and wear a GPS ankle monitor, under supervision of the State, and unable to freely attend high school before the cases against Doe were dismissed.

51.     Second, desperate to find any evidence against Doe in April 2020, Teton County, upon information and belief, filed a perjurious search warrant affidavit to obtain a warrant to search Doe's house. Doe has learned, incidentally, that Allan was intimately involved with the

investigation of Doe and even had weekly meetings with TSCO deputies investigating the matter. When Teton County employees searched Doe's home, they exceeded the bounds of the search warrant and searched and photographed areas of the home that were not permitted to be searched by the warrant. Nonetheless, they found no evidence against Doe, and the IU case was dismissed shortly thereafter but before a *Franks* hearing could be scheduled.

52.     Third, upon information and belief, Teton County knowingly relied on manipulated evidence to bolster the false narrative against Doe. On December 12, 2019, IU emailed Bommer ten screenshots of a text conversation she had with RC the night IU claimed she was assaulted. During IU's first interview with the TCSO in September 2019, IU told Bommer that she had desperately texted RC to pick her up from Doe's house the night of the alleged assault. But IU only expressed a desire to leave in one of the ten screenshots she provided Bommer, asking RC, "is it too late to come back to me?" This text is not related to the night of the alleged offense. This one screenshot is easily recognized as out of sequence and from another day and time since the timestamp changes from 9:21 PM to 1:14 PM and then back to 9:21 PM from one screenshot to the next. IU even admitted to Bommer by text that the deceitful screenshot was from a different day and time. Despite the warning from IU, Bommer continued to use the manipulated false evidence, ostensibly because it was the only screenshot consistent with IU's story. Teton County appears to have relied on this purported evidence as late as April 15, 2020. Indeed, the purported evidence was included in the last batch of discovery Doe received shortly before Teton County was compelled to dismiss IU's case.

     *v.*     *Teton County Deputy Bommer and others within Teton County set out to harm Doe*
     *throughout the County by making baseless statements.*

53.     In their quest to find evidence against Doe in 2020, after Teton County had arrested

and charged Doe, TCSO deputies intentionally prejudiced Doe to members of the community. For

example, TCSO Deputy Bommer told high school students that he interviewed the following:

> *"No. That's fine. Because I... You know, people... I'm finding that people see a different side to [Doe], and it's with everybody. I mean, look at Jeffrey Dahmer. If you don't know who Jeffrey Dahmer is, look him up, but he's a serial, you know, killer, and people didn't see that side of him, which is why he got away with so much, so..."*

> *"Nothing that seemed creepy or weird. Okay. Any – and then we'll wrap it up – but any references ever to pornography or about having pictures of other girls maybe naked or scantily clothed [on the defendant's phone]?"*

> *"Um...and he ended up dying in prison [another individual found guilty of several sex assaults], so... I'm not saying that's what's going to happen to [Doe], but certainly, this needs to end because this isn't right."*

> *"...I...in my world, we would classify him as a predator."*

> *"He's -- I think he needs help. Mentally."*

> *"Whether there's three, four, 10, 100 [victims]...we don't know. Um...but we'll just deal with them each at a time."*

> *"Do you think he's ever been drunk in school?"*

> *"You know? Um...do you think he's done anything other than alcohol? Marijuana? Any other hard-core...harder core drugs?"*

> *"Uh...I will talk to Detective Hodges as well. I'll see him tomorrow again, and I'll just let him know that we've had this discussion, and...um...I guess the good news is, is that you aren't a victim of anything.... And...uh...we were... I know this sounds weird, but we were kind of hoping that you were [a victim] because that was one more nail in [Doe]'s coffin."*

54.     Deputy Bommer's biased statement that he hoped a female high school student was

a victim so that they could be "one more nail in [Doe]'s coffin" demonstrates how the charges

against Doe were a miscarriage of justice by Teton County. The charges Teton County brought against Doe were not about seeking justice for alleged victims; they were about needlessly targeting a high school boy and doing whatever they could to get a conviction, regardless of the facts. Upon information and belief, Teton County had predetermined Doe's guilt and did not conduct a thorough investigation. Only when faced with clear and overwhelming evidence, which they initially brazenly ignored, showing Doe was not guilty of the alleged crimes, did Allan and Teton County dismiss the charges against Doe. But the damage had already been done.

55.     Teton County's conduct and false statements unnecessarily led to numerous front-page articles in the local newspaper, available for anyone to see online to this day, that have permanently branded Doe as a rapist and predator—despite having evidence so weak that Teton County was later compelled to drop both cases.

56.     Because Doe was prevented from attending high school and completing his senior year due to the Defendants' actions, he was forced to decline his acceptance into five colleges, as he lacked the requisite high school diploma. This has also negatively impacted Doe's attempts to find employment.

57.     In arresting, charging, and prosecuting these baseless claims against Doe, County Sheriff Carr, County Attorney Weisman, Teton County, and their various employees, deprived Doe of his constitutional rights, violated statutes meant to protect him, demeaned him, caused him immense emotional distress, and have forever impaired his future. Even lately, as Doe has applied for jobs and had interviews, the false allegations have been raised in interviews, and because of those false allegations, Doe has had difficulty securing employment. These same false allegations have affected Doe's ability to apply to colleges, obtain housing, and form meaningful relationships.

**B.** **William "Mike" Michael Crothers ("Crothers")**

58.    Mike Crothers and his wife were 14-year residents of Teton County where they had raised their children from the ages of 3 and 5. While still in his thirties, Crothers was a self-made success in business, ultimately building a home in Jackson and settling into an independent life with his family. The couple became full-time members of the community and gave of their time, energy, and money. Crothers invested in local, small businesses and mentored the founding entrepreneurs, not for the potential return but because of what he felt was his obligation to guide a younger generation of businesspeople and to support the proliferation of enterprises that supported the local community. Crothers' friends describe him as gregarious, generous in spirit, friendly, and approachable.

59.    Crothers and his wife opened their home to the community, throwing events for their children's school and for their friends and family. Their home was full of play dates and sleepovers. As their children grew, it went from play dates to groups of teenagers spending the day at the Crothers' home, riding bikes to and from the river, and enjoying the Crothers' welcoming home. Whenever friends came over, even as last-minute guests, there was always room for another plate at the dinner table.

      *i.*     *The Party that Happened Unbeknownst to Crothers*

60.    On May 11, 2019, Mrs. Crothers was out of town on business, leaving Mike Crothers and their teenage children behind in Jackson Hole. Crothers went to an early dinner alone in his neighborhood at a restaurant one mile from his home expecting he would return home to his teenagers and a quiet home. While at dinner, Crothers ran into friends who invited him to join them at a long-running, local fundraiser supporting women's health. It was an established fundraiser that raised a record amount in 2019, over $100,000 for breast cancer survivors and awareness. While at the fundraiser, Crothers became inebriated and responsibly took a taxi home.

While Crothers was at the fundraiser, unbeknownst to him, his teenage son, who was in his junior year of high school, had invited friends over. News spreads quickly in the small town and, through electronic means, like the ability to geo-locate each other through Snapchat, the gathering at his home had grown to include other junior and senior high students as well as former students who had aged into legal adults. Several of the attendees brought alcohol and marijuana.[5] An impromptu party had formed. All of this was happening unbeknownst to Crothers, and he was unaware of the scene he was about to stumble into.

61.    Later that evening, Crothers unknowingly walked into a party at his home already in progress that he had not approved and did not condone. Crothers expected to be walking home to a quiet house; otherwise, he would have returned earlier in the evening and in a better capacity to deal with what had organically become a relatively large gathering.

62.    The party attendees were initially alarmed when Crothers' taxi pulled into the driveway as they knew they had been caught. Many of the party attendees knew from past experiences that Crothers would not tolerate this type of behavior in his home. However, the attendees soon learned that Crothers was too inebriated to control the situation, so they continued to illegally drink and party in the Crothers' home. Some thought Crothers' disposition was funny and cheered him on to stay with them.

63.    Most of the party attendees knew the Crothers family well and had grown up socializing in the Crothers home. Their parents socialized with the Crothers regularly and, in some cases, the families had traveled together. For the majority of the attendees, the Crothers were not unknown outsiders. This was a family of community members who knew each other well, skied

---

[5] There is significant alcohol use among teenagers in Jackson Hole. Upon information and belief, Teton County has a high percentage of teenagers involved in the criminal justice system for underaged drinking and drug use, as compared to other areas. Moreover, upon information and belief, Wyoming has one of the highest rates of teenage prosecution and incarceration in the country.

together, ate together, socialized together, and were comfortable in each other's presence. Even after the illegal prosecution of Crothers began, many of the attendees continued to come to the Crothers house, visiting the family. Moreover, many of their parents continued to socialize with Mr. and Mrs. Crothers.

64.     Based on his recollection and other eyewitness accounts, Crothers was friendly, jovial, patted backs, gave hugs, and tried to carry on small talk that evening—much like he always did. He walked through the crowded house, from the garage, through the main area of the home and to his bedroom, all in wide-open areas and in the presence of dozens of people. His presence at the event lasted less than one hour. After Crothers retired, the majority of the teenagers remained at the home, continued partying, and a good portion of them spent the night at the Crothers home. The following morning, the party attendees who remained in the home socialized with each other and went to breakfast together. Crothers had no interactions with the teenagers the following morning.

### ii.     The Rumor Mill Begins at the High School

65.     Although no issues were raised with the authorities on the night of the party, or even next morning, a gossip mill began churning at the high school. One of the party attendees, KH, a teenage girl previously unknown to the Crothers family, began sharing stories with friends about Crothers allegedly acting inappropriately at the party. She never left the party; in fact, the opposite occurred. She stayed and slept with her boyfriend at Crothers' house, and then had breakfast with everyone the next morning. KH later admitted in her police interviews and in court testimony that her memory was hazy because she was so intoxicated that evening. KH has admitted that her mom did not even believe her allegations, and other attendees of the party said KH was known in school for exaggerating accounts to gain attention. That evening, KH did not seek to call

her mother to arrange a ride home; she did not seek to arrange for an Uber; and she did not ask anyone for a ride home.

66.     Nonetheless, KH began claiming she remembered that Crothers was inappropriate with her at the party—even though her boyfriend, RT, whom she slept with that night, had a clear memory of events that evening, was with KH during the relevant times, and later testified under oath that he did not see Crothers act inappropriately towards his girlfriend. The rumor mill then took hold. As additional false rumors began to circulate, the high schoolers started taking sides and bullying each other. There was a "Crothers' camp," who knew he had done nothing wrong, and there was a "KH camp," which primarily consisted of her two best friends and one male friend. It should be noted that one of these friends is the granddaughter of Foster Freiss, a powerful local billionaire who recently was a Wyoming gubernatorial candidate. The mother of one of these two friends is very close in friendship and business with Teton County and Prosecuting Attorney Erin Weisman. And the mother of the other best friend is a freelance journalist who has worked with the local and only newspaper in town, the Jackson Hole News & Guide. These two girlfriends of KH admitted they did not personally see Crothers behave inappropriately with KH.

67.     KH testified that she had "no memory" of an alleged kiss, which became a part of the later allegations against Crothers. Only one of KH's friends, WO, claimed to see anything inappropriate, although even his sole account was riddled with inconsistencies. He claimed to witness Crothers leaning over to kiss KH while KH was sitting on RT's lap in the Crothers' garage. But RT testified that he did not witness Crothers kiss or touch KH while she was on his lap in the garage, and no one else in the small, crowded room full of teenagers witnessed any kiss or other physical interaction between Crothers and KH or anyone else. In a small, crowded room, it would have been impossible to miss the one middle-aged man leaning over and kissing an unwilling teenage girl while she was sitting on her boyfriend's lap—particularly when the boyfriend never

saw the alleged kiss or saw any reaction by KH that might suggest something inappropriate had happened. Yet this was the allegation. WO too spent the evening at the Crothers' home, socialized the next morning and went to breakfast with the other teenagers.

      *iii.*     *An Overzealous School Resource Officer, Andrew Roundy, Learns of the Rumors and Then Begins Secretly Interviewing Numerous Kids from the Party on Videotape Without Their Knowledge*

68.      After three days of bullying and rumors, with teenagers taking sides, switching sides, and doing their best to appease, it came to the attention of Sheriff's Deputy Andrew Roundy, the in-school resource officer, that something had occurred at the Crothers' residence, not at the school. Nevertheless, Roundy was intrigued by the allegations of misconduct by a wealthy, prominent businessman in the community.

69.      Roundy immediately began interviewing teenagers rumored to have attended the party. Roundy never notified any of the teenagers' parents, never notified any of the teenagers of their rights, never advised them that they could ultimately be part of a public trial, and never notified them that he was secretly recording them with what appeared to be his bodycam that he had laid beside him. Indeed, as Crothers later learned, on January 8, 2020, the Jackson High School Principal Scott Crisp emailed Sheriff Carr to let him know that "I have me[t] with 3 different families who have had 'issue' with how the SRO [Roundy] communicated with students about [the Crothers] case."

70.      Roundy disregarded how the rumor mill may have affected any of their accounts, how they compared stories with each other, influencing and polluting the accuracy of their stories, and he never advised any of the teenagers that it was inappropriate to let any rumors of what they had heard affect what they would say. Roundy also assured them, unnecessarily and falsely, that whatever they said would have no consequences other than a potential fine for Crothers. Roundy also failed to properly investigate how credible any of the teenagers' memories may have been,

given their use of alcohol and drugs at the party; rather, Roundy assured the kids that he did not care about the illegal alcohol or drug use by the kids, even though the illegal drug use is a higher degree crime under Wyoming law than what Crothers was initially charged with. Roundy had one target: Crothers. And he led the teenagers right where he wanted them to go.

71.     Notably, the police were not called the evening of the party and did not come to the home. There were no noise complaints from neighbors nor were there any nuisance or disorderly conduct complaints from neighbors. No one from the neighborhood or at the party complained about rude behavior. None of the teenagers told their parents of anything inappropriate by Crothers. Rather, the teenagers continued partying after Crothers went to bed. And many of them, including KH and WO, spent the night and socialized with the Crothers' children the next morning. No one was outraged. Other than KH, no one complained about events related to the party until Roundy came looking for so-called evidence.

        iv.     *Roundy's Report of the Investigation*

72.     Roundy conducted many secret interviews over the following days and ultimately created a report. Roundy's report showed red flags of a meritless case from the beginning that was built on out-of-control rumors, but that never stopped him. Notable issues in Roundy's report include:

- From his first interview with KH, he writes in his report, "…she admitted she had been drinking and had drank too much alcohol," "she turned around to speak with someone else and Crothers grabbed her butt. He then pulled her in and kissed her on the mouth." The report stated that "[KH] said there were about four others who saw it." These eyewitnesses never materialized. Only WO claimed he saw anything, but what WO claimed he saw did not match what KH described. Moreover, WO's version of the events was initially different than KH's. On information and belief,

WO only changed his story after it dawned on him that he was already in trouble with the law.

- During Roundy's second interview with KH, her story changed from her first interview. KH now stated that "Crothers had grabbed her butt about 30 minutes BEFORE he kissed her…later in a hallway of a house when Crothers pulled her in and kissed her." This time she said, "no one else was nearby to see the kiss." This meant that WO didn't see it either, contradicting the only witness who said he saw the kiss. Again, in the second interview, Roundy noted "[d]ue to consuming alcohol she had difficulty remembering some of the specific details of that night." Roundy took no action concerning the admitted alcohol use by a minor.

- Roundy never challenged KH on the inconsistencies in her stories. In fact, Roundy never challenged any of the teenagers on their changing stories.

- WO's story changed, too. As Roundy stated in his report, "[WO] heard other things that may have happened but did not witness these things and did not know if they actually occurred, such as Crothers grabbed [KH's] butt." WO changed his testimony in court. He was asked by the prosecutor: "so you testified that you saw Mr. Crothers try to kiss someone else. Was that DK?" WO Response: "Yes." The allegation involving DK was that Crothers had kissed DK, a friend of the family, only on the cheek.

73.    It should be noted that WO had been pressured to make the statements he made. As one of the witnesses who attended the party and was friends with WO stated: "[WO] was very close to [KH] and sympathized with her because they came from similar socio-economic backgrounds. [WO] did not see Crothers kiss [KH] or kiss [DK], but [WO] felt pressured to say so because he thought it would be helpful to his friends, [KH] and [DK]." The same witness stated

that "[KH] pressured her boyfriend [RT] to testify to confirm her testimony that Mr. Crothers touched her." RT refused to confirm her testimony because he saw nothing, and RT and KH broke up shortly after KH accused Crothers.

74.     Roundy interviewed DK on May 22nd, twelve days after the party. DK had admittedly been drinking at the party. Nevertheless, she claimed that Crothers kissed her on the cheek.

75.     A third girl, LK, claimed she was a victim after initially saying that she did not have a moral issue with anything that occurred. Her allegations led to no charges against Crothers. However, LK eventually was pushed by the prosecutors to testify that Crothers was in essence a sexual predator. Yet her testimony is undermined by her very own actions: LK came over to the Crothers' house approximately ten times after the party at issue in May 2019, many times even bringing her own half gallon of vodka with her, unbeknownst to Crothers, just as she did at the party on May 2019. LK also continued to reach out to Crothers' daughter, indicating that LK was sorry for what she had said about Crothers. LK confided in Crothers' daughter when she had interpersonal problems with her friends and boyfriends. Such actions stand in stark contrast to the behavior of someone who had been allegedly victimized by Crothers.

76.     Moreover, LK incredibly testified at trial that she was hardly drinking and not doing drugs at the party. This was patently not true. LK actually stayed at the party and had a good time with Crothers and others, even after the alleged misconduct occurred. Moreover, Allan, the prosecutor, knew with reasonable likelihood that it was not true when LK's testimony was offered at trial.[6] LK's parents had asked Allan about giving her immunity for drugs and alcohol use at the

---

[6] Crothers also learned after the trial from public records requests that during the trial, LK tried to edit evidence she possessed from the party. She asked the victim services coordinator working with the prosecutor if she could forward photos that made Crothers look bad but she wanted to edit herself out because she was "drinking and having fun." In

party. But Allan allowed her to lie in any event. Crothers did not know about the pocket immunity promised to LK by Allan until after Crothers' trial—because Allan suppressed the favorable evidence from Crothers—so Crothers could do nothing about LK's testimony at trial.

      *v.*    *Roundy Confronts and Interviews Crothers and Then Issues Citations*

77.    After conducting interviews of the teenage students, Roundy blindsided Crothers when he interviewed him. Roundy explained some of the allegations to Crothers, none of which Crothers remembered and none of which Crothers admitted.

78.    Nevertheless, Roundy—having already prepared the citations before speaking with Crothers—immediately issued citations to Crothers after the interview. Crothers was cited with unlawful contact for touching KH, allowing a house party, and breach of peace for allegedly using bad language in a conversation in his own home.

79.    Crothers was not arrested. Crothers was obviously not viewed as a threat or predator to children despite later statements by Roundy and others to the contrary, as Roundy allowed Crothers to go home after issuing the citations.

      *vi.*    *The State Adds Charges After Crothers Refuses to Plead Guilty.*

80.    Crothers refused to plead guilty to the initial counts because he believed he had done nothing wrong, so Teton County law enforcement upped the pressure. The State added two new counts against Crothers after Crothers refused to plead guilty to the three misdemeanors he was cited for. The first addition, another count of unlawful contact, was for an alleged kiss on the cheek of DK. The second addition, a count for sexual battery, turned an alleged unlawful touching of a buttocks into a sex crime, a far more serious charge.

---

other words, she looked bad too—and contradicted her testimony. Crothers does not believe Teton County has forwarded photos of LK that "looked bad" as part of the records request.

81.     Upon information and belief, the charges were added not based on their merit but because Allan and other prosecutors wanted a more high-profile case and/or believed that it would increase pressure on Crothers to plea. Indeed, the same day the TCPA decided to bring the additional charges, a TCPA prosecutor wrote to the victim witness coordinator that the misdemeanor charges will likely be a "high profile case." Further, Allan knew the claims were being overblown, as he told Crothers' attorney; when asked why Crothers was being so aggressively prosecuted, Allan responded that he had been waiting twenty-two years to get a rich guy who lived on the West Bank.

   vii.     *Allan and the Prosecutors Tried Crothers' Case in the Media and Intentionally Leaked Exaggerated and False Information to the Media with the Intent of Embarrassing and/or Prejudicing Crothers*

82.     From the beginning, TCPA and Allan were determined to try this case in the press. One of the deputy county attorneys advised his colleague via email the day the additional battery charge was added that "this would be a high-profile case," and Weisman, the elected county prosecutor, texted the local newspaper court reporter asking for a meeting so Weisman could discuss this case. TCPA employees were communicating information to the media (specifically the Jackson Hole News & Guide), which was ultimately published in articles that harmed Crothers' reputation and violated his rights under the U.S. Constitution and Wyoming law.

83.     Allan intentionally coordinated with the media to provide incendiary information for the local newspaper to print on the front page. Plaintiffs have evidence they received after the trial from public records requests in the form of texts and emails that show Allan and the TCPA coordinating with the media and providing information to the media behind the scenes related to ongoing matters. For example, a Teton County paralegal wrote an email to herself detailing a *future* article to be written based on a *future* pleading by the state in the Crothers matter. No one at Teton

County could have known about this if there hadn't been coordination between the TCPA, Allan, Weisman, and the media.

84.     Upon information and belief, Allan and the TCPA were using the media to put pressure on Crothers, ruin his reputation, and taint the small jury pool. The paper moved forward with the juicy and false details that, upon information and belief, Allan provided, triggering incendiary headlines. In the end, fourteen articles were printed in the press about Crothers. Allan and other prosecutors were ruining Crothers reputation; they had no regard for the facts. Allan repeatedly made prejudicial public statements about Crothers. For example, at one point, Allan unnecessarily and falsely stated that if the girls were six months younger, Crothers would be facing twenty years in prison. Allan's factually and legally baseless hypothetical served no purpose other than to secure a salacious headline in the local press.

85.     Allan further violated Crothers' statutory rights under Wyoming Statute § 6-2-319 by providing identifying information about Crothers prior to the sexual battery charge being filed in the district court. Crothers' case never left circuit court; therefore, it was always subject to the protections under Wyoming Statute § 6-2-319. Allan repeatedly violated the statute by failing to redact court documents to protect Crothers' identity and by making various public statements to the media that fully identified Crothers. Upon information and belief, Allan was providing publicly identifying information with the intent of having the information public and in the newspaper.

viii.     *Roundy Intimidated Witnesses into Testifying, Including by Threatening Criminal Charges, While Allan and the Prosecutors Gave Promises to the Witnesses that They Would Not be Prosecuted for Using Alcohol and Drugs*

86.     On top of coordinating with the media, law enforcement and prosecutors in the Crothers matter were doing everything they could to influence the witnesses, even improperly and illegally at times. That is because the testimony of the witnesses in the Crothers trial were essential

to the prosecution, given that there was no physical evidence of any wrongdoing; everything was a "he said, she said," and issues turned on witness credibility.

87.     Roundy went on a witch hunt to find witnesses and once found, he used every means of pressure he could to influence them to testify, even if it meant threatening criminal conduct based on unrelated events. Upon information and belief, many of the witnesses had a prior criminal record. These witnesses' prior records made the pressure to comply even more severe. Roundy was so determined to find "evidence" against Crothers that he began randomly approaching students at the high school who he knew did not attend the party, asking if they "had any information about the Crothers."

88.     For example, based on public records requests, Crothers has discovered an email sent from the upset mother of PE, a minor who knew the Crothers well, to the principal of the high school on September 16, 2019. The email from the mother reads in relevant part:

> Mr. Crisp,
>
> [Redacted][7] is my son. Tonight, [Redacted] informed me that Deputy Sheriff Andrew Roundy accused him of vandalizing the school over the Summer. Apparently, in this same meeting, [Redacted] was also accused of being at the Crothers' home when there was an encounter between Mike Crothers and a minor. **_The deputy also told [Redacted] that he should influence the minor to testify_**. Both are false.
>
> (Emphasis added).

89.     The intent of Roundy's actions could not be clearer. Roundy brought in PE because Roundy wanted to influence another "minor," potentially KH, to testify, given that Crothers understands that she no longer wanted to testify at that time. To exert more power, Roundy accused PE of a crime to put him in a more vulnerable position—with the aim of having PE cooperate.

---

[7] The emails received through the public records requests had the names redacted. However, the mother's name is not redacted, and Crothers presumes the redacted name is that of PE.

Roundy later admitted that there were only "whispers (less than even rumor) that PE was involved in the graffiti case," but Roundy made accusations against PE, knowing they were without credibility, right before urging him to influence the minor to testify.

90.     Roundy's conduct was so severe that he was later investigated by a senior member of the department, Lloyd Funk, and on September 23, 2019, Sheriff Matt Carr held a meeting concerning this issue. In other words, what Roundy had done was so serious, it was escalated to the top of the department. Crothers was never informed of this meeting before the trial. Moreover, it appears there may have been a cover up of information and/or evidence showing Roundy's misconduct. On September 26, 2019, just three days later, Platt, an Investigations Sergeant, sent a cryptic email to Dustin Richards in IT, where the subject line said only "DELETE." The email stated, "Same for SO190500029 …." The identifier "SO190500029" appears to be the file number for the Crothers' case, and upon information and belief, information was deleted from the Crothers' file—apparently relating to Roundy's conduct.

91.     As for Allan, the Crothers' public record request uncovered an email between the parent of one of the teenage witnesses for the prosecution, where she told the lead prosecutor that "several" of the parents were concerned their kids would get in trouble for "drinking or illegal behavior" (i.e., illegal drugs) at the house party that led to Crothers' charges. Therefore, the parent asked the prosecutor whether "there is some sort of statement that could be made either in writing or otherwise, assuring these families that their kids will not be held legally accountable for underage drinking, etc., while on the stand for the case." Allan responded that he was meeting with "all the witnesses," and that his team would "reassure them about drinking, etc." As a result, the prosecutor, unbeknownst to Crothers, made a pocket immunity deal with all the teenage witnesses for the State that they would not be prosecuted for drinking alcohol or illegal drugs—which is a high misdemeanor—the same type of crime Crothers was charged with. Allan, after being

confronted with the email, later admitted he told the witnesses they would not be charged for drinking alcohol or illegal drugs. That admission and email came far too late—after the trial of Crothers was done. Allan had an obligation to inform Crothers' defense team that he had provided favorable treatment to the State's witnesses. Allan failed to disclose this information.

92.     Witnesses did not want to testify against Crothers because they did not think Crothers had done anything wrong, but Teton County coerced witnesses into testifying while intimidating other witnesses into not testifying on Crothers behalf. Roundy even told the witnesses that the case would not go to trial, and Crothers would merely receive a fine and probation, but later said it was out of his hands and they were the star of the State's case.

93.     Allan and Roundy, and others working in concert, were successful in pressuring the teenage witnesses to testify against Crothers. Indeed, one of the witnesses who testified against Crothers later texted Crothers' daughter, stating that Crothers was "a good guy" and stating that Crothers did not deserve what was happening to him—a radical departure from what she said on the stand when Allan and prosecutors were pressuring her to testify. The father of another witness, LK, even sent an email to Allan, which was never disclosed to Crothers until the public records requests after trial, pleading with him about LK's involvement in the court proceeding. He stated in his letter that his daughter had no moral issues with anything she witnessed at the party and did not want to be involved in prosecuting Crothers—but Allan and others pressured her to acquiesce.

94.     Further, DK, the subject of one of the two unlawful contact convictions against Crothers, indicated after trial that she neither witnessed nor experienced any inappropriate behavior by Crothers on the night of the party and wanted nothing to do with the authorities' pursuit of Crothers but was manipulated and coerced by Teton County and Roundy when he called her into his school office. Likewise, DK indicated after trial that KH, the subject of the second of the two unlawful contact convictions, reached out to DK early in the prosecution's pursuit of

Crothers and firmly expressed that she believed nothing inappropriate had occurred on the night of the party and that she wanted nothing to do with the prosecution's pursuit of Crothers but that she too felt intimidated and coerced by Teton County into cooperating with the authorities on Crothers' case.

ix.     *The Trial of Crothers that Proceeded as a Circus*

95.     Crothers went to trial for several misdemeanors, but the atmosphere of the trial was a circus. The courtroom was packed; in fact, there was not enough room for everyone who wanted to attend. This atmosphere was amplified by Allan and the prosecutors' manipulation of the local media.

96.     Three high school seniors were publicly admonished at the trial for throwing gang signs at a witness and for being generally unruly. The judge threw out one of the three boys, incidentally the Hispanic one. The other two, who were Caucasian, were allowed to stay. Incidentally, this boy is also the son of a former mayor (not Muldoon). This former mayor was also in attendance at the trial.

97.     The former mayor in attendance intercepted the only witness who was brave enough to testify on Crothers' behalf. He was bullied in the witness room and through Snapchat while he was waiting to testify. The former mayor stopped him on his way into the courtroom and said, "Are you sure you want to do this?" By the time he was on the stand, the boy was completely unsettled. This same witness was sent a Snapchat video of someone brandishing a gun as a threat because he was testifying for Crothers. Crothers had other witnesses prepared to testify on his behalf, but they were all intimidated by the alleged victim's friends, family members, and, ultimately, the prosecutor's office, into not participating.

98.     Witnesses for the State, on the other hand, were treating the case like it was a party. They were assured they had nothing to fear, as they were promised not to be prosecuted if they

testified for the prosecution. The night before the trial, several of the teenagers, including both the alleged victims as well as several other potential witnesses, were partying in a hot tub and drinking late into the evening, which they were brazen enough to post on social media. Two of the other attendees in the hot tub were the two boys who were thrown out of the courtroom the day before by the judge. The other boy was in the threatening video sent to Crothers' witness. Allan saw the video but did nothing about it. Moreover, after the trial, contradicting how one would act towards the children of an alleged "sex predator"—as Crothers was inappropriately labeled—both of Crothers' children were contacted by DK and LK, two of the accusers, asking Crothers' daughter if they could "hang out." LK even sent Crothers' daughter a message stating, "I know I have a lot of explaining to do."

99.    As another example, the mother of DK (the journalist) did not like that Crothers had friends supporting him in the gallery at trial. She loudly said, "we need more people" and began making phone calls. From this point on, there was a constant trickle of rude and disrespectful people entering the courtroom. Nearly the entire senior class showed up. This same mother told Crothers' 17-year-old son during the trial that if his dad was not found guilty, they were "coming after him next."

100.    While waiting for the verdict, Crothers' friends and supporters waited peacefully outside the courtroom in their cars as they wanted to be there for Crothers when the verdict was read. DK's mother, along with the mother's friends, arrived in two cars, parked next to Crothers' friends, got out of their cars and began harassing Crothers' friends for supporting him. Upon information and belief, the two moms and daughters were all drunk. The sheriff deputies in the courthouse witnessed this and did nothing to stop it. When someone asked the deputies why they did not intervene, they commented that Crothers' friends were just as guilty as the drunk, angry people who showed up, though this was clearly false

101.    During the trial, Allan presented no evidence to support the sexual battery charge, and the jury returned a not guilty verdict on the sexual battery count. Crothers was only found guilty on the lesser charges, two unlawful contact charges—due primarily to WO's inconsistent testimony that he had witnessed both alleged touchings—and one charge for allowing a house party. After speaking with one of the jurors after the trial, Crothers learned that the jury was strongly divided on whether Crothers was guilty of any of the lesser offenses. The juror stated that if the jury had known about how the witnesses were promised immunity by the State, it is highly unlikely Crothers would have been found guilty of any crime—as the State's case centered entirely on witness credibility because there was no direct evidence of wrongdoing.

102.    After Crothers was acquitted of the most serious charges, he moved to the sentencing portion of his case. During that phase, Allan again acted tortiously. Allan lightly redacted photographs that had been previously sealed from public view to allow them to be published again in the local newspaper. There was no lawful or tactical reasoning behind Allan's decision to lightly redact the photos, rather than sealing them. The decision was made simply to further humiliate and cause emotional and financial damage to Crothers in the media. The light redactions were useless, as everyone knew who the individuals were.

103.    After the trial was over, Crothers and his family were forced to move out of Teton County because of the damage that had been done to their reputation and the harassment and vandalism that he, his children, and his wife faced as a result of Crothers being labeled a sex predator by Allan and the local media.

104.    Further, Crothers was deprived of a fair trial because of the undue media attention Allan and Teton County generated against Crothers related to the baseless sexual battery charge.

C.      Peter "Pete" Muldoon ("Muldoon")

105.    Muldoon served as mayor of Jackson from January 3, 2017 to January 4, 2021. As mayor, Muldoon was responsible for, among other things, overseeing the police department's budget and responsible for holding the police department accountable to a high standard of public service. After multiple disagreements between Muldoon and law enforcement officials regarding budgeting, public relations, and police conduct, upon information and belief, law enforcement officials retaliated against Muldoon by illegally releasing confidential information about Muldoon that caused Muldoon to lose his re-election campaign for town council. The police department in fact coordinated with the TCSO, and particularly Platt, to illegally release records of Muldoon just before his re-election and retaliate against Muldoon to suppress his speech.

  i.      *Muldoon Had a Prior False Accusation of Rape Against Him*

106.    For background, in or around 2017, Muldoon met JE. Muldoon and JE became friendly over time and had consensual sex on a few occasions. Indeed, it was so consensual that they talked about consent before having sex. Over time, JE wanted a more serious relationship with Muldoon, but Muldoon was not interested in that at the time and had been clear about it from the start of their relationship. When Muldoon attempted to end the relationship, JE refused to accept the decision and threatened to claim that the consensual sex was rape. After Muldoon insisted on ending the relationship anyway, JE retaliated by filing a false police report with TCSO claiming that Muldoon had raped her.

107.    TCSO took JE's statement and then transferred the case to the Department of Criminal Investigation ("DCI"), which is responsible for handling investigations into public officials. DCI investigated the allegation thoroughly, reviewing hundreds of text messages in which JE acknowledged that the sex was consensual. Eventually, the DCI produced an over 400-

page report conclusively determining that JE's allegation was false. At this point, the case was closed.

108.   Since Muldoon was never charged, the allegations against Muldoon were kept confidential as required under the law. Nothing more came of the incident at that time.

> ii.   *Muldoon, as Mayor and as a Private Citizen, Had Conflicts with Law Enforcement and Openly Spoke Out Against the Law Enforcement in Teton County*

109.   In the summer 2020, the nation witnessed the killing of George Floyd in broad daylight by a police officer. Along with many, Muldoon was outraged by the police conduct. Following Floyd's death, Muldoon asked Jackson Police Chief Todd Smith if he would make a joint proclamation with Muldoon stating that, as the mayor and chief of police, they recognize that black lives matter. Chief Smith rejected the idea of making a statement that black lives matter in this country and instead wanted to issue a proclamation that would be "supporting our department and its historical efforts to be exceptional," and "to emphasis [*sic*] the good that your department is already doing." That was the last communication Muldoon received from Chief Smith. After that email exchange, tensions mounted between Muldoon and the police department.

110.   Soon thereafter, at the direction of the Town Council, Muldoon and the City Manager asked the police department to submit a budget for review. The police department submitted a $5,000,000 budget but resisted Muldoon's request for details on how the funds would be used. In fact, Chief Smith rallied police supporters to Town Hall to protest Muldoon and the Town Council for performing their duties in reviewing the police department budget.

111.   Shortly after the protest, a police officer was caught trivializing and joking about sexual assault investigations. Muldoon and many others in the town were shocked and, as mayor, Muldoon was vocal about his disapproval of the police officer's conduct. Muldoon spoke out about the inappropriate and unprofessional statement of the police officer and was critical of the officer's

conduct—all matters of public concern. The officer ultimately resigned, but the local law enforcement community was further outraged by Muldoon's actions.

      *iii.*      *The Jackson Police Department Worked Together with the Teton County Sheriff's Office Against Muldoon.*

112.   At this point, law enforcement in Teton County saw Muldoon as a threat, and they were determined to remove him.

113.   It is worth noting the close relationship and coordination between the Jackson Police Department and the Teton County Sheriff's Office (i.e., Defendant Teton County). Their offices are across the street from each other. Employees move between the police department and the sheriff's office frequently. For example, former police chief Smith previously worked at the TCSO. The TCSO also houses the 911 operations that the police department uses, and upon information and belief, the two have financial connections.

114.   The TCSO and Jackson Police Department are also connected through the Teton County Auxiliary. Meg Daly, with Jackson Hole Community Radio, highlighted the joint efforts by TCSO and the Jackson Police Department, through the Teton Sheriff's Auxiliary, against Muldoon in an August 25, 2020 article. Ms. Daly stated that the Teton Sheriff's Auxiliary "provides grants to law enforcement for equipment, training, and housing. In addition to the combined $13 million official budgets for the Teton County Sheriff's Office and Jackson Police Department, these entities receive additional funds from the Auxiliary. According to the Auxiliary's tax returns, past items include grants for K-9 training, 'necessary equipment required by the police department,' and housing assistance." According to Ms. Daly, with the budget dispute above, Chief of Police Todd Smith "asked his friend Jeff Brown at Teton Sheriff's Auxiliary to rally a few police supporters outside town hall [because] [r]umor had it the Town Council would secretly be discussing defunding the police and Smith wanted people to know."

That was not true, of course—there were discussions to be had about the funding of the police—which is common for any organization, police or otherwise—but Muldoon was not intending to completely defund them.

115.    Ms. Daly's article explained the tension between law enforcement and Muldoon (at the Town Council) well:

> Brown wrote an email to supporters. "This coming Monday, August 17, the Jackson Town Council will meet at 3 PM to discuss DEFUNDING the Jackson Police department, called "Mid Year Checking (sic)", aka "Defunding the Police."

> The call to action spread like wildfire on social media. A national pro-President Donald Trump, conservative action group, Turning Point Action, got wind of the planned gathering and sent robocalls to more Jackson residents. Local conservative millionaire Foster Friess attended the town hall rally. Friess provided the seed money for the group Turning Point USA, of which Turning Point Action is a part.

> In the end, dozens of protesters swarmed town hall ready to do verbal battle in support of law enforcement.

> Only problem was, no such discussion was on the agenda for the Town Council's meeting.

> In recent months, police funding has been a hot topic in Jackson Hole, as citizen activists have urged local officials to redirect funding away from law enforcement and toward social services. Opponents say the police are fine as they are, filling a crucial role as protectors and peacekeepers. Caught in the middle are elected officials who have a backlog of other issues to address after a grueling several months mitigating the COVID-19 pandemic. But the pesky issue of police funding won't go away.

116.    Ms. Daly's article continued to outline the distaste of Muldoon by Teton County law enforcement:

> In his email to supporters, Brown said Smith had asked him to inform people about the meeting.

> "Chief Smith has asked that I gather as many as possible to completely overwhelm and outnumber the 'DEFUND' supporters that continually show up and are very outspoken," Brown wrote. "This could be an excellent chance to squelch the DEFUND outcry in Jackson. Mayor Pete Muldoon seems to be fully in support of the idea and is pushing the agenda and needs to be set straight regarding the overwhelming community support of the PD."

Muldoon, for his part, said it is his responsibility to examine policing and its funding streams. "I intend to fulfill that duty, and I'd be disappointed to learn there are people in the community who think the police department and its budget are exempt from public scrutiny," he told KHOL.

The "defund outcry" Brown mentions has been largely led by Act Now JH, a grassroots organization that formed in the wake of the police killing of George Floyd in Minneapolis that sparked a global movement against police brutality and systemic racism. Members of Act Now JH attended a number of town and county meetings this summer as budgets for the 2020/2021 fiscal year were finalized. They also met with councilors and commissioners privately to discuss their concerns. As a result, the board of county commissioners set aside $10,000 for a public safety task force.

One of the main organizers of Act Now JH, Rachel Attias, said that people on both sides of the issue share a goal. "Believe it or not, the group that showed up to the town council meeting wants the same thing we do, which is a safe community."

Attias said the disagreement is over whether law enforcement provides that safety. "Defunding the police really means increasing public safety by creating and supporting community-led measures that prevent crime and enact restorative justice," she said.

No members of Act Now JH attended the August 17 workshop.

Meanwhile, town councilors expressed dismay.

"I am disappointed our community received mistaken information," vice mayor Hailey Morton Levinson said. "Our agendas were published last Thursday and did not include any such item."

The meeting in question was a routine workshop. Three items were posted on the agenda: a mid-year check-in, a proposed ski pass contribution by Jackson Hole Mountain Resort to START, and next steps for the Northern South Park Neighborhood Plan.

Morton Levinson said that if the police budget is to be discussed, the public will know about it. "As with anything we discuss as a council, notice will be given and discussions and decisions will be held in a meeting open to the public," she said.

She also said the public is always welcome to send an email to councilors at any time.

Councilor Jonathan Schechter said the misinformation spread about the meeting was "tremendously unfortunate."

"We already have this incredibly fraught situation that is the state of our world right now," he said. "It's really important for everyone to take great care with our words and actions because everyone is under so much pressure."

Another council member placed the blame on Foster Friess. Councilman Jim Stanford said Friess "is still butt-hurt from failing to buy the governor's race. Maybe he should try a Bayer aspirin." Stanford was referring to Friess's 2012 comment on MSNBC suggesting women should squeeze an aspirin between their knees as a form of contraception.

    iv.    *The Police Department Worked with the Teton County Sheriff's Office to Illegally Release Records about Muldoon to Retaliate and Suppress His Speech, Which Resulted in His Losing the Town Council Election*

117.    It was clear that TSCO and Jackson Police Department were tired of Muldoon and wanted to remove him from office and stop his commentary on law enforcement in Teton County.

118.    The tensions between Muldoon and law enforcement were building up in the summer and early fall of 2020, based on the public statements made by Muldoon. Importantly, Muldoon was running for election to the town council on November 3, 2020 (Muldoon had decided to not run for mayor again and pave the way for a colleague to do so, so he was running for town council instead of mayor).

119.    Then, on September 19, 2020, during the heat of Muldoon's 2020 election campaign, Gloria Courser, a member of the Jackson Police Department's Mounted Patrol, filed a records request for law enforcement records related to Muldoon. As a member of the Jackson Police Department's Mounted Patrol, Courser was in a unique position to know about confidential law enforcement records, including the sealed records detailing the false rape allegations against Muldoon in 2018. Moreover, upon information and belief, Courser's decision to file the records request was done in consultation with or at the urging of law enforcement in Teton County.

120.    In response to Courser's request, Teton County, and specifically Platt, illegally released to Courser records concerning JE's 2018 false rape allegation against Muldoon, which clearly identified Muldoon as the alleged perpetrator. Interestingly, JE's name was redacted. This

release was a violation of the law, and it was also a retaliatory action to suppress Muldoon's speech against law enforcement in Teton County.

121.    The records were ultimately released publicly, and the release received considerable media exposure. Following the illegal disclosure, Muldoon faced intense public backlash, had his reputation tarnished, and ultimately lost the election. Muldoon's campaign advisor bowed out because of the public release. The release, and public backlash, also created severe emotional distress to Muldoon—for which he had to seek professional help. The release undoubtedly severely impacted Muldoon's chance of winning the race. Muldoon was a shoo-in to win a seat on the council based on the primary (prior to the release of the information above), but after the release he suffered at the general election.

122.    In the aftermath of the illegal disclosure, Muldoon learned that JE had falsely accused several other men of rape. In light of the repeated false allegations, Muldoon filed a report with the TCSO detailing JE's alleged crimes, including false reporting, blackmail, and bribery of a public official. To date, TSCO has been unresponsive in providing updates to Muldoon about whether TSCO is investigating JE and whether it is taking any action to prevent JE from harming others.

## VII.   CAUSES OF ACTION

### COUNT I

**Violation of Constitutional Rights Under 42 U.S.C. § 1983 Filed by Plaintiffs against Teton County for Promulgating Customs, Policies, Practices, or Usages that <u>Caused Violations of Constitutional Rights</u>**

123.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

124.    Teton County employed individuals that deprived Plaintiffs of clearly settled constitutional rights.

125.    Plaintiffs' constitutional rights were violated because Teton County engaged in a pattern or practice of inadequately training and inadequately supervising staff to prevent them from committing constitutional violations.

- Doe's Fourth Amendment rights were violated because of Teton County's pattern or practice of inadequately training and supervising staff to prevent malicious prosecution in violation of the Fourth Amendment. Teton County's pattern or practice of inadequate training and supervision to prevent malicious prosecution resulted in false statements and deliberate omissions in Doe's arrest. This pattern or practice caused Doe to suffer damages and injuries.

- Doe's Equal Protection rights were violated because of Teton County's pattern or practice of inadequately training and supervising staff to prevent violations of the Equal Protection Clause. Teton County staff intentionally treated Doe differently than other similarly situated individuals by charging Doe with first degree sexual assault without any investigation into the accusers' allegations and by arguing for excessive bail without adequate investigation and in reliance on false statements of fact. Doe was treated differently because of Teton County's pattern or practice of inadequately training and supervising staff to prevent violations of the Equal Protection Clause. This pattern or practice caused Doe to suffer damages and injuries.

- Doe's Fourteenth Amendment rights were violated because of Teton County's pattern or practice of inadequately training and supervising staff to properly attest in affidavits accompanying arrest warrants. Teton County's pattern or practice of inadequately training and supervising staff to properly attest in affidavits accompanying arrest warrants resulted in Teton County staff incorporating

fabricated evidence into the probable cause affidavit and supplemental affidavit accompanying Doe's arrest warrant. This pattern or practice caused Doe to suffer damages and injuries.

- Crothers' Fourth Amendment rights were violated because of Teton County's pattern or practice of inadequately supervising staff to prevent malicious prosecution in violation of the Fourth Amendment. Teton County's pattern or practice of inadequate training and supervision to prevent malicious prosecution resulted in Teton County maliciously prosecuting Crothers sexual battery without any evidence to support the charge. This pattern or practice caused Crothers to suffer damages and injuries.

- Crothers' Fourteenth Amendment right to a fair trial was violated because of Teton County's pattern or practice of inadequately training and supervising staff to prevent the making of harmful and prejudicial statements in coordination with the media as to deprive criminal defendants their right to a fair trial. Teton County's pattern or practice of inadequate training and supervision resulted in Teton County staff making false, inflammatory remarks to the media regarding the unsupported sexual battery charge against Crothers. This pattern or practice caused Crothers to suffer damages. and inadequately training and supervising staff to properly attest in affidavits accompanying arrest warrants, in violation of the Fourteenth Amendment.

126.    Further, Plaintiffs' constitutional rights were violated because of Teton County's adoption of the custom and pattern or practice of abusing the confidentiality of individuals accused of sexual assault and coordinating with the media to prejudice criminal defendants awaiting trial.

- Teton County violated Doe's Equal Protection rights by intentionally treating Doe

differently than other similarly situated individuals, causing a document to be filed in the lower circuit court with more than enough information to identify Doe as the individual accused of sexual assault—a violation of Wyoming Statute § 6-2-319—and by telling the press—without investigating the charges or reviewing the transcript from Doe's interview—that Doe had made "a full and complete confession"; displayed "predatory behavior"; and would be a "shark in a pool of innocent fish" if allowed to go back to high school. Teton County had no rational basis for the difference in treatment. Moreover, these acts were grounded in hostility. Teton County's custom and pattern or practice of abusing the confidentiality of individuals accused of sexual assault and coordinating with the media to prejudice defendants caused this constitutional violation and caused Doe to suffer damages and injuries.

- Teton County violated Crothers' Fourteenth Amendment rights by disclosing Crothers identity as the individual accused of sexual assault and by coordinating with the media to put pressure on Crothers. Teton County provided the media with incendiary comments about Crothers, including one comment that Crothers would be facing twenty years in prison if the accusers were younger. The comments served no purpose other than to heighten public condemnation of Crothers and secure a salacious headline in the press. Teton County's custom and pattern or practice of abusing the confidentiality of individuals accused of sexual assault and coordinating with the media to prejudice defendants caused this constitutional violation and caused Crothers to suffer damages and injuries.

- Teton County violated Muldoon's First Amendment rights by releasing a false rape allegation against Muldoon, which clearly identified Muldoon as the alleged

perpetrator. This release violated Wyoming Statute § 6-2-319 and was intended to suppress Muldoon's speech against law enforcement in Teton County. The records release was subsequently provided to the media, resulting in severe public backlash and reputational damage. Teton County's custom and pattern or practice of abusing the confidentiality of individuals accused of sexual assault and coordinating with the media to prejudice defendants caused this constitutional violation and caused Muldoon to suffer damages and injuries, including a campaign loss.

127.    In each of these instances, Teton County was deliberately indifferent to the fact that a constitutional violation was highly predictable consequence of the inadequate supervision.

128.    Plaintiffs are entitled to compensatory damages from Teton County because Teton County's customs, inadequate training, and inadequate supervision caused Plaintiffs to be deprived of constitutional rights and suffer damages and injuries.

## COUNT II

### Violation of Constitutional Rights Under 42 U.S.C. § 1983
### Filed by Plaintiffs against Defendants Teton County and Carr, in his individual <u>and official capacity, for Failure to Train and Supervise</u>

129.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

130.    Defendant Carr is the final policymaker for purposes of law enforcement, training and supervision and investigation in Teton County. He failed to train his deputies on how to conduct a proper investigation which could unearth exculpatory evidence. He failed to train his deputies on what constitutes probable cause so that his deputies would not file improper probable cause affidavits. And he failed to train his staff on how to keep statutorily confidential information confidential. Finally, Carr failed to supervise his deputies in the conduct of their investigations and execution of probable cause affidavits.

131.    Defendant Carr failed to train and supervise Defendants Hodges Platt, Bommer, and DOES resulting in a policy or custom of recklessly disclosing identifying information of sexual assault victims and perpetrators.

132.    The policy or custom of recklessly disclosing identifying information of sexual assault victims and perpetrators was the cause in fact and proximate cause of the constitutional violations alleged in Counts VIII-IX and Count XI.

133.    Defendant Carr had actual knowledge of Defendants Hodges, Bommer, Platt and DOES' violation of Plaintiffs' rights and acquiesced in that violation.

134.    Defendant Carr, with deliberate indifference to the consequences, established and maintained a policy practice or custom which directly caused the violation.

135.    Alternatively, Defendant Carr directed his deputies to take the actions they did against Doe, Crothers, and Muldoon, had knowledge of his subordinates' violation of Plaintiffs' rights or acquiesced in that violation, or with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused violations of Plaintiffs' rights. As a result of Carr's conduct, Plaintiffs suffered injury and are entitled to compensatory damages against Defendants, and to punitive damages against Carr in his individual capacity because he acted with callous and reckless disregard of Plaintiffs' clearly settled Constitutional rights.

## COUNT III

**Violation of Constitutional Rights Under 42 U.S.C. § 1983 Filed by Plaintiffs Doe and Crothers (for this count, "Plaintiffs") against Defendants Teton County and Weisman, in <u>her individual and official capacity, for Failure to Train and Supervise</u>**

136.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

137.   Defendant Weisman is the final policymaker for purposes of prosecution-related decisions, prosecution-related investigations, and the training and supervision of prosecutors. Weisman failed to train her prosecutors on probable cause for filing charges against a criminal defendant. Weisman failed to train her prosecutors on how to investigate an accusation or charge. She failed to train her prosecutors on the proper basis for adding a count against a criminal defendant. She failed to train her staff on how to keep statutorily confidential information confidential. And she failed to supervise her prosecutors in the prosecution of baseless charges against Doe and Crothers. Finally, Weisman failed to train and supervise her prosecutors on improper use of the press.

138.   Defendant Weisman failed to train and supervise Defendants Allan and DOES resulting in a policy or custom of recklessly disclosing identifying information of sexual assault victims and perpetrators.

139.   The policy or custom of recklessly disclosing identifying information of sexual assault victims and perpetrators was the cause in fact and proximate cause of the constitutional violations alleged in Counts VIII-IX and Count XI

140.   Defendant Weisman had actual knowledge of Defendant Allan and DOES' violation of Plaintiffs' rights and acquiesced in that violation.

141.   Defendant Weisman, with deliberate indifference to the consequences, established and maintained a policy practice or custom which directly caused the violation.

142.   Further, as it relates to Defendant Weisman in her individual capacity, her conduct in relation to this claim was not part of an advocative function and does not lie at the very core of a prosecutor's role as an advocate.

143.   Alternatively, Weisman directed her prosecutors to take the actions they did against Doe and Crothers, had knowledge of her subordinates' violation of Plaintiffs' rights or acquiesced

in that violation, or with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused violations of Plaintiffs' rights. As a result of Weisman's conduct, Plaintiffs suffered injury and are entitled to compensatory damages against Defendants, and to punitive damages against Weisman in her individual capacity because she acted with callous and reckless disregard of Plaintiffs' clearly settled Constitutional rights.

### COUNT IV

**Violation of Plaintiff Doe's Fourth Amendment Rights Under 42 U.S.C. § 1983 by Defendants Hodges, Bommer, Platt and ROES (for this count, "Defendants")**

144.    Doe realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

145.    While acting under color of state law, Defendants violated Doe's clearly settled Fourth Amendment rights by maliciously prosecuting Doe for First Degree Sexual Assault.

146.    Defendants initiated and continued criminal judicial proceedings against Doe that terminated in Doe's favor.

147.    Defendants Hodges, Bommer, and Platt intentionally misrepresented facts to Weisman in her capacity as a prosecutor.

148.    Defendants initiated the proceedings with want of probable cause.

149.    Doe suffered damages and injuries as a direct cause and consequence of Defendants abuses of process in violation of the Fourth Amendment. He is also entitled to punitive damages because the Defendants acted with callous and reckless disregard for his Fourth Amendment rights.

150.    Defendants are jointly and severally liable for these damages because the Defendants concurrently caused Doe's damages and injuries.

## COUNT V

### Violation of Plaintiff Doe's Fourth Amendment Rights Under 42 U.S.C. § 1983 by Defendants Allan, Hodges, Bommer, and Platt (for this count, "Defendants")

151.    Doe realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

152.    While acting under color of state law, Defendants violated Doe's clearly settled Fourth Amendment right to be free from unlawful seizure as a result of Doe's unlawful arrest.

153.    Allan, deputy prosecutor for the TCPA, directed the investigation and arrest of Doe in coordination with the Hodges, Bommer, and Platt, deputy sheriffs at the TCSO.

154.    In the warrant affidavit for Doe's arrest, Defendants deliberately made false statements and/or omissions that created a falsehood.

155.    Defendants made those false statements and omissions deliberately or with reckless disregard for the truth.

156.    Defendants' false statements and omissions were material or necessary to the finding of probable cause for the arrest warrant.

157.    As a direct cause and consequence of the Defendants' conduct, Doe has suffered damages and injuries. He is also entitled to punitive damages because the Defendants acted with callous and reckless disregard for his Fourth Amendment rights.

158.    Defendants are jointly and severally liable for these damages because the Defendants concurrently caused Doe's damages and injuries.

## COUNT VI

### Violation of Plaintiff Doe's Fourteenth Amendment Rights Under 42 U.S.C. § 1983 against Defendants Allan, Platt, Hodges, and Bommer (for this count, "Defendants")

159.    Doe realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

160.     While acting under color of state law, Defendants violated Doe's clearly settled Fourteenth Amendment right to due process by intentionally delaying in bringing charges against Doe until after November 29, 2019, when Doe turned 18 and could be charged as an adult.

161.     Allan, deputy prosecutor for the TCPA, directed the investigation and arrest of Doe in coordination with Platt, Hodges, and Bommer, deputy sheriffs at the TCSO.

162.     In Defendant Bommer's December 10, 2019 interview with IU, the day after Doe's arrest, Defendant Bommer admitted to IU that the pre-charging delay was an intentional maneuver to gain a tactical advantage over Doe. Indeed, Bommer specifically told IU that "[w]e [the TCPA and TCSO] did wait until [Doe] was over 18, so we could charge him [Doe] as an adult."

163.     The pre-charging delay caused Doe to suffer actual prejudice. Defendants intentional, tactical delay has caused Doe immense emotional distress and has forever impaired his future. Because of Defendants pre-charging delay, Doe was deprived of the protections afforded to juvenile criminal defendants under the Wyoming Juvenile Justice Act (WY Stat. §§ 14-6-201 et. seq.), including the right to confidentiality in Wyoming Statute § 14-6-203. As a result, Doe lost his right to confidentiality and had his reputation ruined with headlines touting his purported confession to rape. The disclosure of the accusations has cost Doe employment opportunities; it has affected his ability to apply to colleges and to obtain housing; and it has prevented him from developing meaningful relationships. As a direct cause and consequence of the Defendants' conduct, Doe has suffered damages and injuries. He is also entitled to punitive damages because the Defendants acted with callous and reckless disregard for his Fourteenth Amendment right.

164.     Defendants are jointly and severally liable because the Defendants concurrently caused Doe's damages and injuries.

## COUNT VII

### Violation of Plaintiff Doe's Fourteenth Amendment Rights Under 42 U.S.C. § 1983 against Defendant Hodges (for this count, "Defendant")

165.    Doe realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

166.    Defendant Hodges knowingly fabricated evidence in a probable cause affidavit and supplemental report.

167.    The fabricated evidence was used against Doe and deprived Doe of his liberty.

168.    The charges against Doe based on this fabricated evidence were ultimately dropped. The Defendant thus violated Doe's clearly settled Fourteenth Amendment rights. He is therefore liable for compensatory damages and punitive damages as well because he acted with callous and reckless disregard for Doe's Fourteenth Amendment rights.

## COUNT VIII

### Violation of Plaintiff Doe's Right to Equal Protection Under 42 U.S.C. § 1983 against Defendants Carr, Weisman, Hodges, Bommer, Platt, Allan, and ROES (for this count, "Defendants")

169.    Doe realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

170.    Doe was intentionally treated differently by Defendants from other similarly situated individuals when Defendants released Doe's name or identifying information in violation of Wyoming Statute § 6-2-319. Defendants had no rational basis for the difference in treatment, moreover, it was grounded in hostility.

171.    Doe was intentionally treated differently by Defendants from other similar situated individuals when Defendants arrested and charged Doe with first degree sexual assault without any investigation into the accusers' allegations. For example, Doe's defense team alerted

Defendants of a Jackson Hole High School student who had described being raped by a PE

teacher/coach at Jackson Hole High School. Yet Defendants failed to investigate, arrest, or charge

said individual.

172.    Doe was intentionally treated differently by Individual Defendants from other

similarly situated individuals when Defendants argued for excessive bail without adequate

investigation and in reliance false statements of fact.

173.    Defendants' conduct was irrational, wholly arbitrary, motivated by the Defendants

animosity towards Doe, and in violation of Doe's clearly settled Equal Protection rights.

174.    Further, as it relates to Defendants Allan and County Attorney Weisman, their

conduct in relation to this claim was not part of an advocative function and does not lie at the very

core of a prosecutor's role as an advocate. This claim is based on their investigatory work.

175.    Defendants' conduct caused Doe to suffer harm, including mental anguish,

reputational harm, pain and suffering, and other damages. He is also entitled to punitive damages

because the Defendants acted with callous and reckless disregard for his Equal Protection rights.

176.    Defendants are jointly and severally liable for these damages because the

Defendants concurrently caused Doe's damages and injuries.

### COUNT IX

**Violation of Plaintiff Crothers' Fourteenth Amendment Rights Under
42 U.S.C. § 1983 against Defendants Carr, Weisman, Hodges,
<u>Bommer, Platt, Allan, and ROES (for this count, "Defendants")</u>**

177.    Crothers realleges and incorporates by reference the allegations contained in the

preceding paragraphs of the Complaint as if fully set forth herein.

178.    Acting under color of law, Defendants made false and prejudicial statements about

Crothers and released prejudicial images of Crothers that were prominently displayed in the media.

These false statements and inflammatory images inflamed Teton County against him and deprived

him of his right to a fair trial in violation of his clearly settled Fourteenth Amendment rights.

179.   Further, as it relates to Defendants Allan and Weisman, their conduct in relation to this claim was not part of an advocative function and does not lie at the very core of a prosecutor's role as an advocate. Providing information to the press and speaking to the press is not a part of the prosecutor's job or role as an advocate.

180.   As a direct cause and consequence of the Defendants' conduct, Crothers has suffered damages and injuries. He is also entitled to punitive damages because the Defendants acted with callous and reckless disregard for his Fourteenth Amendment right.

181.   Defendants are jointly and severally liable for these damages because the Defendants concurrently caused Crothers's damages and injuries.

## COUNT X

### Violation of Plaintiff Crothers' Fourth Amendment Rights Under 42 U.S.C. § 1983 against Defendants Platt, Hodges, Weisman, and ROES (for this count, "Defendants")

182.   Crothers realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

183.   While acting under color of state law, Defendants violated Crothers' clearly settled Fourth Amendment rights by maliciously prosecuting Crothers for sexual battery.

184.   Defendants instituted and continued criminal judicial proceedings against Crothers that terminated in Crothers' favor.

185.   Defendants initiated the proceedings with malice against Crothers.

186.   Defendants instituted the proceedings with want of probable cause.

187.   As a direct cause and consequence of the abuses of process by Defendants, Crothers suffered damages and injuries. He is also entitled to punitive damages because the Defendants acted with callous and reckless disregard for his Fourth Amendment rights.

188.    Defendants are jointly and severally liable because the Defendants concurrently caused Crothers's damages and injuries.

### COUNT XI

**First Amendment Retaliation Under 42 U.S.C. § 1983 Filed by Plaintiff Muldoon against Defendants Platt, Carr and DOES (for this count, "Defendants")**

189.    Muldoon realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

190.    Muldoon was engaged in a constitutionally protected activity—speaking out about the conduct of law enforcement in Teton County.

191.    The release of information by Defendants in violation of Wyoming Statute § 6-2-319 caused Muldoon to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity.

192.    Defendants' actions were substantially motivated by Muldoon's constitutionally protected conduct and violated Muldoon's clearly settled First Amendment rights.

193.    Muldoon suffered damages and injuries as a direct cause and consequence of Defendants retaliation. He is also entitled to punitive damages because the Defendants acted with callous and reckless disregard for his Fourth Amendment rights.

194.    Defendants are jointly and severally liable because the Defendants concurrently caused Muldoon's damages and injuries.

### COUNT XII

**Negligence (Per Se) Filed by Plaintiffs against Certain Individual Defendants**

195.    Plaintiffs reallege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

196.    Plaintiff Doe's and Plaintiff Crothers' claims for negligence (per se) are against

Individual Defendants Carr, Weisman, Hodges, Bommer, Platt, and Allan. Plaintiff Muldoon's claim for negligence (per se) is against Individual Defendants Carr and Platt. Although the named defendants for Plaintiffs' claims vary, the allegations supporting the claims all concern the same illegal abuse of confidential information relating to the identity of alleged sexual assault perpetrators.

197.   Under Wyoming Statute § 6-2-319(a), "[p]rior to the filing of an information or indictment in district court charging a violation of an offense under this article, neither the names of the alleged actor or the victim of the charged offense nor any other information reasonably likely to disclose the identities of the parties shall be released or negligently allowed to be released to the public by any public employee except as authorized by the judge with jurisdiction over the criminal charges. The actor's name may be released to the public to aid or facilitate an arrest. This subsection shall not apply if release of the name or information is necessary to enforce an order for protection against the alleged actor."

198.   Defendants are public employees that violated Wyoming Statute § 6-2-319(a) by releasing or negligently allowing to be released the names or information reasonably likely to disclose the identifies of Plaintiffs, each alleged actors of an offense charged under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2, to the public prior to the filing of an information or indictment in district court charging a violation of an offense under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2.

199.   Defendants were not authorized by the judge with jurisdiction over the criminal charges to release or negligently allow to be released said information.

200.   Defendants did not release the actor's name to the public to aid or facilitate an arrest.

201.   Nor was the release of the Plaintiffs' names or information necessary to enforce an

order for protection against any of the Plaintiffs.

202.    In violating Wyoming Statute § 6-2-319(a), Defendants were not acting under color of law or within the scope of their duties. Rather, they were breaking the law and acting in dereliction of their duties. Plaintiffs assert this cause of action against Defendants as private citizens and not as public officials.

203.    Further, as it relates to Defendants Allan and Weisman, their conduct in relation to this claim was not part of an advocative function and does not lie at the very core of a prosecutor's role as an advocate. Providing information to the press and speaking to the press is not a part of the prosecutor's job or role as an advocate.

204.    Defendants' violation of Wyoming Statute § 6-2-319(a) caused Plaintiffs to suffer reputational harm, mental anguish, pain and suffering, loss of employment, among other damages.

## COUNT XIII

### Intentional Infliction of Emotional Distress Filed by Plaintiffs against Certain Individual Defendants

205.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

206.    Plaintiff Doe's and Plaintiff Crothers' claims for intentional infliction of emotional distress are against Individual Defendants Carr, Weisman, Hodges, Bommer, Platt, and Allan. Plaintiff Muldoon's claim for intentional infliction of emotional distress is against Individual Defendants Carr and Platt. Although the named defendants for Plaintiffs' claims vary, the allegations supporting the claims all concern the same illegal abuse of confidential information relating to the identity of alleged sexual assault perpetrators.

207.    Under Wyoming Statute § 6-2-319(a), "[p]rior to the filing of an information or indictment in district court charging a violation of an offense under this article, neither the names

of the alleged actor or the victim of the charged offense nor any other information reasonably likely to disclose the identities of the parties shall be released or negligently allowed to be released to the public by any public employee except as authorized by the judge with jurisdiction over the criminal charges.   The actor's name may be released to the public to aid or facilitate an arrest.   This subsection shall not apply if release of the name or information is necessary to enforce an order for protection against the alleged actor."

208.    Defendants are public employees that violated Wyoming Statute § 6-2-319(a) by releasing or recklessly allowing to be released the names or information reasonably likely to disclose the identifies of Plaintiffs, each alleged actors of an offense charged under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2, to the public prior to the filing of an information or indictment in district court charging a violation of an offense under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2.

209.    Defendants were not authorized by the judge with jurisdiction over the criminal charges to release or negligently allow to be released said information.

210.    Defendants did not release the actor's name to the public to aid or facilitate an arrest.

211.    Nor was the release of the Plaintiffs' names or information necessary to enforce an order for protection against any of the Plaintiffs.

212.    In violating Wyoming Statute § 6-2-319(a), Defendants were not acting under color of law or within the scope of their duties. Rather, they were breaking the law and acting in dereliction of their duties. Plaintiffs assert this cause of action against Defendants as private citizens and not as public officials.

213.    Further, as it relates to Defendants Allan and Weisman, their conduct in relation to this claim was not part of an advocative function and does not lie at the very core of a prosecutor's

role as an advocate.  Providing information to the press and speaking to the press is not a part of the prosecutor's job or role as an advocate.

214.     Defendants' violation of Wyoming Statute § 6-2-319(a) was extreme and outrageous, and intentionally or recklessly caused Plaintiffs to suffer severe emotion harm such as reputational harm, mental anguish, and pain and suffering.

## COUNT XIV

**Malicious Prosecution Filed by Plaintiff Doe against Defendants Carr, Hodges, Bommer, Platt and ROES Under Wyoming Statute § 1-39-112**

215.     Doe realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

216.     While acting within the scope of their duties, Defendants maliciously prosecuted Doe for first degree sexual assault.

217.     Defendants instituted and continued criminal judicial proceedings against Doe that terminated in favor of Doe.

218.     Defendants instituted the proceedings with malice against Doe.

219.     Defendants instituted the proceedings with want of probable cause.

220.     Doe has suffered damages and injuries as a direct cause and consequence of the abuses of process by Defendants.

## COUNT XV

**Negligence Filed by Plaintiffs against Certain Individual Defendants Under Wyoming Statute § 1-39-112**

221.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

222.     Plaintiff Doe's and Plaintiff Crothers' claims for negligence are against Individual Defendants Carr, Weisman, Hodges, Bommer, Platt, and Allan. Plaintiff Muldoon's claim for

negligence is against Individual Defendants Carr and Platt. Although the named defendants for Plaintiffs' claims vary, the allegations supporting the claims all concern the same illegal abuse of confidential information relating to the identity of alleged sexual assault perpetrators.

223.   This cause of action is brought in the alternative to Count XVI—Intentional Infliction of Emotional Distress.

224.   Under Wyoming Statute § 6-2-319(a), "[p]rior to the filing of an information or indictment in district court charging a violation of an offense under this article, neither the names of the alleged actor or the victim of the charged offense nor any other information reasonably likely to disclose the identities of the parties shall be released or negligently allowed to be released to the public by any public employee except as authorized by the judge with jurisdiction over the criminal charges.   The actor's name may be released to the public to aid or facilitate an arrest. This subsection shall not apply if release of the name or information is necessary to enforce an order for protection against the alleged actor."

225.   Defendants are public employees that violated Wyoming Statute § 6-2-319(a) by releasing or negligently allowing to be released the names or information reasonably likely to disclose the identifies of Plaintiffs, each alleged actors of an offense charged under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2, to the public prior to the filing of an information or indictment in district court charging a violation of an offense under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2.

226.   Defendants were not authorized by the judge with jurisdiction over the criminal charges to release or negligently allow to be released said information.

227.   Defendants did not release the actor's name to the public to aid or facilitate an arrest.

228.   Nor was the release of the Plaintiffs' names or information necessary to enforce an

order for protection against any of the Plaintiffs.

229.    In violating Wyoming Statute § 6-2-319(a), Defendants acted withing the scope of their duties.

230.    Defendants' violation of Wyoming Statute § 6-2-319(a) caused Plaintiffs to suffer reputational harm, mental anguish, pain and suffering, loss of employment, among other damages.

## COUNT XVI

### Intentional Infliction of Emotional Distress Filed by Plaintiffs against Certain Individual Defendants Under Wyoming Statute § 1-39-112

231.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of the Complaint as if fully set forth herein.

232.    This cause of action is brought in the alternative to Count XV—Negligence.

233.    Plaintiff Doe's and Plaintiff Crothers' claims for intentional infliction of emotional distress are against Individual Defendants Carr, Weisman, Hodges, Bommer, Platt, and Allan. Plaintiff Muldoon's claim for intentional infliction of emotional distress is against Individual Defendants Carr and Platt. Although the named defendants for Plaintiffs' claims vary, the allegations supporting the claims all concern the same illegal abuse of confidential information relating to the identity of alleged sexual assault perpetrators.

234.    Under Wyoming Statute § 6-2-319(a), "[p]rior to the filing of an information or indictment in district court charging a violation of an offense under this article, neither the names of the alleged actor or the victim of the charged offense nor any other information reasonably likely to disclose the identities of the parties shall be released or negligently allowed to be released to the public by any public employee except as authorized by the judge with jurisdiction over the criminal charges. The actor's name may be released to the public to aid or facilitate an arrest. This subsection shall not apply if release of the name or information is necessary to enforce an order

for protection against the alleged actor."

235.    Defendants are public employees that violated Wyoming Statute § 6-2-319(a) by releasing or recklessly allowing to be released the names or information reasonably likely to disclose the identifies of Plaintiffs, each alleged actors of an offense charged under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2, to the public prior to the filing of an information or indictment in district court charging a violation of an offense under Article 3 of Wyoming Statutes Annotated Title 6, Chapter 2.

236.    Defendants were not authorized by the judge with jurisdiction over the criminal charges to release or negligently allow to be released said information.

237.    Defendants did not release the actor's name to the public to aid or facilitate an arrest.

238.    Nor was the release of the Plaintiffs' names or information necessary to enforce an order for protection against any of the Plaintiffs.

239.    In violating Wyoming Statute § 6-2-319(a), Defendants were acting with the scope of their duties.

240.    Defendants' violation of Wyoming Statute § 6-2-319(a) was extreme and outrageous, and intentionally or recklessly caused Plaintiffs to suffer severe emotion harm such as reputational harm, mental anguish, and pain and suffering.

## VIII.   RELIEF REQUESTED AS TO ALL COUNTS

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Court enter judgment for Plaintiffs and against Defendants as follows:

a.    Awarding compensatory damages to Plaintiffs against all Defendants jointly and severally for lost wages, costs of seeking substitute employment, costs of relocating residences, emotional distress, harm to reputation, mental anguish, and pain and suffering, in the amount to be determined at trial;

b.      Awarding punitive damages to Plaintiffs against the Individual Defendants for their federal constitutional violations;

c.      Awarding punitive damages to Plaintiffs against the Individual Defendants for intentional infliction of emotional distress and other torts;

d.      Awarding pre- and post-judgment interest on any of the foregoing amounts;

e.      Awarding such other relief as the court deems just and proper under the circumstances; and

f.      Awarding costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

Dated: February 14, 2022                    Respectfully submitted,


By: *Tom Fleener*
_____

Thomas Fleener, Wyo. State Bar #6-3747
tom@fleenerlaw.com
FLEENER PETERSEN, LLC
506 S. 8th St.
Laramie, WY 82070
(307) 460-4333

Rex Mann (pro hac vice forthcoming)
Texas Bar No. 24075509
rmann@winston.com
Dylan French (pro hac vice forthcoming)
dfrench@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl St., Suite 900
Dallas, Texas 75201
Telephone:  214-453-6500
Telecopy:   214-453-6400

Of counsel: Professor Sheldon H. Nahmod
1301 N. Dearborn St. #1206
Chicago, Illinois 60610
Email: snahmod@kentlaw.edu
Phone (cell): 312-485-9599

*Counsel for Plaintiffs*