# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **JOHN DOE, WILLIAM MICHAEL** §<br>**"MIKE" CROTHERS, AND** §<br>**PETER "PETE" MULDOON** §<br> §<br>**Plaintiffs,** §<br> §<br>**v.** §<br> §<br>**TETON COUNTY BOARD OF COUNTY** §<br>**COMMISSIONERS, MATT CARR in his** §<br>**individual and official capacity as Teton** §<br>**County Sheriff, ERIN WEISMAN in her** §<br>**individual and official capacity as Teton** §<br>**County and Prosecuting Attorney, and** §<br>**BRETON BOMMER, DAVID HODGES,** §<br>**CLAYTON PLATT, ANDREW ROUNDY,** §<br>**CLARK ALLAN, AND RICHARD ROES,** §<br>**in their individual capacities,** §<br> §<br> §<br>**Defendants.** § | **CASE NO. 22-CV-28-NDF** |

**Expert Opinion Report: John G. Peters, Jr., CTC, CLS, Ph.D.**
209 South Stephanie Street ◆ Suite B249 ◆ Henderson, Nevada 89012
Telephone: 717.538.5940

    I, John G. Peters, Jr., Ph.D., hereby submit my report that contains a complete statement of opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the opinions; the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the study and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

John G. Peters, Jr., Ph.D.
October 28, 2022

**EXHIBIT A**

2

I.      **CASE SPECIFIC DOCUMENTS REVIEWED/CONSIDERED**: See APPENDIX A.

II.     **FOCUS OF ANALYSIS**

Through counsel for Defendants, Sheriff Matt Carr, Breton Bommer, David Hodges, Clayton Platt, and Andrew Roundy  I am retained to provide expert opinions in the areas of law enforcement practices, policies and procedures, training, supervision, arrest techniques, and criminal investigations. I am not a party to this litigation, and I am over the age of twenty-one. A copy of my *Curriculum Vitae* is provided as an exhibit to Defendants' designation. My *Curriculum Vitae* identifies my education, professional experience, over 280 publications, and other training and experience. There are areas of my education, training, and experience that are truly relevant to issues identified and opinions developed in this matter.

My education includes being a *Certified Litigation Specialist®: Police* and *Corrections* by the Americans for Effective Law Enforcement (AELE), in addition to related certifications in corrections and campus law enforcement. I am also an experienced instructional designer and have developed and taught law enforcement programs across the United States. In addition to my extensive experience as an instructional designer and trainer, I also hold a CLEAR California Teaching Credential (Public Safety), and a *post-doctoral* Master of Arts degree in Education (Career and Technical). I have also earned the designation of *Public Safety Disability Specialist*, in addition to teaching and writing about human disabilities and the Americans with Disabilities Act.

Vocationally, I serve as president of the Henderson, Nevada-based Institute for the Prevention of In-custody Deaths, Inc., (IPICD), and its senior instructional designer. The IPICD provides a variety of Train-the-Trainer programs to law enforcement agencies across the globe. These training programs include but are not limited to: "Prevention and Management of Suicide," "Excited Delirium and Agitated Chaotic Events™ Instructor: Recognizing, Responding, Preventing, and Investigating Arrest-Related and Sudden, In-Custody Deaths Version 6.0;" "Use-of-Force Train-the-Trainer;" and "Arrest-Related and In-Custody Death Investigative Specialist™." Agitated Chaotic Events is a term developed by the IPICD to encompass a constellation of delirium-like, agitated behaviors where the underlying cause is unknown to first responders. The topics include, but are not limited to epilepsy, Hyponatremia, alcohol withdrawal, synthetic drugs, energy drinks, diabetes, autism, and others.

Annually, the IPICD hosts an international conference (2021 was the 16th one) that presents the latest scientific, legal, medical, and psychological research, in addition to street-proven tactics and programs used by law enforcement agencies to identify, prevent, and/or manage sudden in-custody and/or arrest-related deaths. In 2016, presentations included the latest information about Fentanyl and other widely used drugs and how fast they are spreading and killing individuals. The IPICD has also awarded unrestricted grants for the funding of scientific research (e.g., UCSD School of Medicine; University of Miami, Miller School of Medicine), including the conducting of in-house primary research on in-custody and arrest-related deaths topics. The IPICD has also awarded unrestricted grants to the University of California, San Diego, School of Medicine to conduct research that included the first scientific study on the safety of restraint chairs.

In 2014, the Singapore Prison Service had engaged my services to conduct training in Singapore and to evaluate several of its training programs. I also teach in the "Jail: Legal Issues" programs held in Las Vegas, Nevada, which are hosted by the AELE. Several correctional facilities have engaged me to review policies, procedures, and training, including, but not limited to jails in Texas, New Mexico, Idaho, Massachusetts, Pennsylvania, and California.

For more than 30 years I have taught crowd control, defensive tactics, tactical handcuffing, restraint techniques, including the use of a restraint chair and "The WRAP," impact tools (e.g., batons), and arrest techniques instructor- and user-level programs to thousands of law enforcement officers across the globe. I have authored more than 280 publications, including texts on defensive tactics and on tactical handcuffing: *Realistic Defensive Tactics* and *Tactical Handcuffing for Chain- and Hinged-Style Handcuffs*. I have presented law enforcement instructor programs (e.g., defensive tactics, handcuffing, baton, etc.) across the State of Wyoming for the past 30 years, including at the academy in Douglas and at the Wyoming Administrator Conference. I have co-taught investigative programs in Casper and Cheyenne for the Wyoming Division of Criminal Investigation.

I am also a graduate of the TASER M26$^{TM}$ and X26$^{TM}$ ECD Instructor programs who has taken a five-second TASER ECD exposure, the TASER Armorer program, the TASER Evidence Collection and Analysis Training program, the TASER X3$^{TM}$ ECD instructor program, the TASER XREP$^{TM}$ instructor program, the TASER X2$^{TM}$ instructor program, the TASER AXON$^{TM}$ instructor program, the TASER Evidence.com program, and have authored several articles about TASER ECD and related devices.

On February 1, 2020, the Americans for Effective Law Enforcement (AELE) Board of Directors appointed me Executive Director of AELE. In addition to my supervision of a part-time staff of three people, I manage the scheduling and presenters of AELE seminars. I also serve as instructional designer of AELE seminars, webinars, and online programs. These seminars have been approved in many states as certified training for police and other law enforcement personnel, as well as qualifying as Continued Legal Education credits for licensed attorneys.

Since 1982, I have been providing consulting and expert witness services to municipalities, attorneys, and others throughout the United States and Hong Kong. These services have included but are not limited to the review of municipal and/or law enforcement policies, procedures, rules, training, competency-based testing, supervision, internal investigations, and conducting of primary research on sexual harassment and sexual assault.

In addition to writing about and lecturing on law enforcement policy and procedures, use-of-force, force options, force training, force policies, force warnings, excited delirium, sudden in-custody death, investigations, and related topics, I am an AELE Certified Litigation Specialist in Police liability, and a faculty member teaching in its "Discipline and Internal Investigations for Law Enforcement, Public Safety and Corrections" and "Biometric, Psychological and Legal Aspects of Lethal and Less Lethal Force and the Management, Oversight, Monitoring, Investigation and Adjudication of the Use of Force" programs.

I have been a consultant to many correctional facilities, including, but not limited to the Harris County Jail, Houston, Texas (3rd largest jail in the United States). Additionally, I am an AELE Certified Litigation Specialist in Corrections Liability, and a faculty member who teaches in its "Jail Legal Issues," "Internal Affairs," and "Managing Force" seminars. I have also been an invited speaker, on two occasions, at the American Jail Association International Training Conferences, and have been a contracted trainer for the American Jail Association. I have also consulted with the American Correctional Association. I have also conducted training for the California Sheriff's Association throughout California on several occasions and the Los Angeles County Sheriff's Department.

As a former law enforcement administrator, patrol officer, and deputy sheriff, I am familiar with the need for written policy, rules, and procedures, and the need to train officers about them. I was also President of a municipal Civil Service Commission, where I oversaw testing requirements for law enforcement officers and was involved with disciplinary actions involving law enforcement officers. Supervisory training is also a key ingredient to organizational effectiveness, as is having contemporary policies and procedures. I have written about these issues, conducted organizational diagnoses about management, training, policies and procedures, etc. in law enforcement and correctional organizations, and hold graduate degrees (Ph.D. and M.B.A.) in management. I have also served on a Fugitive Squad, working in plain clothes to capture both in-state and out-of-state fugitives.

I have conducted primary research on the efficacy and liquid impedance of Spit Restraint Devices, The WRAP Restraint System, the management of criminal investigations, and teach how to conduct criminal and internal investigations. I am a former criminal and internal investigator.

As a certified *Public Safety Disability Specialist,* I have instructed on various disability issues (e.g., Americans with Disabilities Act, wheelchairs, service animals, identifying and managing disabled individuals, etc.), and co-developed a seminar Wheelchair Instructor program and am co-author of the text *Wheelchair Officers' Field Guide*. I also instruct law enforcement officers about excited delirium, agitated chaotic events, mental illness, and de-escalation interventions across the United States. Since 2006, my training firm, Institute for the Prevention of In-custody Deaths, Inc., has held international conferences on disability, mental health, excited delirium, and arrest-related deaths issues and how to conduct investigations into arrest-related deaths.

## III.   RIGHT TO AMEND

I reserve the right to amend and/or supplement these preliminary opinions when additional information becomes available including but not limited to the deposition testimony of Defendants, Plaintiff, and/or witnesses who were at the scene. It is also my understanding discovery is ongoing and other witness testimony will be taken and deposition transcripts will be issued. Further, I also reserve the right to amend in response to expert disclosures of other parties, or if questions are asked of me that do not relate to information contained in this disclosure.

## IV.     OPINION STANDARDS

Expressed opinions are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## V.     OPINION METHODOLOGY

The following opinions were developed using one or more qualitative and quantitative research methodologies, in addition to my education, training, experience, and literature review. These research methodologies may have included Historiography, Content Analysis, Phenomenology, Ethnography, Discourse Analysis, and Case Study. My methodology included comparing the actions of the Law Enforcement Officers (LEO) involved in this incident, against state and relevant training and operational practices and procedures in the law enforcement profession.

The documents reviewed are classified in the social sciences as *archival records*. Graziano and Raulin (1997) define archival records as "records that already exist" (p. 135). Archival records are one type of unobtrusive measure available to researchers and/or experts. The review and analysis of archival records is an accepted research methodology in the social sciences and applies to law enforcement research. While not as exacting as *experimental research* where there are control and experimental groups, conducting interviews and examining archival records, plus conducting observations are methodologies that are used in the social sciences.

## VI.     EXECUTIVE SUMMARY OF OPINIONS

1.     **Teton County trained its peace officers according to State of Wyoming law enforcement training standards, and other career and technical education and in-service and specialized training standards, guidelines, and recommendations.**

2.     **Sheriff Carr had policies and procedures in place that limited peace officer discretion and provided guidance to both officers and supervisors.**

3.     **Deputy Roundy had conducted a sufficient and an appropriate investigation into the Crothers matter before issuing three citations to Mr. Crothers.**

4.     **The Teton County Prosecuting Attorney's Office (TCPA) properly filed a criminal charge of sexual battery against Mr. Crothers without the involvement of any Teton County Sheriff's Deputies.**

5.     **Deputies Hodges, Bommer, and Platt had conducted a sufficient and an appropriate investigation into the Rosen matter before he was charged with first degree sexual assault.**

6.     Neither Sergeant Platt, Detective Hodges, nor Detective Bommer had the
       authority to determine Probable Cause and/or to prosecute Mr. Rosen
       because these decisions are up to the Teton County Prosecuting
       Attorney's Office (TCPA) and by the judicial officer issuing the arrest warrants.

7.     Sergeant Platt, Detective Hodges, Detective Bommer, and Deputy Roundy
       conducted sufficient and appropriate criminal investigations into both the
       Rosen and the Crothers matters per Teton County Sheriff's Office policies
       and procedures and sexual assault investigative protocols.

8.     Mr. Hummel failed to identify a reliable and valid methodology for
       developing his opinions in this matter as required under Federal Rule 702.

9.     Mr. Hummel made credibility determinations and other inappropriate
       conclusions about witnesses, investigators, including legal opinions.

10.    Sergeant Platt followed the custom and practice of the Teton County
       Sheriff's Office prior to releasing information to the media about former
       Jackson Hole Mayor Pete Muldoon.

## VII.   DISCUSSION OF OPINIONS

1.     Teton County trained its peace officers according to State of Wyoming
       law enforcement training standards, and other career and technical
       education and in-service and specialized training standards, guidelines, and
       recommendations.

I have been teaching in the State of Wyoming since the 1980s and am familiar with the requirements to become a peace officer. The Teton County Sheriff's Office and/or Sheriff Carr has and/or have trained its/their peace officers per the State of Wyoming minimum requirements in addition to providing departmental and State-required in-service training. In-service training is that training an officer received after graduation from a police academy.

My content analysis[1] of the Wyoming Peace Officer Standards and Training (P.O.S.T.) training records of David A. Hodges (Investigator Hodges), Clayton L. Platt (Sergeant Platt), Andrew Roundy (School Resource Officer Roundy), and Breton Bommer (Investigator Bommer) showed they met the requirements to become a Wyoming peace officer, and also had completed additional training that was P.O.S.T. certified, and/or had completed in-service training offered by Teton County. Per Sheriff Carr's testimony, he has four detective positions that are currently filled by "Sergeant Clay Platt . . . Deputy Dave Hodges, Deputy Bret Bommer, and Deputy Chad Sachse" (Carr deposition, 24:22-24). In addition to these four investigators, Sheriff Carr has "20 patrol positions that are sworn . . . 17 detention officers . . . four court security officers . . ." that are sworn positions, and a total of "75 people" when unsworn positions are included (23:15-20).

---

[1] Detailed and systematic examination of the contents of a particular body of material . . . for the purpose of identifying patterns, themes, or biases within the material" (Leedy and Ormond, 2001, p. 114).

Dr. Peters Opinion Report: Crothers, et al. v. Teton County Board of County Commissioners, et al.
©2022. A. R. R.

The Wyoming Law Enforcement Academy (WLEA) taught investigative procedures to those attending the Wyoming Peace Officer Basic Course training and certification program. The investigative skills within the course competencies included "14 topics or Evolutions" totally 85.5 hours (Wyoming Peace Officer Basic Course, 2021, p. 1). The following investigative topics are taught at the WLEA:

| Code | Topic | | |
|---|---|---|---|
| IS1000 | LEARNING | | 43.5 |
| IS1001.1 | Criminal Investigations On-Line Learning | | 2 |
| IS1010.1 | Crime Scene Management Lecture | | 4 |
| IS1020.1 | Search Warrant Concepts On-Line Learning | | 2 |
| IS1030.1 | Auto Theft On-Line Learning | | 2 |
| IS1031.1 | Child Abuse and Neglect On-Line Learning | | 2.5 |
| IS1032.1 | Sexual Assault Investigations On-Line Learning | | 2 |
| IS1033.1 | Gang Awareness On-Line Learning | | 4 |
| IS1034.1 | Wyoming Game & Fish On-Line Learning | 2 | |
| IS1035.1 | Immigration Custom Enforcement (ICE) On-Line Learning | | 2 |
| IS1040.1 | Traffic Collision Investigation I Lecture | | 4 |
| IS1050.1 | Controlled Substances Lecture | | 4 |
| IS1051.1 | Clandestine Laboratories Lecture | | 8 |
| IS1060.1 | Domestic Violence Investigations Lecture | | 4 |
| IS1070.1 | Cooperative Federal Agencies On-Line Learning | | 1 |
| | | | |
| IS1200 | PRACTICAL APPLICATION | | 22 |
| IS1201.1 | Criminal Investigations On-Line Team Practical Activity | | 2 |
| IS1210.1 | Crime Scene Management Practical Activity | | 9 |
| IS1220.1 | Search Warrants Practical Activity I & II | | 3 |
| IS1240.1 | Traffic Collision Investigation I On-Line Practical Activity | | 1 |
| IS1241.1 | Traffic Collision Investigation II Practical Activity | | 7 |
| | | | |
| IS1400 | PRACTICAL INTEGRATION | | 20 |
| IS1401.1 | Investigations Activity #1 | | 4 |
| IS1402.1 | Investigations Activity #2 | | 4 |
| IS1403.1 | Investigations Activity #3 | | 4 |
| IS1404.1 | Investigations Activity #4 | | 4 |
| IS1405.1 | Integrated Practical Evaluation II | 4 | |

(p. 4).

Per the "Training History Reports, State of Wyoming Peace Officer Standards and Training" for Investigator Hodges, Sergeant Platt, School Resource Officer Roundy, and Investigator Bommer, Table 1 shows selected training they had completed.

Table 1  Select Training Completed by Hodges, Platt, Roundy, and Bommer

| NAME | Select Training Completed |
|---|---|
| Hodges | Total hours of training: 3412[2] |
| | Autopsy & Pathology Training: 10 hours |
| | Investigative Interviewing: 40 hours |
| | Cognitive Interviewing: 24 hours |
| | Human Trafficking: Basic Investigative Techniques: 20 hours |
| | Background Investigations: 12 hours |
| | Crime Scene Investigations: 4 hours |
| | Affidavit Writing: 4 hours |
| | Reid Interview Technique: 24 hours |

[2] Training History Report, State of Wyoming P.O.S.T.: David A. Hodges, p. 60.
Dr. Peters Opinion Report: Crothers, et al. v. Teton County Board of County Commissioners, et al.
©2022. A. R. R.

|  | Basic Peace Officer Certification: 1/1/1997 |
|---|---|
| Platt | Advanced Sexual Offender Specialist Interview: 24 hours |
|  | Cognitive Interview: 24 hours |
|  | Crimes Against Children Conference: 20 hours |
|  | First Line Supervision: 40 hours |
|  | Preparing for Leadership: 40 hours |
|  | DCI Basic Drug Investigation School: 45 hours |
|  | Rocky Mountain Command College: 40 hours |
| Roundy | Cognitive Interview: 20 hours |
|  | Digital Evidence: 6 hours |
|  | Investigative Interviewing: 40 hours |
|  | Crimes Against Children: 26 hours |
|  | Preparation for Leadership: 33 hours |
|  | Basic School Resource Officer Course: 6 hours |
|  | Total Training Hours: 2497[3] |
|  | Advanced School Resource Officer Training: 5 hours |
| Bommer | Investigative Interviews: 8 hours |
|  | Cognitive Interviewing: 24 hours |
|  | Keys to Childhood Sex Abuse Investigations: 15 hours |
|  | Induction Interview Systems: 40 hours |
|  | Leadership: 8 hours |
| Bommer cont'd. | Investigations: 8 hours |
|  | Sex Crimes Advanced Investigation Techniques: 32 hours |
|  | Police Investigation of Rape: 6 hours |
|  | Total Training Hours: 3505[4] |

Per the *Standards for Law Enforcement Agencies* (November 2001), training is noted as one of the most important responsibilities and duties of a law enforcement agency. According to the Commission on Accreditation for Law Enforcement Agencies (CALEA), "well trained officers are generally better prepared to act decisively and correctly in a broad spectrum of situations" (p. 33-1).

Teton County Sheriff's Office peace officers have also received on-the-job training. "Shadowing" and/or "hands-on" training are recognized and accepted career and technical education apprentice-type training. Gordon (2008) wrote, "Apprenticeship in America today is a government credentialing system for developing and recognizing specific skills, competencies, and accomplishments. Credentialing is handled in a manner similar to that of schools or colleges" (p. 7). Sheriff Carr testified that Sergeant Lewis conducted some informal training with deputies. "There's everything from tactical training to interview training to physical fitness training, quite a bit of stuff" (Carr deposition, 22:16-18). Deputy Roundy testified, "There are on-the-job trainings, for instance, more experienced deputies giving recommendation, counsel, or

---

[3] Training History Report, State of Wyoming P.O.S.T.: Andrew Roundy, p. 10.
[4] Training History Report, State of Wyoming P.O.S.T.: Brenton Bommer, p. 10.
Dr. Peters Opinion Report: Crothers, et al. v. Teton County Board of County Commissioners, et al.
©2022. A. R. R.

advice during different processes . . ." (Roundy deposition, 23: 5-8). Sheriff Carr testified his deputies go through field training, too (Carr deposition, 39:2).

Gray and Herr (1998) noted, "Although apprenticeships are not school-based school-to-work transition models, they are certainly a major form of work-based learning" (p. 209). Per the authors, "Workforce education must also serve to integrate academic and vocational skills, particularly as these are integrated in work-based learning of different forms" (pp. 213-214). A content analysis of the provided training files and testimony showed that Teton County Board of Commissioners and Sheriff Carr educated their workforce via traditional and apprenticeship-style learning paradigms, which is relevant, acceptable, and consistent with jail and other law enforcement training. A primary advantage of in-service training that uses a hybrid of formal and hands-on training is that narcotics training can be customized to match the needs of the Teton County Sheriff's Office.

Based upon my education (M.A. in Education [Career and Technical]), training, and experience as an instructional designer of law enforcement programs, evidence-based documents (training records) showed Sergeant Platt, Detective Hodges, Detective Bommer, and School Resource Officer Rounds had received classroom and on-the-job-related training in their *core tasks*, which parallels national and State of Wyoming career and technical education and training standards.

In opposition to Plaintiffs' criminal investigations expert, John Hummel (Mr. Hummel) who appeared to have no law enforcement training experience but opined that "the actions of law enforcement demonstrated insufficient training and supervision . . ." Sheriff Carr did not fail to train Sheriff's Deputies in accordance with State of Wyoming law enforcement standards, and further provided specialized and in-service training to its deputies. Mr. Hummel appeared to overlook the criminal investigation training provided to Teton County Sheriff's Office investigators as identified in Table 1 and failed to identify with supporting citations what training the investigators failed to have that would support his *ipsi dixit* and net opinion[5]. My content analysis of the documents found no evidence to show or to support inadequate supervision or training at the Teton County Sheriff's Office.

2.      **Sheriff Carr had policies and procedures in place that limited peace officer discretion and provided guidance to both officers and supervisors.**

A foundational requirement of any county, like Teton County and any law enforcement agency, like the Teton County Sheriff's Office, is to have in place a set of clearly written rules, regulations, and procedures that guide employees in the lawful performance of their specific duties – especially in those areas in which it is foreseeable that they will likely be called upon to properly balance the Constitutional rights of citizens whom they encounter, with their proper performance of assigned duties. It is equally important that these rules, regulations, and procedures prescribe a process for handling issues which arise when confronting certain situations. It is also of equal importance that these rules, regulations and procedures set forth in

---

[5] "A net opinion summarizes an expert's opinions and conclusions without explaining the facts or reasoning the expert used to reach those ends" (Ryskamp, 20201, p. 1).

stark terms the discipline which will be promptly imposed for infractions of the same – including progressively more severe discipline if there is an effort to conceal rather than to disclose such violations.

Contemporary and knowledgeable governmental entity and agency administrators should know and understand the need for written policy and procedures, for officers interacting with the public, suspects, and/or  arrestees. The Commission on Accreditation for Law Enforcement Agencies (CALEA) stated that a law enforcement agency (including correctional facilities) "should establish a formal written directive system to provide employees with a clear understanding of the constraints and expectations relating to the performance of their duties" (CALEA, January 1999, p. 12-2). CALEA Standard 12.2, "Written Directives" lists, at a minimum, what a written directive system must include.

Similarly, the International Association of Chiefs of Police (IACP) *A Police Chief's Desk Reference* (2004), Chief W. Dwayne Orrick noted that policy and procedure manuals and directives "provides staff with the guidance necessary to perform department operations" (p. 139).

Plitt (2006) defined a policy as "a general statement of philosophy, principles and objectives in a given area. Policies tell what the department wants to accomplish and why. Policy provides the framework within more specific guidance can be provided in the form of procedures and rules" (Plitt, p. 42-3).

 "Rules are much more specific. They leave less room for the exercise of discretion and decision-making by the rank-and-file officer. Rules spell out what must be done or not done in specific situations. Rules are intended to mandate specific behaviors. Rules help to make the department's response as uniform as possible to specific situations" (Plitt, 2006, p. 42-3).

I performed a content analysis on the following Teton County Sheriff's Office policies and procedures manual:

TABLE OF CONTENTS

Statement by the Sheriff
How to Find a Policy and Procedure
Statement of Receipt

**CHAPTER HEADINGS /POLICIES**

Chapter 1  ·  **P & P ORGANIZATION**
            1-22-1   Organization of Manual

Chapter 2  ·  **EMPLOYEE RIGHTS AND RESPONSIBILITIES**
            2-22-1   Department Rules of Conduct
            2-22-2   Disciplinary Procedures
            2-22-3   Career Development
            2-22-4   Clothing Attire for Court
            2-22-5   Off-Duty Employment
            2-22-6   FMLA
            2-22-7   Cobra Payments For Lateral Transfers

Chapter 3  ·  **PATROL PROCEDURES**
            3-22-1   Patrol Function
            3-22-2   Sheriff Response to Incidents
            3-22-3   Alternative Patrol Tactics
            3-22-4   Field Supervision Notification
            3-22-5   Diplomatic Immunity
            3-22-6   Alarm Responses
            3-22-7   Use of Force / Blood Samples
            3-22-8   Bomb Threats and Explosives
            3-22-9   Clandestine Drug Labs
            3-22-10  Domestic Violence (Reporting)
            3-22-11  Alternatives to Arrest and Incarceration
            3-22-12  Crime Scene Control and Investigation
            3-22-13  Hazardous Highway Conditions
            3-22-14  Missing Persons Reports
            3-22-15  Mental Holds

            3-22-17  Arrestee Transportation
            3-22-18  Vehicle Operation
            3-22-19  Vehicle Pursuits
            3-22-20  Use of In-Car Camera/Recording Equipment

Chapter 4  ·  **INVESTIGATIONS / RECORDS**
            4-22-1   Criminal Investigations
            4-22-2   Criminal Investigation Process-Preliminary & Follow-up
            4-22-3   Complaints Refused by County Attorney
            4-22-4   Property and Evidence Management
            4-22-5   Release of Criminal Offender Information
            4-22-6   Polygraph Examinations
            4-22-7   Investigator Call-out Procedures
            4-22-8   Case Disposition Procedures
            4-22-9   Temp Assignment of Patrol to Investigations
            4-22-10  Electronic Recordings of Custodial Interviews

Chapter 5  ·  **EQUIPMENT**
            5-22-1   Authorized Firearms
            5-22-2   Uniforms and Equipment
            5-22-3   Car Each Plan
            5-22-4   Patrol Vehicles / Emergency Equipment
            5-22-5   Computer Network
            5-22-6   Internet and Email
            5-22-7   Mobile Data Computer Use
            5-22-8   Care of Department Equipment & Professional Appearance
            5-22-9   Body-Worn Cameras

Chapter 6  ·  **USE OF FORCE**
    6-22-1   Use of Physical Force
    6-22-2   Use of Firearms—Deadly Force
    6-22-3   Discharge of Firearm
    6-22-4   Electronic Control Device Technology

Chapter 7  ·  **MISCELLANEOUS PROCEDURES**
    7-22-1   Barricaded Suspect and Hostage Negotiations
    7-22-2   Traffic Accidents Involving County Vehicles
    7-22-3   Criminal Process
    7-22-4   Communications Administration
    7-22-5   Confidential Reports
    7-22-6   Criminal Subpoenas
    7-22-7   Mutual Aid
    7-22-8   Ride-Along Program
    7-22-9   Sub Gun/Shotgun/Patrol Rifle
    7-22-10 Use of Speed Measuring Devices
    7-22-11 Tactical Response Team
    7-22-12 Tow Truck Use

    7-22-13 Juvenile Custody and Detention
    7-22-14 School Resource Officer
    7-22-15 K-9 Program
    7-22-16 Motor Vehicle Inventory
    7-22-17 Employee Recognition
    7-22-18 Wyoming CJIS Security Policy

(Bates Stamp, Carr00971-Carr00973)

As an experienced policy writer and policy reviewer, my specific content analysis of the Teton County Sheriff's Office "Criminal Investigation, Number: 4-22-1, July1, 2000," and "Criminal Investigation Process-Preliminary and Follow-Up, Number: 4-22-2, July 1, 2000 policies and procedures (Bates Stamp, CARR01023-01024; 01025-01028) identified categories of investigations and procedures, which are consistent with national, local, and investigative categories and definitions, particularly within the State of Wyoming.

Based upon my education, training, and experience, my content analysis of the Teton County Sheriff's Office policies and procedures that were in place in May through September 2019, showed they were consistent with recognized national policy standards and recommended guidelines as previously discussed. Sheriff Carr had written policies, procedures, and rules in place to help manage and supervise peace officers. These policies, procedures, and rules also assisted supervisors in their evaluation of employees and can serve as a foundation for discipline. Sheriff Carr neither failed to issue policies, procedures, and rules, nor failed to supervise the Sheriff's Deputies. My content analysis of the documents found no evidence to show or to support inadequate supervision or training at the Teton County Sheriff's Office.

    **3.**    **Deputy Roundy had conducted a sufficient and an appropriate investigation into the Crothers matter before issuing three citations to Mr. Crothers.**

In opposition to Mr. Hummel's net and *ipsi dixit* opinion that "It is axiomatic that investigators should chase down **all leads**, interview **all witnesses**, and gather **all evidence** before assessing the incident in question and making conclusions about guilt," [emphasis added] (Hummel, Opinion Report, p. 5), investigators often do not chase down every lead, or interview all witnesses, or gather all evidence before concluding the elements of a crime have been

established. Many times, potential evidence is unknown to investigators until after the person has been arrested, later interrogated, or someone brings forth evidence that was unknown. Further, Mr. Hummel failed to offer one iota of support for his net opinion, and I know of no such investigative standard in the investigative literature that required chasing down all leads, interviewing all witnesses, and gathering all evidence, even when the potential evidence may not be known or available.

Based upon my education, training, and experience, Deputy Roundy had conducted a sufficient and an appropriate investigation into the reported offenses committed by Mr. Crothers. Deputy Roundy had issued three citations to Mr. Crothers: Breach of Peace, Permit House Party Minors Present, and Unlawful contact—Rude, Angry, Insolent (Bates Stamp, Weisman-allan002206). Deputy Roundy testified that he had interviewed Katie Haldeman (victim) and a number of other students related to the party in the Crothers' residence (Roundy deposition, 80: 10, 14; Bates Stamp, weisman-allan002221). Some party attendees reported not seeing Mr. Crothers touch Ms. Haldeman, but they had heard about it, or were not in a position to see the touching.

Deputy Roundy also interviewed Mr. Crothers who said that he did not remember kissing any underage girls. Lyla Kirkpatrick (Ms. Kirkpatrick) told Deputy Roundy that Mr. Crothers had tried to kiss her, but that she had turned her head (Bates Stamp, weisman-allan002222). She also said that Mr. Crothers "was calling his wife a 'cunt,' a 'bitch,' and 'evil,' and said he 'needed pussy' (weisman-allan002222). Mr. Crothers told Deputy Roundy that "he did not remember" saying that he "needed pussy" (weisman-allan00222). Based upon the several interviews of people who were at the party, Deputy Roundy concluded that he had the elements of the three offenses and issued citations to Mr. Crothers.

Deputy Roundy had conducted a sufficient and appropriate investigation into the allegations that Mr. Crothers had inappropriately touched Ms. Haldeman, had committed a breach of peace, and permitted a house party with minors present. Investigators determine when they have enough evidence to issue citations, and do not need to interview every witness, identify all evidence, and run down every lead. The numerous interviews conducted by Deputy Roundy was more than sufficient to establish the elements of the offenses. My content analysis of the investigative file found no omissions by Deputy Roundy prior to issuance of the three citations to Mr. Crothers. The sexual battery charge filed on Mr. Crothers was not filed by Deputy Roundy or other Teton County Sheriff's Deputies.

4.      **The Teton County Prosecuting Attorney's Office (TCPA) properly filed a criminal charge of sexual battery against Mr. Crothers without the involvement of any Teton County Sheriff's Deputies.**

Clark Collin Allan (Mr. Allan) was a prosecutor employed by the TCPA in 2019 (Allan deposition, 10:1; 14:25; 35:14). During his twenty-two-year career, he went from deputy prosecutor to chief deputy (15:20-21). Mr. Allan left the TCPA and is not a circuit court judge in Douglas (19:2-3).

Mr. Allan testified that when he was a prosecutor, if a case came in "by citation" (Allan deposition, 17:15), he would ". . . review the affidavit and decide what the charges should be,

and draft an information and file it, and then you prosecute the case" (17:20-24). Although Wyoming has a system where a grand jury can be convened to get an indictment, "it's rarely used in Wyoming" (21:8) because "most prosecutors use the circuit court and the preliminary hearing system" (21:10-11).

Mr. Allan testified that he concluded Mr. Crothers committed a sexual battery on K.H. when "Mr. Crothers had grabbed her by the back side. And the statute requires that if a defendant or a suspect, whatever, of the subject, touches the clothing covering the intimate parts of a victim, then that's a sexual battery" (Allan deposition, 168: 1-5). Continuing his testimony, Mr. Allan further concluded, "And her pants covered her anus, which is a sexual part. And by her statement, his hand covered the clothing that was covering the immediate—immediate area of her anus. That's what he [Mr. Crothers] touched. He touched the clothing covering the immediate area of her anus" (168: 6-12).

The statement given to law enforcement was that Mr. Crothers "grabbed her ass, not that he grabbed her knee. She said he grabbed her ass. And, you know, it also has to be done with the purpose of sexual arousal, which there was a lot of evidence o that, a ton of evidence that he was not doing it for the purpose of sexual arousal" (Allan deposition, 169: 4-10). Per Mr. Allan, Mr. Crothers "made a ton of statements that made it clear that this was all a sexual issue" (169:18-20).

Based upon my education, training, and experience, the decision to criminally charge Mr. Crothers with sexual battery was solely made by the TCPA, not by any Teton County Sheriff's Office investigator. Prosecutor Allan testified that while Officer Roundy had written the original complaint, he had not cited Mr. Crothers for sexual battery (Allan deposition, 179: 11). Mr. Allan testified, "I certainly believe there was probable cause for that offense" (Allan deposition, 180: 17-18). Mr. Allan's testimony eviscerates Plaintiffs' criminal investigations expert, Mr. Hummel, who opined "In Crothers' case, they [apparently meaning the Teton County Sheriff's Officer investigators] filed sexual battery charge without probable cause to do so" (Hummel, Opinion Report, p. 55). Mr. Hummel's opinion is in error.

 "I woke her up . . ." and further he agreed that he probably did not have consent because "she didn't say yes" (123:5512-5525).

**5.      Deputies Hodges, Bommer, and Platt had conducted a sufficient and an appropriate investigation into the Rosen matter before he was charged with first degree sexual assault.**

As previously discussed, there is no support for Mr. Hummel's net and *ipsi dixit* opinion that "It is axiomatic that investigators should chase down **all leads**, interview **all witnesses**, and gather **all evidence** before assessing the incident in question and making conclusions about guilt," [emphasis added] (Hummel, Opinion Report, p. 5). Investigators often do not chase down every lead, or interview all witnesses, or gather all evidence before concluding the elements of a crime have been established. Further, Mr. Hummel failed to offer one iota of support for his net opinion, and I know of no such investigative standard in the investigative literature that required chasing down all leads, interviewing all witnesses, and gathering all evidence.

Based upon my education, training, and experience, Teton County Sheriff's Office investigators had conducted a sufficient and an appropriate investigation into the rape allegation that focused on Mr. Rosen. Although Mr. Hummel has criticized the depth of the investigation into the Rosen allegations, neither he nor investigators identified anyone inside the bedroom who had witnessed the alleged rape. The only two individuals reportedly inside the bedroom were Mr. Rosen and his alleged victim. As Mr. Hummel wrote in his opinion report, ". . . the main challenge of sexual assault prosecutions is that there are usually no witnesses to the alleged crime—it comes down to a he said/she said scenario" (Hummel, Opinion Report, p. 27).

Amy Ross (Ms. Ross) of the Montana State University Police Department interviewed MR on September 30, 2019. MR told Ms. Ross that on March 11, 2018 she was at the Ski Village Resort after being picked up by Tommy Jennings (Mr. Jennings) (Hodges deposition Exhibit 70). MR, Mr. Jennings, and a middle school student (at that time) went to Mr. Rosen's residence, located at the Ski Village Resort. The group, which now included, Brad, walked to Brad's residence, also in the Resort, where they smoke marijuana in the garage, and then went back to Mr. Rosen's residence where MR estimated she drank 3-4 PBR beers (Exhibit 70). MR reported having "a very short dating relationship" with Mr. Rosen, but they were not in a "dating relationship on March 9, 2018 (Exhibit 73).

While lounging on the couch, Mr. Rosen asked her to have sex with him, and she told him "No" (Hodges deposition Exhibit 70). Over an approximate ten-minute time period, MR told Ms. Ross that Mr. Rosen had asked her repeatedly to have sex with him (approximately eight times) and she "turned him down each time" (Exhibits 70, 73). Mr. Rosen then "proceeded to put his arm around [MR's] neck—with her throat in the crook of his elbow—and physically dragged her into his room" (Exhibit 70). After entering the room, Mr. Rosen took MR's phone, locked the door, and pushed her onto a bed before removing her pants and underwear (Exhibit 70). After removing his pants, Mr. Rosen forced his penis inside of MR while he held her throat (Exhibit 70). When he was finished, he told MR to get dressed. MR got dressed, left the room, and had Mr. Jennings give her a ride back to her residence (Exhibit 70).

Sergeant Platt and Detective Hodges interviewed MR on October 28, 2019. MR told Hodges and Platt that: (1) She did not give consent to have sex with Mr. Rosen; (2) She repeatedly told Mr. Rosed no to sex; (3) She was dragged, by force, into the bedroom by Mr. Rosen in a headlock; (4) At first, MR did attempt to break free of Mr. Rosen; (5) However, Mr. Rosen had her grasped by the throat; (6) Overpowered, she was hopelessly trapped as the bedroom door was locked and Mr. Rosen had taken her phone; (7) Feeling helpless, MR gave in as she saw no other way out until Mr. Rosen was done with her.

Detective Hodges filed an "Affidavit" outlining what the interviews of MR revealed and requested an arrest warrant be issued for the arrest of Mr. Rosen for "Sexual Assault in the first degree" Hodges deposition Exhibit 73). A warrant for Mr. Rosen's arrest was issued, and he subsequently was arrested by the Teton County Sheriff's Office.

After his arrest, Mr. Rosen was interrogated Sergeant Platt and Detective Hodges. When discussing whether or not Mr. Rosen had been given consent by MR to have sexual intercourse with her, Mr. Rosen responded, "She didn't say yes" (Interview with Charlie Rosen, 122:5490). The following transcript of Mr. Rosen's interview clearly showed that he knew MR had not given him consent, because she was so intoxicated that she had "passed out" and he told investigators that "I woke her up . . ." and further he agreed that he probably did not have consent because "she didn't say yes" (123:5512-5525).

| | | |
|---|---|---|
| 5512 | A: | Um, so the whole, like, so I know, like, yes means yes. But the whole, like, if |
| 5513 | | I do this with you will you do this with (Tommy) and she says yes, then in the |
| 5514 | | room when she passed out and I woke her up I said are you okay. She said, |
| 5515 | | "What are we doing again?" And I explained to her. She said, "Oh right." And |
| 5516 | | started taking off her clothes. |
| 5517 | | |
| 5518 | Q: | So I know the answer to this. But answer this for me. |
| 5519 | | |
| 5520 | A: | It's probably no. 'Cause she didn't say yes. |
| 5521 | | |
| 5522 | Q: | If you had a fucking girl passed out on the couch that you have to wake up, do |
| 5523 | | you think there's any consent left there? |
| 5524 | | |
| 5525 | A: | No. |

Based upon my education, experience, and background,  Deputies Hodges, Bommer, and Platt had conducted a sufficient and an appropriate investigation into the Rosen matter before he was arrested. The investigators followed investigative protocols. Although Mr. Hummel was critical of the investigation because investigators had not interviewed a witness who provided an Affidavit contradicting a part of MR's description of how she was "dragged" into the bedroom, this does not change the fact that the Affiant was not in the bedroom and did not witness the alleged sexual assault. No one knows if the Affiant, being a friend of Mr. Rosen, may have given an Affidavit in support of Mr. Rosen because they are friends.

Another criticism by Mr. Hummel focused on the interrogation of Mr. Rosen and that even though Mr. Rosen consented to providing the password to his cellular telephone after asking that someone call his lawyer, no Teton County Sheriff's Office Deputy denied Mr. Rosen's request. Mr. Rosen voluntarily consented to providing the password to his telephone.

In short, this was a sufficient investigation. There are countless examples of investigations that have resulted in a finding of probable cause by a court, the perpetrator arrested, only then to have unknown evidence surface that impacts part of the investigation. The decision not to prosecute Mr. Rosen was solely up to the TCPA and not the investigators.

**6.      Neither Sergeant Platt, Detective Hodges, nor Detective Bommer had the authority to determine Probable Cause and/or to prosecute Mr. Rosen because these decisions are up to the Teton County Prosecuting**

**Attorney's Office (TCPA) and by the judicial officer issuing the arrest warrants.**

Neither  Sergeant Platt, Detective Hodges, nor Detective Bommer could unilaterally decide to issue an arrest warrant for Mr. Rosen. This issuance was up to a judicial officer who read the information contained in the Affidavit submitted by the requesting peace officer and then determined if there were probable cause to issue a search and/or an arrest warrant. The investigators conferred with the prosecuting attorney to obtain an arrest warrant from a judicial officer, who determined there was probable cause.

Based upon my education, training, and experience, not only was probable cause found by a judicial officer, but also the TCPA found probable cause to prosecute Mr. Rosen

7.   **Sergeant Platt, Detective Hodges, Detective Bommer, and Deputy Roundy conducted sufficient and appropriate criminal investigations into both the Rosen and the Crothers matters per Teton County Sheriff's Office policies and procedures and sexual assault investigative protocols.**

As previous discussed in Opinion #2, Teton County Sheriff's Office had promulgated several policies and procedures including "Criminal Investigation, Number: 4-22-1, July1, 2000," and "Criminal Investigation Process-Preliminary and Follow-Up, Number: 4-22-2, July 1, 2000 policies and procedures (Bates Stamp, CARR01023-01024; 01025-01028) that provided guidance to investigators. These policies identified categories of investigations and procedures, which are consistent with national, local, and investigative categories and definitions, particularly within the State of Wyoming.

Investigators in the Rosen and Crothers investigations followed Teton County Sheriff's Office investigative guidance as published in the policies and procedures manual:

1. Reviewing and analyzing reports of the preliminary investigation;

CARR01027

2. Recording information obtained during follow-up investigation;
3. Reviewing departmental records for investigative leads;
4. Seeking additional information (from uniformed deputies, informants, contacts in the community, or other investigators/agencies, etc.);
5. Conduct follow-up interviews of the victims and/or witnesses;
6. The interrogation of suspects;
7. Arranging for dissemination of information as appropriate (teletypes, bulletins, etc.);
8. Planning, organizing, and conducting searches;
9. Collecting of physical evidence that is discovered during the follow-up investigation;
10. Recovering stolen property;
11. Arranging for the analysis of evidence;
12. Reviewing results of laboratory examinations;
13. Identifying and apprehending the suspects;
14. Checking for suspect's criminal history;
15. Determining if the same suspect may have committed other crimes;
16. Plan and implement surveillance needed to develop information pertinent to the investigation;
17. Determining if the suspect meets career criminal criteria;
18. Consulting with the Prosecuting Attorney's office and preparing cases for court presentation and assisting in the prosecution thereof;
19. Notifying victims and witnesses when their presence is required in court;
20. Provide testimony in court;
21. **Keep victims aware of the status of their case through follow-up contact.**

(Bates Stamp, CARR01027-01028).

As the policy and procedures indicated various functions to be performed, if appropriate and applicable, some of the 21 items identified did not apply to either of these investigations such as "recovering stolen property." Investigators are given wide discretion in how they perform their investigations because one cannot write a "must follow" checklist because of the fluidity of most investigations. In my primary research on "Managing Criminal Investigations," I found there were great variations in investigative practices from agency to agency and investigator to investigator. While most of these variations were predicated on the size of a law enforcement agency, others were based on geographical location.

Checklists are often recommended to help guide investigations. The "Managing Criminal Investigations" project that was funded by the University Research Corporation of Washington, DC and other studies conducted by the Police Foundation, created the following investigation checklist that is similar to the guidance of the Teton County Sheriff's Office. A derivative of that checklist is show below:

- "Victim interviewed in person
- "Victim interviewed by phone
- "Victim interviewed at home (if not, explain)
- "Witnesses interviewed in person

Dr. Peters Opinion Report: Crothers, et al. v. Teton County Board of County Commissioners, et al.
©2022. A. R. R.

- "Witnesses interviewed by phone . . ." (Thibault, Lynch, & McBride, 2004, p. 228)

Contrary to Plaintiffs' criminal investigation expert, Mr. Hummel, whose *ipsi dixit* opinion that "law enforcement, in both the Crothers and Rosen cases, violated best practices and standards of care" lacked definitions and literature support (Hummel, Opinion Report, p. 55). It is clear from Mr. Hummel's background that he never served as a peace officer, never was a criminal investigators for a law enforcement agency and has no law enforcement investigative experience (p. 1).

 In my law enforcement practices experience, the term "standards," as applied to a law enforcement officer's conduct, or law enforcement agency's actions or inactions, has often been widely abused and misused, with many different uses, interpretations, phrases, convolutions, false equivalencies, implications, exaggerations, myths, and identifiers. These vary between "accountability standards," those that violation of can foreseeably be reasonably expected to potentially result in criminal culpability or civil liability, and "guidance considerations" that are suggestions, guidelines, or recommendations, that are thoughts, ideas, suggestions, policies and training (if more restrictive than accountability standards), individual, group, or advocacy organization statements and opinions (ipse dixit, net opinions, bias, and non-legislative), etc.

While Mr. Hummel claimed that law enforcement (vague) "violated best practices and standards of care," he failed to identify the "best practices" and the "standards of care" to which he refers. So-called "best practices" are limited to what works for one agency, which will most likely not work for another law enforcement agency or situation, like conducting criminal investigations into sexual assault and battery allegations. Mr. Hummel also does not offer the reader a definition of "best practices" so the reader does not know what this means. If Mr. Hummel could cite to a peer-reviewed definition of "best practices" or to a statistically significant standard of "best practices" (e.g., Alpha level of .05 or .01), then there may be a basis for his claims.

Similarly, Mr. Hummel failed to identify the "standards of care" to which he refers. Mr. Hummel should know there are few national standards governing law enforcement in the United States. Law enforcement officers and contemporary police practices experts know that the only police practices "national standards" are United States Supreme Court holdings such as those that govern when an arrest is effected (California v. Hodari D., 111 S. Ct. 1547 [1991], or set forth the standard for evaluating an officer's use-of-force (Graham v. Connor, 490 U.S. 386, 104 L.Ed. 443, 109 S. Ct. 1865 [1989].

It appears that Mr. Hummel is attempting to pass off a fallacy by implying that a private organization's recommendations and/or a vendor's advertising literature are the equivalent of constitutional standards and/or set "best practices" or other standards that law enforcement agencies and officers must follow. Admittedly, the International Association of Chiefs of Police (IACP), the Commission on the Accreditation for Law Enforcement Agencies (CALEA), and PERF have published "recommendations," but these organizations do not establish national standards for law enforcement agencies. Rather, they develop recommendations on various law

enforcement topics, but no United States municipality, law enforcement agency, and/or officer must read and/or adopt them.

When a literary device such as "generally accepted police practices"  to conceal a dubious claim, this is known as a *slanter* (Epstein, 2002, p. 195). Epstein (2002) argues "slanters are bad because they try to get us to assume a dubious claim is true without reflecting on it" (p. 195). Examples include sensational headlines such as "Another Taser death," "Another pepper spray death," "best practices," etc. Often the rhetoric that follows is comprised non-scientific information that is used for what is known as *proof substitute*.

According to Epstein (2002), "a *proof substitute* is a word or phrase that suggests the speaker has a proof, but no proof is actually offered" (p. 199).When *slanters* or *proof substitutes* are used, it shifts the burden of proof to the other party. The other party, say, the first person to claim that the world is round, is now faced with the monumental task of "disproving" the opposition's claim. As scientific researchers know, it takes more evidence to disprove a claim, than to prove it. As Epstein noted, "It's easier to ask for a disproof of your claims than to prove them yourself" (p. 219).

Based on my education, training, and experience as a university faculty member who taught speech and writing for several years, Mr. Hummel used fallacy, slanter, and proof substitutes because he failed to know or identify actual evidence-based police practices that may be nationally, regionally, or locally used. His claims failed because he cannot cite support for them.

Additionally, based upon my education, training, and experience as a former criminal investigator who now teaches how to conduct several types of investigations, the investigations conducted by Teton County Sheriff's Office investigators were consistent with investigation protocols (e.g., interview the victim(s), interview the alleged perpetrator(s), obtain evidence, interview witnesses, and so forth). Mr. Hummel's criticism of the criminal investigations appears to be predicated on "hindsight," which is not permitted. The fact that a suspect who was charged with a specific crime was not found guilty has nothing to do with what investigators provide to prosecutors who decide about probable cause and then decide on what charges to file. In the instant matter, Prosecutor Allan's office made the decisions on what charges to file.

8.     **Mr. Hummel failed to identify a reliable and valid methodology for developing his opinions in this matter as required under Federal Rule 702.**

Plaintiffs' criminal investigations expert, Mr. Hummel, identified on page one of his opinion report the methodology he used to develop his opinions. As a former professor of research methods and statistics, "reviewing all the material" is not a research methodology. Mr. Hummel, like me, had to read the many documents to gain an understanding of the events. Further, conducting a literature review on Wyoming law is also not a quantitative or qualitative research methodology. Based upon my education, training, and experience, Mr. Hummel must use a reliable and proven research methodology to comply with Federal Rule of Evidence 702. He failed to cite any such reliable and proven research methodology and failed to identify any

literature or law enforcement investigative proven practices he considered and used to support his opinions.

Rather, Mr. Hummel's opinions appear to be based on whether or not he viewed the facts from a prosecutor's or defense attorney's viewpoint. His opinions appear to be based on what he would like to have seen the investigators do, not what they did or how they failed to comply with reliable investigative practices. Even if he were to cite to an investigative checklist for sexual assault and/or battery investigations, he still needed to identify what items on the checklist might apply to the instant matter, and what items would not apply and why.

Based upon my education, training, and experience as a professor who taught research methods and statistics at both the graduate and undergraduate levels, Mr. Hummel failed to identify a reliable and valid methodology for developing his opinion in this matter.

### 9.    Mr. Hummel made credibility determinations and other inappropriate conclusions about witnesses, investigators, including legal opinions.

It is my understanding of the federal rule about experts that they are not permitted to make legal opinions, like Mr. Hummel did throughout his report regarding probable cause. Specifically, he wrote, "In Crothers' case, they filed the sexual battery charge without probable cause to do so" (Hummel, Opinion Report, p. 55). Even though Mr. Hummel is an attorney, it is my understanding that he is prohibited from answering the ultimate question away from the trier of fact. Should the court permit his legal opinions, I reserve the right to write a rebuttal report to address his legal opinions and conclusions.

Mr. Hummel determined that K.H.'s account of the incident was "unreliable" (Hummel, Opinion Report, p. 2). His apparent basis for criticism is that Deputy Roundy "did not inquire how much alcohol or marijuana K. H. consumed at the party nor what impact it had on her" (p. 2). Although he concluded that K.H.'s account of the incident was "unreliable," Mr. Hummel failed to identify anything other than a few inconsistencies that even he attributed to intoxication.

Mr. Hummel also criticized Deputy Roundy because "once he made up his mind, he downplayed and/or ignored evidence of innocence . . ." (Hummel, Opinion Report, p. 3). I do not understand how Mr. Hummel knew what was in Deputy Roundy's mind when he allegedly made decisions about what witnesses to interview, etc. The implicit or conscious bias Mr. Hummel exhibits toward investigators in this matter is quite clear. He is very critical of some witnesses, and yet claimed that because Mr. Crothers did not "confess or admit to kissing or touching butts" that somehow this should be taken automatically as true and accurate information. Seldom in my investigative experience did a perpetrator of a crime admit to the criminal activity. I found this particularly true in sexual assault incidents.

Mr. Hummel also appeared to not be confident in some of his opinions. For example, he wrote, "They **almost certainly** violated *Brady* [emphasis added]" (Hummel, Opinion Report, p. 56). Using "almost" in this opinion appears to not be solid and appeared that Mr. Hummel is not sure. He also claimed that prosecutors "made outlandish and unprofessional statements to

witnesses that had the (**almost certain**) effect of harming Rosen's reputation in the community [emphasis added]" (p. 55). Again, he appeared to not be sure of his claim.

Based upon my education, training, and experience, Mr. Hummel's opinion report is little more than making credibility determinations, offering legal opinions, offering net opinions, offering *ipsi dixit* opinions, and forming inappropriate conclusions without supporting them with facts, supporting documents, or literature.

### 10. Sergeant Platt followed the custom and practice of the Teton County Sheriff's Office prior to releasing information to the media about former Jackson Hole Mayor Pete Muldoon.

A public records request was made for information about an investigation on Pete Muldoon (Mr. Muldoon). The Teton County Sheriff's Office consulted with John Graham, a lawyer with the Teton County Attorney's Office, about how it should respond to the request. The TCSO followed the advice of Mr. Graham in releasing the information.

Based upon my education, training, and experience as a former police department liaison with the media, it is clear the Teton County Sheriff's Office had a customary practice to have public records requests reviewed and approved by the county attorney's office prior to releasing any information. In short, Sergeant Platt followed the county attorney's decision. This is an excellent procedure to have in place and removed unilateral decision-making from Teton County Sheriff's Office Deputies.

## VIII.   DEMONSTRATIVE EVIDENCE and EXHIBITS

I reserve the right to use demonstrative evidence and Exhibit I at trial to illustrate the facts and my opinions expressed above. The exhibits, testimony aids, or list of references used as a summary of, support for, and/or graphic depiction or illustrative description, summary, or synopsis, for the information, statements, summaries, and opinions in this report specifically include, but are not limited to, each (or any compilation, synopsis, summary, demonstrative, illustration, or graphic) pleading, document, statement, deposition, diagram, photograph/image, report, citation, reference, paper, book, illustration, graphic, chart, drawing, diagram, table, PowerPoint® slide, set, or deck, picture, image, and/or video in this report, referenced or cited in this report, or included in any of the references to this report. These may be utilized as exhibits, explanatory, or demonstrative aids to support deposition and/or trial testimony, or for any other purpose. These exhibits specifically include any illustrative evidence such as visual presentation of computer-generated slides and visual images projected onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned exhibits. I reserve the right to create, use, utilize PowerPoint or other graphics or illustrations, or compilations, as exhibits at deposition, trial, or for any other purpose after submission of this report.

## IX.   COMPENSATION: See APPENDIX B.

## X.   CV and PUBLICATIONS: My Curriculum Vitae and list of publications are in APPENDIX C.

## XI.   CASE LISTINGS: Over the past four years I have testified as an expert at trial are shown in APPENDIX D.

## EXHIBIT I

### Qualification Summary Slides:  John G. Peters, Jr., Ph.D.





1

2





3

4









7

8





9

10







13



14





## REFERENCES

Commission on Accreditation for Law Enforcement Agencies. (2001, November). *Standards for law enforcement agencies (4th ed.)*. Fairfax, VA: Author.

Epstein, R. L. (2002). *Critical thinking*. Belmont, CA: Wadsworth/Thompson Learning.

Gordon, H. R. D. (2008). *The history and growth of career and technical education in America* (3rd ed.). Long Grove, IL: Waveland Press, Inc.

Graham v. Connor, 109 S. Ct. 1865 (1989).

Gray, K. C., & Herr, E. L. (1998). *Workforce education: The basics*. Boston: Allyn and Bacon.

Graziano, A. M., & Raulin, M. L. (2000). *Research methods: A process of inquiry* (4th ed.). Boston: Allyn and Bacon.

Graziano, A. M., & Raulin, M. L. (1997). *Research methods: A process of inquiry* (3rd ed.). New York: Longman.

Leedy, P. D., & Ormrod, J. E. (2001). *Practical research: Planning and design* (7th ed.). Upper Saddle River, NJ: Merrill Prentice Hall.

Plitt, Jr., E. (2006). Use of force. In *Police Civil Liability and the defense of citizen misconduct complaints* (pp. 62-1 – 62-9). Park Ridge, IL: AELE Law Enforcement Legal Center.

Thibault, E. A., Lynch, L. M., & McBride, R. B. (2004). *Proactive police management* (6th ed.). Upper Saddle River, NJ: Pearson-Prentice Hall.

# APPENDIX  A

## CASE DOCUMENTS CONSIDERED and/or REVIEWED

### Crothers, et al. v. Teton County Board of Commissioners, et al.

**Sent 09/07/22 via Google Drive**

- Complaint & Amended Complaint
- Depositions (with hyperlinked exhibits) of Bret Bommer, William Crothers, Clayton Platt, and Andrew Roundy
- Transcripts or video/audio recordings of interviews conducted in both the Crothers and Rosen matters
- Police Reports for both the Crothers and Rosen matters
- 02/28/20 Trial Transcript
- POST (Training) Records for Breton Bommer, Matt Carr, Dave Hodges, Clayton Platt & Andrew Roundy
- Plaintiffs' Expert Disclosures
- Select Teton County Sheriff's Office Policies & Procedures

**Sent 10/05/22 via Email**

- Crothers_0002499-2505

**Sent 10/21/22 via Email**

- Resent Depositions of Bret Bommer, William Crothers, Clayton Platt, and Andrew Roundy
- Deposition transcripts & exhibits of John Hummel, Matt Carr, Erin Weisman, Dave Hodges, Clark Allan
- 02/27/20 Trial Transcript

**Sent 10/26/22 via Email**

- Defendant Platt's Responses to Plaintiffs' Second Set of Interrogatories
- Defendant Hodges' Responses to Plaintiffs' Second Set of Interrogatories
- Defendant Bommer's Responses to Plaintiffs' Second Set of Interrogatories
- Defendant Roundy's Responses to Plaintiffs' Second Set of Interrogatories

**Sent 10/27/22 via Email**

- Two Arrest Warrants for Mr. Rosen

Dr. Peters Opinion Report: Crothers, et al. v. Teton County Board of County Commissioners, et al.
©2022. A. R. R.

# APPENDIX  B

## COMPENSATION

### Crothers, et al. v Teton County Board of County Commissioners, et al.

**Compensation**

The charges applicable to my expert fees charged in this case are as follows:

<u>Document Review and Report Preparation</u>: Flat fee of $7500 (received).

<u>Deposition</u>: $2000.00 per day or any portion thereof, if at my location (Las Vegas metro area) <u>and pre-paid</u>, plus travel, lodging, and per diem; $3000.00 outside the Las Vegas metro area, or not pre-paid, plus travel, lodging, and per diem.

 <u>ZOOM or similar format0 depositions</u>: $2000.00 per day.

<u>On-site visits</u>: $3000.00 per day, plus travel, lodging, and per diem.

<u>Trial testimony</u>: $2000.00 per day, or any portion thereof, in the Las Vegas metro area.
 $3000.00 per day, or any portion thereof, outside the Las Vegas area, plus travel, lodging, and per diem.

## APPENDIX  C

## CURRICULUM VITAE

See separate document.

# APPENDIX  D

# TESTIMONY

| 2018 | Deposition | Trial |
|---|---|---|
| James Neuroth v. Mendocino County, et al. United States District Court Northern District of California No. 3:15-cv-03226-RS Defense: Training; In-custody death; Policy & Procedures. | X | |
| Morgan Emmett v. Shannon Armstrong, et al. United States District Court for the District of Wyoming No. 14-CV-1012-J' Plaintiff: Training; Use of Force; Policy & Procedures; Supervision | X | |
| Dustin Burnikel v. Michael Fong, et al. United States District Court in and for The Southern District of Iowa No. 4:15-cv-00050 Defense: Use of Force; Policy & Procedures; Discipline | X | X |
| Edward Nash, Plenary Guardian of the Estate of Irene Nash v. Cook County, et al. Circuit Court of Cook County, Illinois No. 14 L 4174 Plaintiff: Correctional policy and procedure. | X | |
| State of Nebraska v. Scotty L. Payne District Court of Douglas County, NE No. CR-18-60 Defense: Use of Force; Policy & Procedures; Training; TASER® warnings. | | X |
| Anthony T. Brown, et al. v. City of Alexandria, et al. United States District Court, Western District Of Louisiana, Alexandria Division No. 1:17-cv-00798 | X | |

| | Col 1 | Col 2 |
|---|---|---|
| Plaintiff: Use of Force; Training; Policy & Procedures; Internal Investigation. | | |
| State of Nevada v. Valdez and Navarette No. C-18-333098-1/2 District Court, Clark County, NV Defense: Correctional Use of Force; Policy | | X |

**2019**

| | Col 1 | Col 2 |
|---|---|---|
| Louisiana Cleaning Systems, Inc., et al. v. The City of Shreveport, et al. United States District Court, Western District of Louisiana No: 16-cv-00014 Plaintiff: Policy, Procedure, Rules; Internal Investigation; Discipline; Training. | X | |
| Joseph A. Nelson, individually and as Personal Representative of the Estate of Joel A. Nelson v. Thurston County, et al. United States District Court, Western District Of Washington at Tacoma No. 3:18-cv-05184-RBL Plaintiff: Policy, Procedure, Rules; Internal Investigation; Training; Use of Force. | X | |
| Charlene Klein v. Officer Stephen Madison, et al. United States District Court, Eastern District of Pennsylvania No. 17-04507 Plaintiff: Policy, Procedure, Rules; Internal Investigation; Use of Force; Supervision. | | X |
| Harvey Garber, M.D. v. City of Boynton Beach, et al. United States District Court Southern District Of Florida No.18-CV-80576 Defense: Policy, Procedure, Rules; Use of Force; Internal Investigation; Supervision | X | |

| Case | Col1 | Col2 | Col3 | Col4 |
|---|---|---|---|---|
| Gulstan E. Silva, Jr., and Jessica Y. Haleck v. City and County of Honolulu, et al. United States District Court, District of Hawaii No. CV15-00436 HG/BMK Defense: Policy, Procedure, Rules; Use of Force; Internal Investigation; Electronic Control Weapon; OC Spray; Defensive Tactics; Restraints |  |  |  | X |
| McCabe Harrison v. United States of America United States District Court for the Northern District of West Virginia No.: 1:18-cv-00129-IMK Plaintiff: In-custody Death; Training; Policies; Restraints. |  | X |  |  |

**2020**

| Case | Col1 | Col2 | Col3 | Col4 |
|---|---|---|---|---|
| State of Nevada v. Griffith Evidentiary Hearing District Court Defendant: Choke hold |  |  | X |  |
| Timothy Solloway, et al v. State of Louisiana, et al. State of Louisiana, Parish of Ouachita, 4th District Court No. 16-2128 Plaintiff: Policy, Procedure, Rules; Internal Investigation; Use of Force; Supervision | X |  |  |  |
| Davon Johnson v. Las Vegas Metropolitan Police Dept., et al. United States District Court, District of Nevada No. 2:19-cv-01817-JCM-NJK Defense: Policy, Procedure, Rules; Training; Arrest; Use of Force | X |  |  |  |
| Susan Doxtator, et al. v. Erik O'Brien, et al. United States District Court Eastern District of Wisconsin No. 1:19-cv-137-WCG Defense: Use of force; OC | X |  |  |  |

Dr. Peters Opinion Report: Crothers, et al. v. Teton County Board of County Commissioners, et al.
©2022. A. R. R.

Use; policy & procedures;
Training.

Margaret Agwomoh vs. Village          X
Of Dolton, et al.
Circuit Court of Cook County, IL
No. 18 L 2677
Plaintiff: Use of Force; Training

Odell Edwards vs. Roy Oliver, et al.          X
United States District Court for the
Northern District of Texas Dallas Division
No. 3:17-CV-1208
Plaintiff: Policy and procedures; Use of
Force; Internal Investigation

**2021**

Donald Hawkins vs. City of Prichard, et al. X
Unites States District Court Southern
District of Alabama—Mobile Division
No. 1:19-cv-00992
Plaintiff: Use of Force; Training; Internal
Investigation.

Bobbie Allen Woods v. City of Hayward, et al.          X
United States District Court
Northern District of California
No. 19-cv-01350-JCS
Plaintiff:  Detention; Training; ADA.

Richard Lucibella v. Officer Richard Ermeri, et al. X
United States District Court
Southern District of Florida
No. 9:20-cv-82156-AMC
Defense:  Training; Internal Affairs Investigation;
Arrest; Defensive Tactics

United States District Court                                        X
For the District of Hawaii
No.: 19-00116 LEK-WRP
Defense: Sexual assault; Supervision; Policy;
Training; Internal Affairs Investigation.

Victor Perez vs. State of Nevada, et al.          X
U.S. District Court, District of Nevada

Dr. Peters Opinion Report: Crothers, et al. v. Teton County Board of County Commissioners, et al.
©2022. A. R. R.

No. 2:15-cv-01572-APG-DJA
Defense: Deadly force; training;
Policy; competency-based testing.

**2022**

Victor Ezeibe v. Corey Chivers, et al.
United States District Court
Middle District of Pennsylvania
No. 1:19-cv-00189
Daubert Testimony
Plaintiff: Use of Force; Traffic Stop

Otis Davis, Sr., et al. v. The City of Dallas, TX, et al.                    X
United States District Court
Northern District of Texas (Dallas Division)
No. 3:16-CV-2548
Plaintiff: Use of Force

Yaron Barami, et al. v. Las Vegas Metro Police, et al.        X
District Court, Clark County, NV
No. A-20-815852-C
Defense: Use of Force; Arrest

Thurman King v. City of Rockford, et al.                       X
United States District Court
Western District of Michigan, Southern Division
No. 1:21-cv-259
Plaintiff: Traffic stop; Detention; Arrest; IA

Rose Marie Celestin v. City of Ocoee, et al.                   X
United States District court
Middle District of Florida
No. 6:21-cv-00896-RBD-EJK
Defense: Use of Force; Behavioral Cues; Restraint

Keith Adams v. Las Vegas Metropolitan Police Dept., et al. (Arbitration)
Eighth Judicial District Court, Clark County, NV
No. A-21-837784-C
Defense: Handcuffing; Investigative Detention

State of New Mexico v. Sandoval                                        X
Defense: Manslaughter; prone restraint