

**FILED**

2:21 pm, 1/27/23

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| WILLIAM MICHAEL CROTHERS et al., | |
| Plaintiffs, | |
| vs. | Case No.  22-CV-028-NDF |
| TETON COUNTY SHERIFF MATTHEW CARR in his official capacity, et al., | |
| Defendants. | |

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the Defendants' Motions for Summary Judgment and supporting memoranda.   ECF 118, 119, 120, 121.   The Prosecutor Defendants, comprised of Teton County and Prosecuting Attorney Erin Weisman in her official and individual capacities and Chief Deputy Prosecutor Clark Allan in his individual capacity, brought their Motion for Summary Judgment and supporting memoranda as non-public documents at ECF 118 and 119.[1]   The Peace Officer Defendants, comprised of Teton County Sheriff Matt Carr in his official and individual capacities and Deputies Breton Bommer, David Hodges, Clayton Platt, and Andrew Roundy in their individual capacities, brought their Motion for Summary Judgment and supporting Memorandum at ECF 120

---

[1] Redacted versions of the Prosecutor Defendants' Motion for Summary Judgment and supporting memorandum are publicly available at ECF 122, 123.

and 121.[2]   The Plaintiffs, Robert Charles "Charlie" Rosen, William Michael "Mike" Crothers, and Peter Muldoon responded with a single memorandum, ECF 131, 132.[3]   The Defendants have replied.   ECF 134, 142.[4]

The Court GRANTS the Defendants' Motions to Dismiss.   Plaintiffs fail to meet their burden regarding the discrete constitutional claims for each Plaintiff in Counts IV through XI.   As a result, the *Monell* claims for constitutional injuries caused by municipal policies, and the companion claims for constitutional injury caused by individual supervisory failures, also do not survive summary judgment.   As the Court is dismissing all of the claims arising under federal law, the Court declines to further exercise supplemental jurisdiction and accordingly dismisses Counts XII-XVI with claims arising solely under Wyoming state law.

## I.  FACTS

The Plaintiffs' claims revolve around three discrete fact patterns, one for each Plaintiff.   The relevant facts that are raised by the parties, cited to the record, and supported by the record are as follows:[5]

---

[2] Redacted versions of the Peace Officer Defendants' Motion for Summary Judgment and supporting memorandum are publicly available at ECF 124, 125.

[3] Redacted versions of Plaintiffs' response and supporting materials are available at ECF 135.

[4] The Prosecutor Defendants' reply at ECF 134 is a public document.   The redacted version of the Peace Officer Defendants' reply is publicly available at ECF 143.

[5] Plaintiffs' memorandum includes countless citations to the record that are either incorrect or do not support all of the asserted information.   Where the Court identified the information in the record the Court has corrected the citations and included only those facts supported by the record.   But for many asserted facts, Plaintiffs have failed to cite to the record whatsoever.   Where the Court has stumbled on the asserted information in Plaintiffs' 1631 pages of exhibits, the Court has cited to the record and included the asserted facts.   But some facts remain unaccounted and thus cannot and do not contribute to the Court's analysis.   These facts are excluded from this opinion except where noted.   *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("[t]he district court has discretion to go beyond the referenced portions of these materials, but is not required to do so.   If the rule were otherwise, the

*A.     Facts regarding Plaintiff Robert Charles "Charlie" Rosen's Claims*

On September 19, 2019 I.U. came forward with sexual assault allegations against Rosen.  UW Police Report, ECF 132-2 at p. 2.  Deputy Bommer, an investigator for the Teton County Sheriff's Office ("TCSO"), conducted a videotaped interview of I.U. on September 27, 2019.  Bommer Aff., ECF 121-3 ¶¶ 2, 3.  During the videotaped interview, I.U. stated that she got bored at the Rendezvous Festival in March 2019 and asked Rosen to hang out.  Bommer Interview of I.U., ECF 132-18 p. 8:4.  I.U. and Rosen then went to the hot tub at Shooting Star Country Club after they left the Rendezvous Festival.  *Id.*  I.U. told Bommer that she texted her friends while at Shooting Star asking them to come pick her up so she could get away from Rosen.  Bommer Interview with I.U., *Id.* p. 23-25.  I.U. stated that she had the text messages evidencing her pleas.  *Id.*  I.U. and Rosen went to Rosen's house; I.U. reported that Rosen sexually assaulted her at the house and she provided details of the assault.[6]  Bommer Report, ECF 121-4 p. 4.

Bommer believed he had probable cause to arrest Rosen after the September 27, 2019 interview and believed that Rosen was a "predator."  Bommer Dep., ECF 132-19 pp. 51:7-11; 61:1-3.  Bommer claims he did not arrest Rosen at the time because he was not the lead detective on the matter—that was Dave Hodges, another investigator at the TCSO.  *Id.* pp. 51:19–20.  Deputy Hodges said the opposite during his deposition.  Hodges Dep., ECF 132-11, p. 76.  According to Hodges, that was "Bommer's case."  *Id.*

---

workload of the district courts would be insurmountable) (citing *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)).  "The burden is not an onerous one for the nonmoving party . . .  but does not at any point shift to the district court."  *Id.* (citing Fed. R. Civ. P. 56(e), (f)).

[6] Additional details of the assault that I.U. reported are not relevant or necessary for the resolution of this motion and are omitted.

Sometime after interviewing I.U., Bommer interviewed A.C. and suggested Rosen could have numerous victims.  Bommer interview of A.C., ECF 132-13 p. 1.  ("[W]hether there's three, four, ten, one hundred, we don't know.").  Bommer also told A.C. that "the thing that [they were] struggling with was that "the crimes that have occurred . . . he's still a juvenile.  He's still under 18." *Id.* p. 58:3-7.  According to Bommer, "depending on how -- he could be charged as an adult. . . . which holds some bigger ramifications." *Id.* p. 58:12–21.

M.R. came forward with sexual assault allegations against Rosen on September 26, 2019.  Ross Aff., ECF 121-5 ¶ 7; MSU Report, ECF 121-6.  Sergeant Amy Ross of the Montana State University Police Department interviewed M.R. on September 30, 2019. *Id.*  M.R. detailed that Rosen had sexually assaulted her at his home in Jackson Hole, Wyoming on or around March 11, 2018. *Id.*  Among other things, M.R. reported the following to Ross: Rosen proceeded to put his arm around M.R.'s neck—with her throat in the crook of his elbow—and physically dragged her into his room.  Rosen took M.R.'s phone and locked the door then sexually assaulted her.[7] *Id.*  She identified two individuals who were present the night of the alleged assault, T.J. and "B." whose last name was unknown.  MSU Report, ECF 132-14.

TCSO Deputies Platt and Hodges interviewed M.R. at the Montana State Police Department on October 28, 2019.  ECF 121-7 ¶ 3.  During the interview, M.R. provided

---

[7] Additional details about the assault that M.R. reported are not relevant or necessary for resolution of this motion and are omitted.

details regarding a sexual assault by Charlie Rosen that occurred at his home on March 9, 2019.  ECF 121-7 ¶ 4; ECF 121-8 ¶ 4.  M.R. identified Rosen as the suspect.  *Id.*

Among other things, Hodges's report indicated that M.R. was dragged by force into the bedroom by Rosen in a headlock; at first, M.R. did attempt to break free of Rosen; overpowered, she felt hopelessly trapped as the bedroom door was locked and Rosen had taken her phone.  Hodges Report, ECF 121-9 p. 2.

Hodges also included a heading in the report documenting M.R. and Rosen's "Prior Dating Relationship."  *Id.*  Hodges noted that Rosen and M.R. had been in a "very short dating relationship" prior to the alleged assault in March 2018, and "[t]he relationship did include sex."  *Id.*  Hodges noted that the relationship ended after a few weeks, and "M.R. confirmed the two of them have not been in a dating relationship since."  *Id.*

M.R. later told investigators that one of the two witnesses, T.J., would "be her strongest ally [and] witness" because "T.J. would have seen Rosen drag M.R. to the bedroom" and would have heard M.R. "deny Rosen for sex" through the door.  ECF 132-1 ¶ 23; ECF 132-23.  The investigators did not interview T.J. before arresting Rosen and Hodges took no additional investigative steps regarding the M.R. allegation before arresting Rosen.  Hodges Dep. 132-11 pp. 114:25-115:1; Platt Dep., ECF 132-21 p. 46:9.

According to Clark Allan, deputy prosecutor at the Teton County and Prosecuting Attorney's Office, ("TCPA"), "some investigators expressed that they wanted to wait to file the case until after [Rosen's] birthday."  Allan's Interrog. Responses No. 1 at 3, ECF 132-24.  The two witnesses M.R. identified also came up during at least one of the biweekly meetings between the TCSO and TCPA.  *Id.* at 4 ("[T]here were two witnesses to major

portions of the sexual assaults that had not been interviewed yet."). *Id.* Erin Weisman, the Teton County and Prosecuting Attorney, and Allan expressed their desire for the investigators to interview these witnesses during the discussion of the investigation. *Id.* at 4–5.

On December 3, 2019, Hodges submitted separate probable cause affidavits for Rosen's arrest for first degree sexual assault on I.U. and M.R. Hodges Aff. (I.U.), ECF 121-2; Hodges Aff. M.R., ECF 121-11. In the affidavits, Hodges summarized I.U.'s and M.R.'s allegations. Hodges Aff. (I.U.), ECF 121-2 ¶¶ 4-13; Hodges Aff. (M.R.), ECF 121-11 ¶¶ 4-10.

On December 5, 2019, a prosecutor submitted Informations charging Rosen with two counts of first degree sexual assault under Wyoming Statutes §§ 6-2-302(a)(i) and 6-2-306(a)(i). Information (I.U.), ECF 121-12; Information (M.R.), ECF 121-13. Hodges's affidavits, in a redacted form, were submitted with the Informations. *Id.* A legal assistant in the prosecutor's office redacted the affidavits. Allan Dep., ECF 121-14 pp. 158-60. However, name "Charlie" was not redacted; neither was Rosen's address, and Allan admitted that "was a mistake." *Id.* p. 60; ECF 121-12 p 2. ¶¶3-4; ECF 121-13 p 3 ¶¶ 3-4. At the time, TCPA had no policy on redactions other than "follow the statute and redact" and nothing in the way of policy to decrease the chances of mistakes. Allan Dep., ECF 121-14 p. 60 ¶¶ 19-23.

A circuit court judge issued arrest warrants for Rosen on December 6, 2019. Warrant (I.U.) ECF 121-15; Warrant (M.R.) ECF 121-16. On December 9, 2019, after Rosen's 18th Birthday, Platt and Roundy arrested Rosen in accordance with the arrest

warrants.  Platt. Aff., ECF 121-7 ¶ 5.  Neither T.J. nor B. had been interviewed.  Hodges Dep. ECF 132-11 pp. 114:12-115:1; Platt Dep, ECF 132-21 p. 46:9; Allan Aff. ECF 132-24 p. 4.  Bommer had not received or reviewed the text messages I.U. claimed to have as proof.[8]

The same day they arrested him, Platt and Hodges then conducted a custodial interview of Rosen.  Rosen Interview, ECF 132-4.  At one point, Rosen described several subsequent sexual encounters with both I.U. and M.R. after the alleged assaults.  Bommer Dep.  ECF 132-19 pp. 74–75.  At another point, Platt told Rosen, "we do a lot of what we have in our work based on a lot of gut feelings with where we head in directions. Okay? We don't base an actual case on that.  But the directions which we take cases sometimes happen based on our gut. . . . The reality though is when I talk[ed] to [M.R.] – when I first read the report Case -before we talked to [M.R.], for me, I'm shooting you straight, it did seal the deal."  Rosen Interview, ECF 132-4 lines 5474–5481.

On December 20th, 2019 Hodges drafted and submitted a supplemental report with a second sexual assault described during the M.R. interview on October 28, 2019.  Hodges Supplemental Report 12/20/19, ECF 132-28.  The report indicates that in August 2018 Rosen was alone with M.R. and 'want[ed] to have sex," and that M.R., "from experience [] was aware that if she said 'no' to Rosen he would physically force her into sex" so "she

---

[8]  Plaintiff's citation to Pls.' Ex U, ECF 132-23, contains no reference to the I.U. text messages. However, the Parties agree that the screenshots of I.U.'s texts were not provided to Bommer until after Rosen's arrest.  *See* Pls.' Mot. in Opp'n, ECF 131 p. 16; Peace Officer Def's Reply, ECF 142 note 3. Additionally, the context of Bommer's interview of I.U. and R.C. on March 30, 2020 supports that Bommer didn't yet have the screenshots.  ECF 132-20 pp. 16, 29,78.  The screenshots attached to Plaintiff's motion indicate they were printed by the TCSO on April 7, 2020 several days after the Upton and R.C. interview.  ECF 132-25.

said nothing and remained silent." *Id.*  The report additionally states that "Sgt. Platt had to explain to M.R. she did not consent to sex with Rosen," and concludes that "she was frightened and said nothing; but she also did not give consent." *Id.*

Hodges stated that he did not include the subsequent alleged sexual assault in his original report because he did not want to "confuse the reader" and because the subsequent alleged sexual assault did not rise to "probable cause." Hodges Dep., ECF 132-11 pp. 136:18–137:3.  Hodges later produced his notes from the October 28, 2019 interview in response to a defense discovery demand. Hodges Notes, ECF 132-29 p. 2.  The first page contains the notes relevant to the newly-reported subsequent alleged assault in August 2019. *Id.* p 3.  That page includes notations: "I didn't say yes because I knew happens [sic] if I said 'no,'" and "didn't recognize it was rape by legal standards." *Id*.

On March 30, 2020 I.U. and friend R.C. went to the TCSO for a supplemental interview.  Bommer Interview of I.U. and R.C., ECF 132-20.  Bommer told them: "So anyway, he's in jail.  We did wait until he was 18, so we could charge him as an adult." *Id.* p. 79:13.  When I.U. and R.C. asked "how that works," Bommer explained that the "ramifications aren't very good" for a juvenile, that the "penalties are different," and that Rosen could get "registered as a sex offender [as an adult]." *Id.* pp. 79:24-25, 80:1.

I.U. provided screenshots of the text messages but the text message that corroborated her statement that she wanted to leave Rosen's house had an earlier timestamp than the others and appeared as though it was inserted in the middle of text messages from the night of the alleged assault. ECF 132-25.  Either R.C. or I.U. indicated that the out-of-

sequence text was from an earlier time or different day.  Bommer Dep., ECF 132-19 pp. 102:13 - 104:11.

The TCSO subsequently interviewed other witnesses.  During these interviews, Bommer told the interviewees that he found Rosen "creepy," he likened Rosen to "Jeffrey Dahmer"; and he expressed disappointment that one interviewee was not a victim because that would have been just "one more nail in Charlie's coffin."  KH Interview ECF 132-32 p. 21:24-27; L.J. Interview, ECF 132-33 p. 19:11.  Carr and Platt neither had any awareness of Bommer's statements during these interviews nor have ever disciplined him in any way for his conduct during these interviews, even after being made aware.  Carr Dep. ECF 132-38 pp. 111:22-112:1. Platt Dep. ECF 132-21 pp. 65:6, 66:21-67:15.

Rosen waived a preliminary hearing in both the I.U. case and the M.R. case, and as a result, he was bound over to district court in each case.  Waiver of Preliminary Hearing (I.U.), ECF 121-19; Waiver of Preliminary Hearing (M.R.), ECF 121-20; Transfer to District Court (I.U.), ECF 121-21; Transfer to District Court (M.R.), ECF 121-22.

A prosecutor dismissed the M.R. case on March 6, 2020.  Order of Dismissal, ECF 121-23; A prosecutor dismissed the I.U. case on May 21, 2020.  Order of Dismissal, ECF 121-25.

Sherriff Carr, and Deputies Bommer, Roundy, Platt and Hodges stated that they have never communicated in any way with any member of the media about Rosen, any allegations against Rosen or the criminal cases against Rosen.  Carr Aff. ECF 121-24 ¶ 3; Bommer Aff., ECF 121-3 ¶ 5; Roundy Aff., ECF 121-17 ¶ 5; Platt Aff., ECF 121-7 ¶ 6; Hodges Aff., ECF 121-8 ¶ 5.

At some point during the Rosen prosecution, his defense lawyers discovered information about sexual abuse of I.U. by a physical education teacher on her cellphone. ECF No. 71 ¶ 44.  The information was turned over to the prosecution.  *Id.* ¶ 45.  Bommer opened an investigation into the matter, but I.U. refused to cooperate.  Bommer Dep., ECF 121-37 pp. 114-120.  Bommer did not speak with I.U. about the allegation until months after he claims to have discovered the note. Bommer Dep., 132-19 p. 109:7-13 ("I found the note in early spring").

Like Bommer, the PE teacher was also a football coach, and Bommer knew the PE teacher because "he was part of the coaching staff."  Bommer Dep., ECF 132-19 p. 141.  Bommer did not interview others to determine if they were additional victims of the PE teacher and he never interviewed the PE teacher, though he agreed that he had probable cause to arrest him.  *Id.* pp. 117:6-9, 119:13–15.

B.   *Facts Regarding Plaintiff William Michael "Mike" Crothers's Claims*

On May 11, 2019 Mike Crothers was fifty-two years old.   Crothers Dep., ECF 121-28 p. 11.  He went out to dinner alone at about 6:00 p.m. that evening.  *Id.* pp. 31, 50.  Crothers drank sake at dinner.  *Id.* p. 49.  Crothers then went to a fundraiser at the Cowboy Bar.  *Id.* p. 51.  Crothers drank an unknown number of mixed drinks at the bar while he was at the bar for three hours.  *Id.*

According to Crothers, he went home "very intoxicated" and "really wasn't in a position to be making judgments at the time."  *Id. p.* 59. On a drunkenness scale of 1-10, 1 being no effect and 10 being passed out, Crothers was a 9 by the time he got home.  *Id.* pp. 184-85.

Meanwhile, Crothers's seventeen-year-old son invited some friends over and a large party ensued at Crothers's home. *Id.* pp. 56, 158; Second Amended Complaint, ECF 71 ¶ 60. Several of the partygoers brought alcohol and marijuana to the party. *Id*; Crothers Dep. ECF 121-28 p. 168. For the past year or two, Crothers's son and his friends had been getting together from time to time to drink alcohol at Crothers's home. *Id.* pp. 36, 180. Crothers allowed his son to have these gatherings. *Id.* pp. 36-37.

When he arrived home, Crothers was surprised by the number of people there. *Id.* p. 56. There were dozens of people there including high school students and some young adults. Second Amended Complaint, ECF No. 71 ¶¶ 60, 64. Crothers did not shut the party down. Crothers Dep. ECF 121-28 p. 159.

Witness testimony at Crothers's criminal trial was that Crothers hit a bong a couple of times at the party, smoking marijuana. Trial Transcript, ECF 121-29 pp. 77-78, 123. Crothers then handed the bong to L.K., one of his teenage guests, and told her to "loosen up." *Id.* pp. 70-71, 78. While looking L.K. in the eye, Crothers said he "needed some p****". *Id.* pp. 79-80. L.K. felt she was the target of this comment. *Id.* p. 80. L.K. was sixteen years old. *Id.* pp. 70-71. Crothers also told one boy that the high school girl standing next to him was a "hot piece of a**". *Id.* pp. 113-14, 125, 139.

Trial testimony also indicated that Crothers hugged K.H. and grabbed her buttocks at the party. Trial Transcript, ECF 121-29 p. 222. Crothers also kissed K.H. twice. *Id.* pp. 198, 225. On one occasion, Crothers bent down to kiss K.H. while she was sitting on her boyfriend's lap. *Id.* pp. 198-99. K.H. leaned back as far as she could but could not get

away and Crothers kissed her on the lips. *Id.* Somebody pulled Crothers off of her. *Id.* p. 199. K.H. cried. *Id.* pp. 49, 226. K.H. was seventeen years old. *Id.* pp. 213-14.

Further trial testimony indicated that Crothers tried to kiss D.K., another high school girl, on the lips at the party as well. Trial Transcript, ECF 121-29 pp. 143, 150-51. D.K. turned her head because she did not want to kiss him. *Id.* p. 151. Crothers kissed her on the cheek. *Id.* pp. 150-51. Crothers later put his hand on D.K.'s upper thigh. *Id.* p. 152. Crothers eventually went to bed. Crothers Dep., ECF 121-28 p. 187. The party went on. *Id.*

In his deposition, Crothers admitted that he does not know whether: (a) he grabbed K.H.'s bottom, Crothers Dep., ECF 121-28 p. 204; (b) he kissed K.H. twice, *Id.* pp. 201, 203; (c) he tried to kiss D.K., *Id.* p. 203; (d) he hit a bong a couple of times at the party, *Id.* p. 202; (e) he handed a bong to L.K. and told her to "loosen up," *Id.*; or (f) he said he "needed some p****" to L.K. *Id.* Crothers does not recall all the events of May 11, 2019 because he had been intoxicated, but he has testified and repeatedly indicated that the alleged behavior is entirely out of character for him. *Id.* pp. 61:2–5; 64:5–7; 86:11.

Deputy Roundy is a deputy in the investigations unit at the TCSO and is assigned as a school resource officer primarily at Jackson Hole High School. Roundy Aff., ECF 121-17 ¶ 2.

The Crothers's matter came to Roundy's attention on May 15, 2019 when K.H. went to a school counselor and then Roundy was asked to meet with them. Roundy Dep. ECF 121-31 pp. 79-80; Roundy Primary Report, ECF 121-32 p. 1. Roundy proceeded to conduct a videotaped interview of K.H. Roundy Aff., ECF 121-17 ¶ 4. K.H. told Roundy

about the house party.  Roundy Primary Report ECF 121-32 p. 1.  K.H. also reported that Crothers had grabbed her butt and kissed her.  *Id.*  Roundy subsequently interviewed three other teenagers who attended the party.  *Id*. pp. 1-3.

Roundy videotaped the students during these interviews.  Roundy Dep., ECF 132-37 pp. 71-72.  He did not tell them he was videotaping the interviews.  Scott Kirkpatrick Email, ECF 132-38.  Instead, he took his body camera off his person, placed the body camera on the counter, and hit record.  Roundy Dep., ECF 132-37 pp. 81-82.

The TCSO Policy and Procedures Manual ("SOP") states that "it is imperative that the SRO work hand in hand with school officials in determining the policies and interviewing students in school; regardless of whether they are suspects or witnesses." ECF 132-12 at Carr_01061.  Roundy further testified that it is a practice developed with the School Administrators to notify them whenever students are interviewed or contacted for law enforcement-specific issues.  Roundy Dep. ECF 132-37.  Roundy did not follow the SOP or the practice developed with the School Administrators.  *Id*. p. 66

Shortly after Roundy conducted these interviews, parents complained to Carr about Roundy's behavior.  One parent sent an email saying "[o]ur daughter was led into a video-taped interrogation without sufficient explanation of what her statements could result in . . . without consulting parents, giving her proper legal or moral support, or any disclosure . . . of the consequences.  I feel that, particularly in the case of a minor, this was unprofessional."  Scott Kirkpatrick Email, ECF 132-38.  Another parent emailed the principal of the school to express concern that Roundy falsely accused her son of being at Crothers's house the night of the incident and said that Roundy "told [her son] that he

13

should influence [another] minor to testify" against Crothers.  Roundy Dep. ECF 132-37 pp. 171–73.

Despite awareness of these complaints about Roundy's interactions with the students at the high school, Sheriff Carr did not discipline Roundy in any way for this behavior.  Carr Dep.  ECF 132-8 pp. 57-58; 63:23.

Roundy interviewed Crothers on May 17, 2022.  Roundy Report ECF 121-32 pp. 3-4.  Crothers confirmed his attendance at the party.  *Id.* p. 3.  Roundy told Crothers that allegations had been made against him.  Crothers Dep. ECF 132-28 pp. 204-05.

After interviewing Crothers, Roundy issued him three citations: (a) one citation for unlawful contact with K.H.; (b) one citation for a house party where minors were present; and, (c) one citation for breach of peace.  *Id.* pp. 164-65.  Roundy did not arrest Crothers. Roundy Aff., ECF 121-17 ¶ 4.  Roundy did not cite Crothers for sexual battery.  Allan Dep., ECF 121-14 p. 179.

A prosecutor later added a sexual battery charge and a second unlawful contact charge with respect to K.H.  First Amended Information, ECF 121-40 pp. 1, 2.  The prosecutor also added an unlawful contact charge with respect to D.K.  *Id.* p. 2.

Allan, the prosecutor on the case, was aware that what he stated in his pleadings or in the Court would be picked up by the press.  Allen Dep. ECF 132- 3 pp. 189-90.  Allan stated that there's some things that can be said [to the media about pending cases] and maybe were "from time to time."  *Id.* p. 189.

Tracey Trefren is a victim witness coordinator who attended bi-weekly meetings between the TCSO and TCPA.  She wrote an email note to herself during one of these

meetings on December 19, 2019.  Trefren Email, ECF 132-6.  The email read in relevant part: "coruthers [sic] didn't accept the plea.  Fleener filed a motion that the statute is not valid.  Article in paper.  Another will be coming based on Clark [Allan]'s response with details. ETC."  *Id.*  Allan filed his response the following day, December 20, 2019.  State's Response to Defs' Mot. to Dismiss Counts, ECF 132-41.  An article was published in the Jackson Hole News and Guide on December 24, 2019.  Emily Mieure, *Prosecutor Alleges Disturbing Details in Wilson Sexual Battery Case*, Jackson Hole News and Guide, Dec 24, 2019, ECF 132-40.

Carr, Bommer, Roundy, Platt and Hodges testified that they never communicated in any way with any member of the media about Crothers, any allegations against Crothers or the criminal case against Crothers.  Carr Aff., ECF 121-24 ¶ 4; Bommer Aff., ECF 121-3 ¶ 6; Roundy Aff., ECF 121-17 ¶ 6; Platt Aff., ECF 121-7 ¶ 7; Hodges Aff., ECF 121-8 ¶ 6.

While the parties were preparing for trial, Allan stated: "I have been waiting my entire career for a case like this.  I'm sick and tired of these rich guys from the West Bank having zero regard for the law and drinking and using drugs with no consequences."  Kelsey Fleener Aff., ECF 132-42.  Allan disputes that he made such a statement.  Allan Dep. ECF 132-3 pp. 199-200.

Allan stated that trial was at times "like a zoo."  Allan Dep. ECF 132-3 p. 205.  The courtroom was packed and had a line of people outside of the courtroom waiting to get inside.  *Id.*  Allan has never seen anything else like Crothers's trial in his twenty-plus years of practice in Teton County, trying misdemeanor and felony cases.  *Id*. pp. 205-06.

A jury convicted Crothers on the D.K. unlawful contact charge, one of the K.H. unlawful contact charges and the house party charge. Judgment and Sentence ECF 121-41. The Jury acquitted Crothers of the K.H. sexual battery charge, one of the K.H. unlawful contact charges, and the breach of the peace charge. *Id.*

C.   *Facts Regarding Plaintiff Peter Muldoon's Claims*

Pete Muldoon was Mayor of Jackson Hole from 2016 until 2020. Muldoon spoke openly about his perceived issues with law enforcement during his tenure as Mayor. Muldoon was particularly concerned with law enforcement funding and potentially wasteful spending.[9]

On September 25, 2020, after obtaining legal advice from the TCPA, the TCSO released records of a sexual assault allegation made against Muldoon by a Jennifer Econopouly in 2018. Public Records Response, ECF 121- 35; Muldoon Dep., 121-36 p. 117.

On September 18, 2020, Gloria Courser had filed a public records request with Teton County for law enforcement records regarding Muldoon, which was routed to the TCSO. Public Records Request, ECF 121-42.

Sergeant Platt is the records officer for the TCSO and is responsible for fulfilling or denying public records requests. Platt Dep., ECF 132-22 p. 178. However "[i]t is Carr's ultimate decision on whether something is released or not." *Id.* p. 181. Carr testified in

---

[9] Plaintiff provides no citation to the record for these introductory facts. However, Defendants' motions do not put these facts in issue so they are included for context.

his deposition that he is not familiar with the specifics of the relevant statute governing the relevant redactions.  Carr Dep. ECF 312-8 p. 47.

The TCSO submitted the public records request to the TCPA, specifically attorney John Graham, for review.  Weisman Dep., ECF 121-28 p. 121.  "The sheriff received legal advice from [the TCPA], and the record was released without [Muldoon's] name being redacted."  *Id.* p. 123; Graham E-Mail, ECF 121-29.

Platt claims that John Graham ultimately decided that it was proper to release the records.  Platt Dep., ECF 132-21 p. 182.  However, Weisman and Carr were both part of the decision-making process for the redactions.  *Id.* p. 181:24-25.

The first media article published about the referenced records, dated October 1, 2020, is entitled "Mayor Says Sheriff Broke Law by Releasing Name in Alleged Sex Assault Case After No Charges Were Filed."  Muldoon Dep., ECF 121-36 p. 96.  The article included a lengthy quote from the Teton County and Prosecuting Attorney, in which she stated that her office had declined to prosecute the case and an agent for Division of Criminal Investigation held the opinion that no crime has occurred.  *Id.* pp. 102-03.  Ultimately, Platt released Muldoon's records with the alleged victim's name redacted and Muldoon's name left unredacted throughout the report.  Platt Dep. ECF 132-21 p. 80.

On October 4, 2020, Muldoon allegedly asked Eden Morris to take down her Facebook post about her own sexual assault experience.  Muldoon Dep., ECF 121-36 pp. 108-09.  Morris spoke about Muldoon's action at a Town Council meeting.  *Id.* pp. 109-10.  A media article setting forth Morris's allegations, entitled "Who Gets to Speak About Sexual Assault," was published on October 6, 2020.  *Id.* pp. 107-10.  The allegations could

have caused some voters not to vote for Muldoon. *Id.* pp. 110. Carr and Platt stated that the response to Courser's public records request was motivated solely by a desire to comply with the public records act. Carr Aff., ECF 121-24 ¶ 7; Platt Aff., ECF 121-7 ¶ 9.

After Muldoon's records were released unredacted in response to Courser's record request, Weisman sent an email to John Graham and other deputy attorneys at the TCPA regarding "concerns about release of sexual assault records from law enforcement." Weisman Dep. ECF 132-43. Weisman's concerns arose because she was "interested in taking a more conservative approach than [she] had in the past with respect to legal advice" to the TCSO related to Wyo. Stat § 6-2-319. *Id.* The conservative approach is to redact both the alleged victim and the alleged actor's name. *Id.* Weisman stated "[m]y policies evolved, and this was a policy that had evolved." *Id.* Weisman stated that she has written policies concerning confidential information and redactions for the TCPA. Weisman Dep. ECF 132-44 p. 59.

Sheriff Carr and Deputies Bommer, Roundy, Platt and Hodges stated that they never communicated in any way with any member of the media about Muldoon or any allegations against Muldoon. Carr Aff., ECF 121-24 ¶ 5; Bommer Aff., ECF 121-3 ¶ 7; Roundy Aff., ECF 121-17 ¶ 7; Platt Aff., ECF 121-7 ¶ 8; Hodges Aff., ECF 121-8 ¶ 7.

## II.  STANDARD OF REVIEW

The Court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard requires "there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A

material fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. "Summary judgment is inappropriate where there is a genuine dispute over a material fact, 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248). The Court "examine[s] the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party, without making credibility determinations or weighing the evidence." *Roberts*, 884 F.3d at 971, n.3.

## III. ANALYSIS

Plaintiffs generally assert three categories of claims. First, Counts IV - XI are 42 U.S.C. § 1983 claims that allege discrete constitutional injuries for each of the three Plaintiffs. Next, Counts I - III are § 1983 municipal *Monell* claims and individual supervision claims that municipal policies and failures of individual supervisors caused the injuries in Counts IV - XI. *See Monell v. Department of Social Servs.*, 436 U.S. 658 (1978). Lastly, Counts XII - XVI are supplemental jurisdiction claims under Wyoming law.

In addition to the defenses on the merits that are discussed below, the Prosecutor Defendants argue throughout their memorandums that they have absolute prosecutorial immunity and qualified immunity, and the Peace Officer Defendants argue throughout their memorandums that they have qualified immunity. *See* ECF 119, 121, 134, 142.

A.    *Plaintiffs' Discrete Constitutional Claims in Counts IV - XI.*

    1.    *Count IV: Rosen's Fourth Amendment Claim (malicious prosecution); Count V: Rosen's Fourth Amendment Claim (Franks)*

Count IV is Plaintiff Rosen's Fourth Amendment claim[10] for malicious prosecution and Count V is his Fourth Amendment *Franks* claim[11] for including false information or omitting material exculpatory information from the probable cause affidavits supporting Rosen's arrest warrants.  *See* Second Amended Complaint, ECF 71 at ¶¶ 144-150, 151-158; *Franks v. Delaware*, 438 U.S. 154 (1978).  The claims are analyzed together because they are resolved by resolution of Count V.

A malicious prosecution claim requires showing: 1) Defendants caused the Plaintiff's continued confinement or prosecution; 2) the original action terminated in the Plaintiff's favor; 3) there was no probable cause to support the Plaintiff's initial arrest, continued confinement, or prosecution; 4) Defendants acted with malice; and 5) the Plaintiff sustained damages.  *Bledsoe v. Carreno*, 53 F.4th 589, 614 (10th Cir. 2022) (citing *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014).

A *Franks* claim requires showing that the "affiant[s] seeking arrest warrants knowingly, or with reckless disregard for the truth, include[d] false statements in a supporting affidavit or omit[ted] information which, if included, would prevent the warrant from lawfully issuing."  *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020).  "In addressing the materiality of the omitted information, [the court] look[s] to see whether a warrant would issue in a 'but-for world where the attesting officer faithfully represented the facts.'"  *Id.* (citing *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir

---

[10] Count IV, Plaintiff Rosen's Fourth Amendment malicious prosecution claim, names Peace Officer Defendants Hodges, Bommer, Platt.
[11] Count V, Plaintiff Rosen's Fourth Amendment *Franks* claim, names Peace Officer Defendants Hodges, Bommer, and Platt and Prosecutor Defendant Allan.

2015)).  "[The court] make[s] this assessment by (1) removing any false information from the affidavit, (2) including any omitted material information, and then (3) inquiring whether the modified affidavit establishes [or negates] probable cause for the warrant." *Id.* (citing *Puller v Baca*, 781 F.3d 1190, 1197 (10th Cir. 2015.)

Regarding Count IV for Malicious prosecution, the Peace Officer Defendants contend that there is no evidence that they lacked probable cause or acted with malice.  *See* ECF 121 pp. 28-29.  Regarding Count V, the Peace Officer Defendants argue that affiants did not have the challenged *Franks* information until after the arrest.[12]  *See* ECF 121 p. 25.

Regarding Count IV, Plaintiff Rosen does not challenge the probable cause affidavits as drafted but instead relies on his *Franks* claim, Count V, to establish the lack of probable cause for both claims.  *See* ECF 131 pp. 35-38.  Plaintiff Rosen contends there is a material question of fact whether Defendants had probable cause to arrest Plaintiff Rosen because they omitted exculpatory phone information and witness testimony from the probable cause affidavits.  ECF 131, p 35.

Probable cause is evaluated "as of the events in question."  *Tiscareno v. Frasier*, 603 F. App'x 672, 677 (10th Cir. 2015) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004)).  Accordingly, the relevant inquiry in this case is whether the Defendants knowingly included, or recklessly omitted, the proffered *Franks* information as of Plaintiff Rosen's arrest on December 9, 2019.

---

[12] Plaintiff Rosen correctly points out that the Prosecutor Defendants' motion and memordandum conflates the prosecutions at issue, those regarding I.U. and M.R., with a separate case against Rosen.  *See* ECF 131 p. 34; ECF 119 pp. 7, 13, 16-17.  However, the Court's analysis of the Peace Officer Defendants' arguments necessarily disposes of Rosen's claim as to the Prosecutor Defendants as well.

Turning first to the I.U. Affidavit, Plaintiff Rosen points to the omission of the out of sequence text message obtained from I.U.  I.U. stated she had texts to corroborate that she was trying to leave Plaintiff Rosen.  But when she later provided the screenshots of the texts on her phone, the only screenshot that corroborated I.U.'s interview appeared to be inserted in the middle of the conversation because the text had a timestamp hours earlier than the rest.  *See* ECF 131, pp. 35-36; ECF 132-25.  Nevertheless, Plaintiff Rosen acknowledges that I.U. did not provide the text messages to the Defendants until after Plaintiff Rosen was arrested.  ECF 131 p 16.  So Defendants could not have knowingly omitted that fact from the probable cause affidavit.

Plaintiff Rosen also points to a document on I.U.'s phone where the alleged assault was listed among other sexual encounters, arguably indicating that I.U. characterized the encounter as consensual.  ECF 131 p. 35; 132-39 p. 15.  However, the record shows that the encounter list was unknown to the Defendants before Rosen was arrested in December 2019 and that the document was not discovered by Defendant Bommer until the Spring of 2020.  ECF 132-19 pp.108-110; ECF 132-29.

Further, Plaintiff raises no question of material fact whether the omission of the text messages or the encounter list was made with a reckless disregard of the truth.  "To establish recklessness, 'there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations.'"  *Kapinski*, 964 F.3d at 908 (citing *Stonecipher,* 759 F.3d at 1142).  "A reviewing judge may infer recklessness from 'circumstances evincing obvious reasons to doubt the veracity of the allegations.'"  *Id. (*citing *Beard v. City of Northglenn,* 24 F.3d 110*,* 116 (10th Cir. 1994)).

22

Plaintiff Rosen points to no direct evidence that, as of December 9, 2019, Defendants possessed the requisite "serious doubt as to the truth of the allegations" and Plaintiff does not raise or argue circumstances evincing obvious reasons to make such an inference. *See Kapinski,* 964 F.3d at 910 (citing *Stonecipher*, 759 F.3d at 1142; *Beard*, 24 F.3d at 116). Plaintiff harshly criticizes the TCSO for not investigating more thoroughly between I.U.'s September interview and Plaintiff Rosen's December arrest, but an imperfect investigation is not enough to establish Rosen's claim. *See Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1203 (10th Cir. 2017). Rather, "the failure to investigate a matter fully, to 'exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence' rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to be[]token negligence 'at most.'" *Id.* (quoting *Beard,* 24 F.3d at 116).

Analyzed in the light most favorable to Plaintiff Rosen, Defendants' conduct in not undertaking additional investigation during the months between I.U.'s interview and Plaintiff Rosen's arrest can at most be considered "token negligence," which is insufficient to establish a *Franks* claim. *Beard,* 24 F.3d at 114 ("[a]llegations of negligence or innocent mistake are insufficient.") (quoting *Franks*, 438 U.S. at 171).

The analysis is similar regarding the M.R. affidavit. Plaintiff Rosen contends that Defendants omitted Snapchat messages showing that M.R. eventually said yes to sex and Defendants included four facts that were false: (1) Rosen proceeded to put his arm around M.R.'s neck—with her throat in the crook of his elbow—and physically dragged her into his room; (2) "After repeated requests for sex, Rosen reached over and suddenly seized

23

M.R. in a head lock"; and (3) "[M.R.] was dragged, by force, into the bedroom of Rosen in a headlock"; and (4) M.R. was "hopelessly trapped as the bedroom door was locked." ECF 131, pp. 35-36.

First, Plaintiff Rosen does not cite to evidence in the record either supporting his argument that a photo showed the door did not lock from the inside or supporting his argument that Snapchat messages indicated M.R. eventually said yes to sex.  ECF 131, p 36.  The Court has not located these facts in the record and therefore cannot consider them in its analysis.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998).

Plaintiff Rosen cites the affidavit of T.J. to contradict the first three facts, but that affidavit was signed on February 3, 2020 - several months after Plaintiff Rosen's arrest. ECF 132-30, p. 3.  As with the I.U. affidavit, Plaintiff Rosen does not cite to any evidence or argue that Defendants knew about this proffered *Franks* information at the time Plaintiff Rosen was arrested on December 9, 2019.  ECF 131, p. 36.

Next, Plaintiff Rosen fails to raise direct evidence that Defendants "entertained serious doubts as to the truth of [the] allegations,'" or any "obvious reasons" supporting such an inference.  *See Kapinski,* 964 F.3d at 908 (citing *Stonecipher*, 759 F.3d at 1142). Plaintiff Rosen criticizes Defendants for not interviewing T.J., but as with the I.U. Affidavit, an imperfect or even negligent investigation is insufficient to raise a question of material fact whether defendants held a reckless disregard for the truth.  *See Harte,* 864 F.3d at 1203.

Because the Court finds there is no evidence that the Defendants knowingly or recklessly included or omitted the proffered *Franks* information from Plaintiff Rosen's arrest warrant, the inquiry ends here.  The Court does not need to consider whether the affidavits would have fallen short of probable cause with the *Franks* alterations.  Plaintiff Rosen fails to meet his burden for his *Franks* claim under Count V.

Further, as Plaintiff Rosen has relied on his Count V *Franks* theory to establish the lack of probable cause for his Count IV claim for malicious prosecution, his Count IV malicious prosecutions claim fails as well.

Counts IV and V are DISMISSED with prejudice.

2. *Count VI: Rosen's Fourteenth Amendment Claim (delayed prosecution)*

Count VI is Plaintiff Rosen's Fourteenth Amendment claim[13] that Defendants violated due process by delaying Plaintiff Rosen's prosecution until after his 18th birthday. ECF 71 ¶¶ 159-174.

To demonstrate a due process violation based on a pre-charging delay a plaintiff must show: (1) actual prejudice; and, (2) evidence that the delay was purposeful in order to gain a tactical advantage.  *United States v. Engstrom*, 965 F.2d 836, 838-39 (10th Cir. 1992) (citing *United States v. Comosona*, 848 F.2d 1110, 1113 (10th Cir. 1988)).[14]

---

[13] Count VI, Plaintiff Rosen's Fourteenth Amendment claim for delayed prosecution, names Peace Officer Defendants Hodges, Bommer, and Platt and Prosecutor Defendant Allan

[14] *Engstrom* considers pre-indictment delay under the Fifth Amendment for Federal prosecutions. 965 F.2d at 838-39.  The same standards apply under the Fourteenth Amendment for prosecutions in state courts.  *See Parker v. Burt,* 595 F. App'x 595, 600 n.3 (6th Cir. 2015).

Peace Officer Defendants argue that Plaintiff Rosen lacks a requisite Fourteenth Amendment property right because prosecutors could choose whether to prosecute Rosen in a juvenile court or in adult court. ECF 121 p. 30.

Plaintiff Rosen argues that the charging delay until after his 18th birthday affected his right to seek a hearing to transfer his case to juvenile court where he would benefit from less severe penalties and confidentiality of information, reports, and hearings. ECF 131 p. 40.

The Peace Officer Defendants reply that they did not prosecute Rosen because they are not prosecutors and that under Wyoming law a Plaintiff can still file a transfer motion when charged as an adult for an alleged offense committed as a minor and cites to *Rosen v. State,* 2022 WY 16, another case where Plaintiff Rosen filed such a motion. ECF 142 pp. 4-5.

The Court rejects Defendants' argument that the peace officers are not liable for delayed prosecution because they are not prosecutors. ECF 142 p. 4. In *Pierce v. Gilchrist*, a case for malicious prosecution, the expert witness who tampered with test results made essentially the same argument. 359 F.3d at 1279. The Tenth Circuit rejected the argument and stated that defendants "cannot hide behind the officials whom they have defrauded." *Id.* The same principal applies here; if the Peace Officer Defendants caused an unconstitutional delay this court will not have them hide behind the prosecutors they influenced to do it.

Next, Plaintiff Rosen has easily met his burden to raise a material question of fact whether the Peace Officer Defendants caused the charging delay for the purpose of a

tactical advantage.  Bommer stated to I.U. and R.C. "[s]o anyway, he's in jail. We did wait until he was 18, so we could charge him as an adult."  ECF 132-20 p. 79:13.  When I.U. and R.C. asked "how that works," Bommer explained that the "ramifications aren't very good" for a juvenile, that the "penalties are different," and that Rosen could get "registered as a sex offender [as an adult]."  *Id.* at 79:24-25, 80:1.  Similarly, Allan stated that "some investigators expressed that they wanted to wait to file the case until after [Rosen's] birthday." ECF 132-24.

Nevertheless, Plaintiff Rosen cannot establish the prejudice element because, as a matter of law, he did not lose the opportunity to file a transfer motion to juvenile court. Rather, Rosen himself did file such a motion in another case and his right to file that motion was vindicated by the Wyoming Supreme Court.  *Rosen v. State*, 2022 WY 16, ¶ 18. Although the statute was ambiguous at the time charges were brought against Rosen regarding I.U. and M.R., the Wyoming Supreme Court, at Rosen's own invitation, has clarified that an adult may file a motion for transfer to the juvenile court for crimes allegedly committed as a minor.  *Id.*  Accordingly, Plaintiff Rosen's assertion that the delay robbed him of the right to file a transfer motion is not supported by the law and does not amount to prejudice.

The Court also agrees with Defendants that Plaintiff Rosen has not established a sufficient Fourteenth Amendment property interest in having his trial transferred to juvenile court because the transfer decision is discretionary.  To possess a protected property interest, Plaintiff Rosen "must show that state statutes, established rules, or mutually explicit understandings give [him] a 'legitimate claim of entitlement' to that

interest." *Martin Marietta Materials, Inc. v. Kan. DOT*, 810 F.3d 1161, 1187 (10th Cir. 2016). "An 'abstract need or desire for it' or a 'unilateral expectation' is insufficient." *Id.* (quoting *Curtis Ambulance of Fla., Inc. v. Bd. of Cty. Comm'rs*, 811 F.2d 1371, 1375 (10th Cir. 1987). "State laws, rules, and regulations don't create property interests if 'the governing body retains discretion' to confer or deny a benefit." *Id.*

Plaintiff cites *Hyde Park Co. v. Sante Fe Counsel,* 226 F.3d 1207 (10th Cir 2000) for the proposition that the "right of access [to juvenile court] is a 'legitimate claim of entitlement created and defined by existing rules or understandings' under Wyoming State law." ECF 131 p. 40. But *Hyde Park* does nothing to support Plaintiff Rosen's position; that was a zoning case and the Tenth Circuit ruled against the plaintiff who unsuccessfully argued that he had a property interest in the approval of his zoning application. 226 F.3d at 1210.

The existence of a property right turns on "the degree of discretion given to the decisionmaker and not to the probability of a favorable outcome." *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence*, 927 F.2d 1111, 1116 (10th Cir. 1991). It is the Plaintiff's burden to show there are "significant substantive restrictions" on the decision maker's discretion that would give rise to a "legitimate expectation" that the decision maker would decide in the plaintiff's favor.

Plaintiff Rosen does not raise any facts or law showing limits on the District Court's discretion in determining whether to transfer his case to juvenile court. Nor can he -- the Wyoming Supreme Court, in another of Rosen's cases, has reinforced the District Court's broad power to exercise discretion in evaluating transfer motions. *See Rosen v. State,* 2022

WY 16, ¶ 34; Wyo. Stat § 14-6-237.  As such, Plaintiff Rosen has not established a sufficient property interest to support his claim of delayed prosecution under the Fourteenth Amendment.  Count VI is DISMISSED with prejudice.

    3.    *Count VII: Rosen's Fourteenth Amendment Claim (fabrication of evidence).*

Count VII is Plaintiff Rosen's claim that Defendant Hodges violated Rosen's Fourteenth Amendment Rights by fabricating evidence against him.  "To rise to the level of a constitutional violation, a plaintiff must assert a causal connection between the fabrication of evidence and the deprivation of liberty.  *Truman v. Orem City*, 1 F.4th 1227, 1236 (10th Cir. 2021) (citing *Warnick v. Cooley*, 894 F.3d 746, 753 (10th Cir. 2018)).  To state a fabrication of evidence claim, a plaintiff must allege (1) the defendant knowingly fabricated evidence, (2) the fabricated evidence was used against the plaintiff, (3) the use of the fabricated evidence deprived the plaintiff of liberty, and (4) if the alleged unlawfulness would render a conviction or sentence invalid, the defendant's conviction or sentence has been invalidated or called into doubt.  *Id.*

Defendant urges that there is no constitutional right to an accurate police report and asserts that the allegedly fabricated information did not cause Rosen's deprivation of liberty because he was never prosecuted for the second M.R. assault.  ECF 121 p. 5.

Plaintiff Rosen contends there is a question of fact whether Defendant Hodges fabricated the second assault to counter Plaintiff Rosen's interview statements to the effect that there were subsequent consensual sexual encounters with M.R.  ECF 131 pp. 43-44.

Plaintiff Rosen does not argue that the information was used in the arrest warrant, and instead argues that the information was used to prolong his house arrest. *Id.*

Defendant replies that Plaintiff's allegation of fabrication is mere speculation and suspicion, and that Plaintiff cites no evidence that the fabrication prolonged his house arrest. ECF 142 p. 6.

The Court finds that Plaintiff Rosen has failed to raise any evidence tending to show a causal connection between the allegedly fabricated evidence and any prolonging of his house arrest. In fact, Rosen's deposition undermines the claim. The M.R. matter was dismissed in March 2020, ECF 132-24; ECF 121-23, but Rosen stated that he was under house arrest until June 2020. ECF 135-5 p. 97. Plaintiff Rosen raises no facts or argument whatsoever indicating that his continued house arrest for months after the M.R. matter was dismissed was still somehow connected to the M.R. police report. Accordingly, because there is no evidence of a causal nexus between the allegedly fabricated evidence and any prolonging of Rosen's house arrest, the Court does not need to address whether there is a question of fact regarding fabrication. Count VII is DISMISSED with prejudice.

    iv.       *Count VIII: Rosen's Fourteenth Amendment Claim (unequal investigation).*

Count VIII is Plaintiff Rosen's claim that, as a "class of one," his equal protection rights were violated by the Defendants because there was no rational basis for Defendants to investigate him but not to investigate a PE teacher.[15]

---

[15] Plaintiff Rosen's Count VIII claim of unequal investigation names Prosecutor defendants Weisman and Allan, and Peace Officer Defendants Carr, Hodges, Bommer, and Platt.

To establish an equal protection violation, a plaintiff must show that the defendants treated him differently than other similarly situated persons accused of similar offenses. *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998).

Individuals are "similarly situated" only if they are alike "in all relevant respects." *Id.* (citing *Coal. for Equal Rights, Inc. v. Ritter*, 517 F.3d 1195, 1199 (10th Cir. 2008)). The plaintiff must then show that the difference in treatment was without rational basis. *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011). "This standard is objective—if there is a reasonable justification for the challenged action, [the court] do[es] not inquire into the government actor's actual motivations." *Id.* (citing *Jicarilla Apache Nation*, 440 F.3d 1202, 1211 (10th Cir. 2006)).

Defendants argue that Rosen and the PE teacher were not similar in all material respects because, among other things, both victims wanted to participate in the case against Plaintiff Rosen while no victims wanted to participate in the case against the PE teacher. ECF 121 p. 33. Defendant also points out that the I.U. case against Rosen was dismissed when I.U. did not want to participate and the M.R. case was dismissed after M.R. said she did not want to participate. *Id.* Defendants also argue that it was rational to close the case after the victim did not want to participate. *Id.*

Plaintiffs argue that Rosen and the PE teacher were materially similar because I.U. documented both alleged sexual assaults on her phone, Defendant Bommer believed both allegations, and Defendant Bommer had reason to believe there were additional victims in both cases. ECF 131 p. 47. Plaintiff acknowledges that I.U. "did not want to be involved

in additional investigation because of her experience in the Rosen investigation," but Rosen argues there was no rational basis not to interview the PE teacher or seek additional potential victims among the "scores of other potential victims" who attended school at the same time as I.U. *Id.* p. 48.

The Court agrees with the Defendant that the non-participation of the PE teacher victim is both a material difference in the case and a rational basis for the Defendant to close the case. The case against Rosen had two victims willing to pursue the matter while the case against the PE teacher had none. Objectively, this is a material difference. And while the allegations against the PE teacher are extremely serious, the lack of a complaining witness would be a serious obstacle during investigation and would likely render trial impossible. It was not "irrational and abusive, and wholly unrelated to any legitimate state activity," for Defendants to close the case against the PE teacher, nor was it irrational to continue investigating the case against Rosen. *Kansas Penn Gaming, 656 F.3d at 1216.*

Count VIII is DISMISSED with prejudice.

### 5. *Count IX: Crothers's Fourteenth Amendment Claim (Pre-trial Publicity)*

Count IX is Plaintiff Crothers's Fourteenth Amendment claim that Defendants deprived him of his right to a fair trial by making "false and prejudicial statements about Crothers and release[ing] prejudicial images of Crothers that were displayed in the media." ECF No. 71 at ¶ 178.

The Peace Officer Defendants characterize the claim as one for "false publicity" and contend that it is undisputed that defendants never communicated with any member of the media about Crothers and that there is no evidence that the information at issue was known

to the jury, that Crothers was deprived of a fair trial, or that other remedies were not available.  ECF 121 p. 39.

Plaintiff Crothers contends there is a dispute of material fact whether Defendants coordinated with the media. ECF 131 p. 49.  He specifically points to the email that the Victim Coordinator, Tracy Trefren, sent after a biweekly meeting between the TCPA and TCSO that accurately predicted a future article about [Allan's] future responsive filing.  *Id.* Plaintiff Crothers contends that the media coordination resulted in a trial environment that was "kind of a zoo" with a line of people waiting outside the courtroom waiting to get inside. *Id.* at 50.

The Court analyzes Crothers' claim as one of presumed prejudice because he does not raise any evidence that media coverage actually biased the jury.  "Pre-trial publicity in topical criminal cases is inevitable."  *United States v. Abello-Silva*, 948 F.2d 1168, 1176 (10th Cir. 1991).  A presumption of prejudice based on media coverage "attends only the extreme case," *Skilling v. United States*, 561 U.S. 358, 381 (2010), and requires showing "that the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings and created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial."  *Hale v. Gibson*, 227 F.3d 1298, 1332 (10th Cir. 2000) (internal quotes omitted) (citing *Murphy v. Florida*, 421 U.S. 794, 799 (1975); *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Estes v. Texas*, 381 U.S. 532, 577-78, (1965)).

"[P]retrial publicity--even pervasive, adverse publicity--does not inevitably lead to an unfair trial." *Skilling*, 561 U.S. at 384 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S.

539, 554 (1976). Ultimately, "in order to demonstrate that prejudice should be presumed, the defendant must "establish that an irrepressibly hostile attitude pervaded the community."" *Hale*, 227 F.3d at 1332 (citing *Stafford v. Saffle*, 34 F.3d 1557, 1567 (10th Cir. 1994)).

This is not the "extreme case," and Plaintiff Crothers cannot show that media coverage resulted in an unconstitutionally unfair environment at trial. Plaintiff Crothers only describes and attaches a single news article in his memorandum, and Trefren's email to herself is the only indication in the record that there was a second. ECF 131 p. 26. Plaintiff points to a photo of Crothers with a bong, but he says it was published after sentencing and cites nothing in the record to support that it was published at all. ECF 131 pp. 27, 50. There is no evidence supporting Plaintiff's proffered fact that "[f]ourteen newspaper articles followed through sentencing." ECF 131 p. 25.

Moreover, the Prosecutor's statement that there was a "packed courtroom" with a "line of people waiting to get in" does not rise to the "extreme case" of an unconstitutional "circus atmosphere," or "bedlam in the courthouse." *See Sheppard,* 384 U.S. at 333 ("bedlam reigned at the courthouse . . . a temporary table within a few feet of the jury box and counsel table sat some 20 reporters staring at Sheppard and taking notes . . . the judge lost his ability to supervise that environment . . . [p] articipants in the trial, including the jury, were forced to run a gantlet of reporters and photographers").

Finally, as the Supreme Court has termed "of prime significance," the fact that the jury acquitted Crothers of three of the six charges demonstrates that media coverage did not render the trial unfair. *Skilling*, 561 U.S. at 383. Here, as in *Skilling* "[t]he jury's ability

to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues and reinforces [the] belief and conclusion that the media coverage did not lead to the deprivation of [the] right to an impartial trial." *Id.*

Since Plaintiff Crothers has not raised a question of fact whether media coverage deprived him of a fair trial, Count IX is DISMISSED with prejudice.

6.    *Count X: Crothers's Fourth Amendment Claim (malicious prosecution)*

Count X is Plaintiff Crothers' Fourth Amendment claim of malicious prosecution against Prosecutor Defendant Allan and Peace Officer Defendant Roundy.  ECF 131 p. 52. Plaintiff Crothers claims that the TCPA maliciously added the sexual battery charge shortly after Crothers rejected a plea offer, without any new evidence. [16]

Peace Officer Defendant Roundy argues that he is not liable because there was probable cause, there is no evidence of malice, prosecutors independently added the charge, and because Plaintiff Crothers was never seized.  ECF 121 p. 40.  Prosecutor Defendant Allan argues that he is absolutely immune because charging is a core prosecutorial function.

Plaintiff Crothers reiterates that his claim of malicious prosecution is made solely under the Fourth Amendment to avoid the existence of an adequate state-law remedy that would defeat a claim under the Fourteenth Amendment.  ECF 131, p. 52 n. 8; ECF 71 ¶ 183.  He argues that malicious prosecution under the Fourth Amendment only requires

---

[16] Plaintiff Crothers's theory is based on the assertion that "[i]mmediately after Crothers rejected a plea deal, the prosecution added a charge for sexual battery.  The prosecution had no new evidence to support the charge.  The junior prosecutor in charge warned that Crothers's misdemeanor case would be 'high profile' and that an article in the Jackson Hole News & Guide would soon be coming out."  ECF 131 ¶ OO.  But Plaintiff cites nothing in the record for these assertions.  *Id.*

showing seizure for cases that are dismissed before trial. *Id.* p. 52.  He also argues that the Peace Officer Defendants may be liable if they provided information forming the basis of the charge. *Id.* p. 54.

The Court agrees with the Defendant that Plaintiff Crothers's claim fails because he has not raised facts indicating he was seized under the Fourth Amendment.  Plaintiff Crothers argues that Defendants' authority, *Becker v. Kroll*, 494 F.3d 904, 914–15 (10th Cir. 2007), is limited to malicious prosecution claims based on charges that were dismissed before trial.  ECF 131 p. 52.  The Court disagrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." *Manuel v. City of Joliet*, 580 U.S. 357, 364 (2017).  As in the Supreme Court's recent case *Thompson v. Clark,* "[b]ecause this claim is housed in the Fourth Amendment, the plaintiff also has to prove that the malicious prosecution resulted in a seizure of the plaintiff."  142 S. Ct. 1332, 1337 n.2 (2022) (citing *Manuel,* 580 U. S. at 365-366).  Plaintiff Crothers raises no evidence indicating that he was arrested or otherwise seized in relation to the Sexual Battery Charge that forms the basis of his malicious prosecution claim.  As a result, Plaintiff Crothers cannot establish his claim under the Fourth Amendment.  Count X is DISMISSED with prejudice.

 *7. Count XI: Muldoon's First Amendment Claim (retaliation)*

Count XI is Plaintiff Muldoon's First Amendment claim that Peace Officer Defendants Platt and Carr unlawfully released his identity as the subject of an unsubstantiated sexual assault allegation in retaliation for his criticism of law enforcement. ECF 131 p. 55.

To establish a claim for First Amendment retaliation, a plaintiff must show: (1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). "At the summary judgment stage, some facts must demonstrate the defendants acted on the basis of a culpable subjective state of mind to satisfy the third step." *Trant v. Oklahoma*, 754 F.3d 1158, 1170 (10th Cir. 2014).

Defendants contend that Plaintiff cannot show that Defendants acted on a retaliatory motive because they released the reports containing Muldoon's identity in response to a public records request after consultation with the TCPA. ECF 121 pp. 37-38. Defendants also contend that the release would not have the requisite chilling effect where, as here, the prosecutor immediately and publicly debunked the allegations. Lastly, Defendants argue that the allegation is pure speculation. *Id.* p. 37.

Plaintiff Muldoon contends that there is a genuine issue of material fact regarding the chilling effect because the prosecutor merely said "no crime occurred," and Muldoon continued to be publicly confronted with questions about the allegations. ECF 131 p. 56. Plaintiff also contends that there is a genuine issue of retaliatory motive because Muldoon's criticism of the police was closely followed by the records release. *Id.* Plaintiff further contends that there is a material fact whether Defendants Carr and Platt prompted the records request because the requestor stated she had been prompted to make the request by

someone familiar with the allegation and who knew she regularly made such requests. *Id.* p. 37.

Plaintiff's attempt to establish that the release was motivated by a retaliatory motive is comprised of speculation built upon unsupported facts. First, Plaintiff Muldoon relies on the timeline of Muldoon's police criticism to establish a retaliatory motive, but he cites nothing in the record to establish when Muldoon criticized the police. ECF 131 p. 56. Without that there is no timeline. Even if the timeline was in evidence, relying on temporal proximity alone -- and this is all that Plaintiff uses to argue retaliatory motive -- would run contrary to the requirement that Plaintiff show "some facts demonstrate[ing] . . .a culpable subjective state of mind" at the summary judgment stage. *See Trant,* 754 F.3d at 1170 ("temporal proximity between the protected speech and the alleged retaliatory conduct, without more, does not allow for an inference of a retaliatory motive") (citing *Butler v. City of Prairie Village,* 172 F.3d 736, 746 (10th Cir. 1999).

Next, Plaintiff argues that Defendants acted from a retaliatory motive because Carr and Platt were connected with Rebecca Courser, the public information requestor. ECF 131 p. 57. Citing no evidence in the record, Plaintiff asserts "Courser noted that she was prompted to make the records requests, and indeed [was] informed about the allegations against Muldoon, by someone who knew she had been regularly making such requests and was familiar with the process." *Id.* Building on that unsupported fact, Plaintiff Muldoon speculates that Courser was talking about Defendant Platt: "there is no one else more familiar with the records process than Platt, who serves as records officer for the TCSO." *Id.* Then Plaintiff Muldoon simply extends that speculation beyond Platt to reach Carr:

"Platt's only superior in the records release process is Carr, who . . . makes the 'ultimate decision on whether something is released or not." *Id.* This is far too little.[17] Without facts cited to the record - and without a nexus greater than speculation, Plaintiff Muldoon has not met his burden of establishing a material question of fact. Count XI is DISMISSED with prejudice.

B.   *Plaintiffs' Monell and Individual Supervision Claims*

> *Count I.  Violation of Constitutional Rights for Promulgating Customs, Policies, and Practices against Teton County*
> *Count II. Violation of Constitutional Rights against Defendants Teton County and Carr, in his individual and official capacity, for Failure to Train and Supervise*
> *Count III. Violation of Rosen's and Crothers's Constitutional Rights against Defendants Teton County and Weisman, in her individual and official capacity, for Failure to Train and Supervise*

Counts I, II, and III include Plaintiffs' *Monell* claims alleging that Teton County and Prosecuting Attorney Weisman and Teton County Sheriff Carr, in their official capacity as senior policy makers for the TCPA and TCSO respectively, executed policies that caused constitutional violations. *See Monell,* 436 U.S. at 694. In Counts II and III, Plaintiffs also claim that Carr and Weisman are individually liable for failing to train and supervise their employees resulting in the same constitutional violations. ECF 71.

"Suing individual defendants in their official capacities . . . is essentially another way of pleading an action against the county or municipality they represent." *Porro v.*

---

[17] Plaintiff also asserts that "Platt commented on social media in support of one of Muldoon's harshest critics, Eden Morris, who had just days prior publicly condemned Muldoon at a town council meeting. Eden's post described the problems of the culture surrounding sexual assault and used Muldoon as an exemplar of the issue. Platt commented that the culture Morris described in her post—which she had specifically associated [with] [sic] Muldoon—will 'always be until voices ring through that archaic drivel.'" But here again there is no citation to the record supporting this assertion. ECF 131 p. 57.

*Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).  To establish municipal liability under *Monell*, "a plaintiff must first show a municipal policy or custom—either an official rule or one so entrenched in practice as to constitute an official policy." *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022).  "Next, a plaintiff must show that the municipality was deliberately indifferent to constitutional violations that were the obvious consequence of its policy." *Id. (*citing *Crowson v. Washington County,* 983 F.3d 1166, 1188 (10th Cir. 2020).  "Finally, a plaintiff must show that the policy directly caused his constitutional injury." *Id.* (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

To establish § 1983 claim against an individual defendant based on supervisory responsibilities, the Plaintiff must show: (1) personal involvement; (2) causation; and, (3) state of mind.  *Burke v. Regalado*, 935 F.3d 960, 997-98 (10th Cir. 2019) (citing *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013)).  "Under the first element, the plaintiff 'must show an affirmative link between the supervisor and the constitutional violation.'" *Id.* (citing *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014))

Plaintiffs argue that "there are material issues of fact whether Carr's and Weisman's deliberate indifference to training and supervision has resulted in informal policies and customs in the TCPA and TCSO that caused the constitutional violations for each of the Plaintiffs as described [in Counts IV-XI]."  ECF 131 p. 59.  Defendants argue, among other things, that the *Monell* and supervisory claims fail because no constitutional violations occurred in Counts IV-XI.  ECF 121 p. 43; ECF 119 p. 19.

The Court agrees with Defendants.  As discussed above in dismissing Counts IV-XI, Plaintiffs have failed to raise a reasonable question of material fact that the resulting constitutional violations occurred.  As such, Plaintiffs cannot establish municipal liability or individual supervisory liability against Carr or Weisman.  *See Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (explaining that it would be "inconceivable" to hold the municipality liable if it[] . . . inflict[ed] no constitutional harm, regardless of whether the municipality's policies might have "authorized" such harm) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Accordingly, Counts I - III are DISMISSED with prejudice.

Because the Court has dismissed all § 1983 claims in Counts I - XI on the merits, the Court does not need to address Defendants' assertions of absolute and qualified immunity.

C.      *Plaintiffs' Claims under Wyoming Law*

>   *Count XII: Negligence (Per Se)*
>   *Count XIII: Intentional Infliction of Emotional Distress*
>   *Count XIV: Rosen Malicious Prosecution -- Wyo. Stat. § 1-39-112*
>   *Count XV: Negligence Claim -- Wyo. Stat. § 1-39-112*
>   *Count XVI: Intentional Infliction of Emotional Distress -- Wyo. Stat. § 1-39-112*

Counts XII -XVI comprise Plaintiffs' claims arising under Wyoming state law. While the § 1983 claims in Counts I - XI arise under the Court's original jurisdiction, the Court has only supplemental jurisdiction over the claims made under state law.  *See* 28 U.S.C. § 1367(c).

The Court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) [of Section 1367] if … the district court has dismissed all claims over which

it has original jurisdiction." 28 U.S.C. § 1367(c). "The Supreme Court has encouraged the practice of dismissing state claims or remanding them to state court when the federal claims to which they are supplemental have dropped out before trial." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.,* 956 F.3d 1228, 1238 (10th Cir. 2020).

The Tenth Circuit "has followed suit when the claims over which the district court had original jurisdiction are dismissed on pretrial motion." *Id.* This is because "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988).

The Court has dismissed claims arising under the Court's original jurisdiction and all that remains are claims under the Court's supplemental jurisdiction. The balance of factors points toward declining to exercise jurisdiction, particularly considering that it appears questions regarding Wyoming Statutes § 6-2-319, Names Not to be Released, and § 1-39-101, the Wyoming Governmental Claims Act, would require statutory interpretation without the benefit of governing Wyoming Supreme Court precedent.

Accordingly, the Court declines to further exercise jurisdiction over the claims made under Wyoming law. Claims XII - XVI are dismissed without prejudice.

### IV. CONCLUSION

Therefore, it is HEREBY ORDERED:

Defendants' motions for summary judgment (ECF 118, 120) are **GRANTED**.

Counts I through XI of Plaintiffs' complaint are **DISMISSED with prejudice.**

Counts XII through XVI of Plaintiffs' complaint are **DISMISSED without prejudice**.

All other pending motions (ECF 139, 144, 154, 161, 170) are **DISMISSED AS MOOT**.

Consistent with above, the Clerk's Office shall enter final judgment for Defendants and close the Case.

IT IS SO ORDERED this 27th day of January, 2023

_____
NANCY D. FREUDENTHAL
UNITED STATES SENIOR DISTRICT JUDGE